IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Vs. | ) | Case No.17-CR-239-M |
| | ) | |
| JERRY DRAKE VARNELL, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO SUPPRESS
## FACEBOOK SEARCH WARRANT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES                                                        3, 4

THE SEARCH WARRANT AFFIDAVIT:  OVERVIEW…………………………5

ARGUMENT

PROPOSTION ONE:

   I. ***All Evidence Seized as a Result of the Warrant Must Be Suppressed Because the Affidavit Contains False Statements that must be Disregarded***………………………………………………………...8

   1. Criminal History of CHS-1…………………………………………………………………..12
   2. Mental Health History…….………………………………………………………18
   3. Substance Abuse History……………………………….…………………………………19
   4. Promises made to Elisens…………………………….……………………….…………..19
   5. False Assurances of Corroboration…………………………...……………...21

PROPOSITION TWO:

   THE SEARCH WARRANT WAS OVERBROAD………………………………………...….…………31

CONCLUSION……………………………………………………………..33

CERTIFICATE OF SERVICE…………………………………………………….……35

## TABLE OF AUTHORITIES

### STATUTES

Fed.R.Crim.P.12(b)(3)(C). 41
(h)……………………………………………………………………………………….5
U.S. Const. Amend.
IV……………………………………………………………………………………….5

### CASES

*Illinois v Gates,*
        462 U.S. 213, 238 (1983)……………………………………………………..8, 30

*Whitely v Warden, Wyo. State Penitentiary,*
401 U.S. 560, 565 n.8 (1971)…………………………………………………………...8

*United States v. Beck,*
129 Fed. Appx. 950, 954 (10th Cir. 2005)……………………………………………9

*Weeks v United States,*
232 U.S. 383, 34 S.Ct. 341 (U.S.1914)………………………………………………9

*Franks v Delaware,*
438 U.S. 154 (1978)……………………………………………………9, 10, 11, 30, 33

*U.S. v Cortina,*
630 F.2d 1207 (7th Cir. 1980)……………………………………………………..9

*U.S. v Davis,*
714 P.2d 896 (9th Cir. 1983)…………………………………………………………9

*U.S. v Leon,*
468 U.S. 897 (1984)…………………………………………………………...…9, 33

*Easton v. City of Boulder,*
776 F.2d 1441, 1449 (10th Cir. 1985)……………………………………...……...10

*United States v Avery,*
295 F.3d 1158, 1168 (10th Cir. 2002)……………………………...……...10

*United States v. Williams,*
576 F.3d 1149, 1160 (10th Cir. 2009)………………………………………………11

*United States v. Garcia-Zambrano,*
530 F.3d 1249, 1254 (10th Cir. 20058)……………………………...……………12

*United States v. Herrera,*
782 F.3d 571, 575 (10th Cir. 2015)…………………………………………………………12

*Stewart v. Donges,*
915 F.2d 572, 582-583 (10th Cir. 1990)……………………………….....………..30

*Groh v. Ramirez,*
540 U.S. 551, 557 (2004)……………………………………….………….……………30

*United States v. Leary,*
846 F.2d 592, 605 (10th Cir. 1988)……………………………………….….….…….30
.
*United States v. Blake,*
868 F.3d 960, 974 (11th Cir. 2017)………………………………………….…………...32

*Coolidge v. New Hampshire,*
403 U.S. 443, 467 (1971)……………………………………………….………………32

*Cassady v. Goering,*
567 F.3d 628, at 638 (10th Cir. 2009) …………………………………..….……..33

*Boyd v. United States,*
116 U.S. 616,635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886)………………………………33

COMES NOW, the defendant, Jerry Drake Varnell by and through Counsel Marna Franklin, pursuant to Fed. R.Crim.P. 12(b)(3)(C), 41(h) and U.S. Const. Amend. IV, moves to suppress all evidence seized or obtained as a result of a warrant authorizing the search of Facebook Account and Email Account of User ID:  100000485040364, www.facebook.com/jerry. varnell.9.  These records were seized pursuant to a warrant, but the officer seeking the warrant omitted information that was material to the finding of probable cause, and those omissions were made with reckless disregard to the truth.   Further, warrant was overbroad in the universe of information that Facebook was required to disclose.

<u>The Search Warrant Affidavit:  Overview</u>

On September 12, 2017, Agent Eric A. Larsen of the FBI made application for a search warrant for Facebook Account and Email Account of User ID:  100000485040364, www.facebook.com/jerry varnell.9.  In support of said application, Agent Larsen presented a 30 page Affidavit in Support (Exhibit 1).    The Believed User of the Facebook account was listed as Jerry Drake Varnell, with the Facebook ID number of 100000485040364, https://www.facebook.com/jerry.varnell.9.    Agent Larsen requested items to be produce pursuant to Attachment B, which

included 5 pages of information to be disclosed by Facebook pursuant to the warrant since February 26, 2010.

The purpose of the Affidavit includes Agent Larsen's belief that there was probable cause to believe that Jerry Drake Varnell had used the Subject Account to facilitate his crime, that there was probable cause to search information described in the Attachment A for evidence as described in Attachment B.

The alleged facts supporting probable cause for the warrant begins on page 4 of the Affidavit.  According to Agent Larsen, on December 21, 2016, an FBI Confidential Human Source (thereafter CHS-1) voluntarily provided to the FBI information that Mr. Varnell was "aspiring to bomb the Federal Reserve Building in Washington D.C. in a manner similar to the Oklahoma City Bombing."   Agent Larsen thereafter states that information provided by CHS-1 has been reliable, he was unaware of any false information provided by CHS-1, and that "information provided by CHS-1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, administrative subpoenas, and searches of public records."  Affidavit, Exhibit 1, pages 4-5

Agent Larsen also advised the issuing Court that CHS-1 had a "criminal history" and had not been promised anything in exchange for his cooperation, except for monetary compensation.

Agent Larsen then describes information obtained by CHS-1 on April 3, 2017, April 17, 2017, April 24, 2017, April 25, 2017, May 9, 2017, May 10, 2017, May 17, 2017, and May 24, 2017.  On May 31, 2017, agents met with CHS-1 and FBI Undercover Employee (UCE-6361) wherein further information was obtained by CHS-1.  Agent Larsen further describes information obtained by CHS-1 on June 1, 2017, June 21, 2017, and July 19, 2017.  Agent Larsen further states that on March 17, 2017, law enforcement determined via an open source search that Mr. Varnell's Facebook URL was https://www.facebook.com/jerry.varnell.9 with an ID: 100000485040364.1 Based on the warrant being obtained2, on October 5, 2017, Agent Larsen indicated that a total of 25,766 pages related to this Facebook account was provided as defined in the search warrant, Attachment B.  The 25,766 pages contain an immense amount of data, far beyond postings and messages that may have contained communication and coordination mentioned in the affidavit that could potentially be relevant to any alleged crime.

<u>Argument</u>

---

1 This information has yet to be verified through discovery review.
2 The warrant is presumed to exist; although it has not yet been identified in discovery review.

### I.  All Evidence Seized as a Result of the Warrant Must Be Suppressed Because the Affidavit Contains False Statements that must be Disregarded

In reviewing an affidavit which seeks the issuance of a search warrant, the magistrate must make a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates* 462 U.S. 213, 238 (1983).  It is a judicial officer who must make the determination of probable cause, not an investigating agent.  (*Id.* at 239["Sufficient information must be presented to the magistrate to allow the official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.  In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued."].)   If the Judge granting the warrant considered only a supporting affidavit in issuing a warrant then the reviewing Court likewise determines the existence of probable cause for the warrant exclusively from the supporting affidavit's four corners.  See *Whitely v. Warden, Wyo. State Penitentiary*, 401 U.S.

560, 565 n.8 (1971); *United States v. Beck*, 129 Fed. Appx. 950, 954 (10th Cir. 2005).

The Fourth Amendment provides for the right of people to be secure in their persons, house, papers and effects, against unreasonable searches and seizures.  The law provides for the suppression of evidence secured as a result of a Fourth Amendment violation.  *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341 (U.S.1914).

> The tendency of those executing Federal criminal laws to obtain conviction by means of unlawful seizures and enforced confessions in violation of Federal rights is not to be sanctioned by the courts, which are charged with the support of constitutional rights.

Evidence should be suppressed in this case because it was seized in violation of Mr. Varnell's Fourth Amendment rights.  The affiant who obtained the search warrant for the premises acted with reckless disregard for the truth under the standard outlined in *Franks v. Delaware*, 438 U.S. 154 (1978).  See *U.S. v. Cortina*, 630 F.2d 1207 (7th Cir. 1980); *U.S. v. Davis*, 714 P.2d 896 (9th Cir. 1983); *U.S. v. Leon*, 468 U.S. 897 (1984).  Furthermore, the time frame for information pursuant to the search warrant fails to establish probable cause for the issuance of the search warrant.

Pursuant to *Franks*, where a defendant makes a substantial preliminary showing that a false statement "knowingly and intentionally," or

"with reckless disregard for the truth," was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. *Franks* at 155-156. If, at that hearing, the allegation of false statements or reckless disregard "is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable case was lacking on the face of the affidavit." *Franks* at 156.

Warrants that rely on evidence provided by confidential informants are generally viewed with "skepticism and careful scrutiny." *Easton v. City of Boulder*, 776 F.2d 1441, 1449 (10th Cir. 1985). Indeed, many confidential informants "suffer from generally unsavory character and may only be assisting police to avoid prosecution for their own crimes." *United States v. Avery*, 295 F.3d 1158, 1168 (10th Cir.2002) (quotations omitted). Courts must consider the informant's veracity, reliability, and basis of knowledge. *Id.*

Here, the information in the Affidavit to establish the credibility of CHS-1's reliability, veracity, or basis of knowledge is Agent Larsen's

acknowledgment that CHS-1 has a criminal history, was serving a prison sentence for a probation violation, that CHS-1 had not been promised anything in exchange for his/her cooperation, and that monetary compensation had been provided.   Agent Larsen further offered that information provided by CHS-1 had been reliable and he was unaware of any false information provided by CHS-1, and further advised the court that the information provided by CHS-1 "has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, administrative subpoenas, and searches of law enforcement databases."  (Exhibit 1, page 3)

However, in this case, agent's information regarding the reliability and the corroboration of CHS-1 and the information provided was not accurate and at the very least, substantially misleading.  To satisfy *Franks*, a defendant must show an officer's affidavit contains false statements or material omissions that were made intentionally or with reckless disregard for the truth, and that were necessary to a finding of probable cause.  See *United States v. Williams*, 576 F.3d 1149, 1160 (10th Cir. 2009).  Stated another way, a search warrant must be voided and the fruits of the search suppressed where a court (1) finds that the affiant knowingly or recklessly included false statements in or omitted material information for an affidavit

in support of a search warrant and (2) concludes, after excising such false statements and considering such material omissions, that the corrected affidavit does not support a finding of probable cause. *United States v. Garcia-Zambrano*, 530 F.3d 1249, 1254 (10th Cir. 2008). "If the affidavit contains intentional, knowing, or reckless omissions, a court must add in the omitted facts and assess the affidavit in that light." *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015).

In the presentation of information in support of the Affidavit for the Search Warrant, Agent Larsen made omissions with reckless disregard, in that any reasonable person determining probable cause would have wanted to know the following: 1) the true nature and extent of CHS-1's criminal history, 2) CHS-1's mental health history, 3) CHS-1's substance abuse history, 4) the agreement Agent Martin made with CHS-1 for his cooperation, and 5) the actual lack of effort of corroboration conducted to determine CHS's reliability.

1. <u>Criminal history of CHS-1</u>

While Agent Larsen may have advised the Court that CHS-1 had a "criminal history" and was serving a prison sentence for a probation violation at the time of his agreement to cooperate, he did not state the extent of that criminal history nor did he advise the court that not only was CHS-1

serving a prison sentence for a probation violation at the time of his agreement to cooperate, but he was also serving a state sentence of incarceration for threatening to perform his own act of violence on others.

Investigation has revealed CHS-1 to be Brent Allen Elisens. This determination is based, in part, on the following information:

-After being appointed as counsel for Mr. Varnell, undersigned counsel Marna Franklin was contacted by an individual whom identified himself as **Brent Elisens**, and he further identified himself as the undercover in the Varnell case and provided contact information. Since then, Mr. Elisens has been interviewed by a defense investigator and thereafter sent to the defense recordings made during his contact with the FBI.

-Since the arrest of Mr. Varnell, Mr. Elisens has made postings on Facebook regarding his participation as the informant on the case. (Exhibit 2)

-On October 4, 2017, Mr. Elisens was identified by "Injustice in Oklahoma Exposed" on Facebook as a "hero" in the Jerry Varnell "bombing" case referenced with audio files of Agent Larsen. (Exhibit 3)

The undisclosed "criminal history," of CHS-1, Brent Allen Elisens that should have been provided to the Court to assess the credibility of the information provided by CHS includes convictions starting as far back as

2005 and has continued to date as follows:

2005:  Possession of drug paraphernalia, Floyd County District Court, Charles City, IA, SMR018625; Harassment, 3rd degree, Cerro Gordo County District Court, Mason City, IA, SMSM019632; Theft, 4th degree, Floyd County District Court, Charles City, IA, FECR018755; Interference with official acts, Floyd County District Court, Charles City, IA, FECR018748; Forgery, Floyd County District Court, Charles City, IA, FECR018756; Possession of a Schedule I Controlled Substance, Floyd County District Court, Charles City, IA, SRCR018757;

2008:  Interference with Official Process, Norman Municipal Court, Norman, Oklahoma N07-418;

2009:  Violation of Protective Order, Cleveland County District Court, Norman, Oklahoma, CM-2009-1542.  The allegation in this case involved Mr. Elisens saying things like "kill, murder, kill" while in the courtroom waiting for the formal protective order hearing.  (Exhibit 4, page 2)  A guilty plea was given in the case, and in Mr. Elisens' sworn plea petition in that case, it was written that Mr. Elisens suffered from schizophrenia, bi-polar, PTSD, and social anxiety, and that he was treated by Dr. Gutierrez at "Oklahoma City Mental Health Center."  (Exhibit 4, page 2 of Summary of Facts).

2010:  Driving while Suspended, Norman Municipal Court, Norman, Oklahoma, #508169; Assault and Battery by Strangulation, Cleveland County, Oklahoma, CF-2010-75.  On April 20, 2010, an Order for Competency determination was issued in the case. (Exhibit 8)  In addition, in 2010, he was convicted of Violation of protective order, Cleveland County, Oklahoma, CF-2010-590 and Violation of protective order, Cleveland County, Oklahoma, CF-2010-1280.  In the Cleveland County sworn plea petition for CF-2010-75, CF-2010-590, and CF-2010-1280, regarding mental health treatment, it is stated that Mr. Elisens received treatment at "COC-MHC-Norman3 for over 5 years, BiPolar (type 2), Rapid Cycling w/mixed PTSD, and social anxiety."  (Exhibit 9, page 2).

2011:  Willfully using a Telephone to Make a Threat by Fire or an Explosive, Western District of Oklahoma, 10-CR-343-C.    This basis for this offense conduct included Mr. Elisens' claim of previous murders, turning into the next Ted Bundy (Exhibit 5), referencing Timothy McVeigh, and his threat to throw a grenade into the Norman Police Department.  On November 23, 2010, Mr. Elisens entered a guilty plea to his offense.  According to the sworn plea petition, regarding mental health treatment, Mr. Elisens had been "hospitalized 3 or 4 times as an adult for approximately 10

_____

days at a time."  (Exhibit 6, page 2).

According to the Government's Sentencing Memorandum, at the time of proposed sentencing date in 2011, Mr. Elisens had nine convictions, including one for third degree harassment, which was asserted to be "tantamount to his present conviction."  (Exhibit 7, page 7).   Further, the government stated, "the audacity of the defendant to attempt to call his assigned judge to inform her that he's going to 'kill his enemies' and his threat to throw a grenade into the police department shows that he is a danger to the community."  (Exhibit 7, page 8)

2017:    Threatening to Perform Act of Violence and Placing Obscene/threatening Harassing Phone Calls, CM-2016-939.    Per OSCN court records, this offense occurred on March 25, 2016.  According to the affidavit for arrest, Mr. Elisens had threatened the life of B.R. by saying, "I'm gonna come over there and kill all you mother*******" and that he called H.M. 263 times in one day after being told to stop.   He was convicted of his offense on January 3, 2017, days after he first contacted the FBI about Mr. Varnell and the same month that he began to cooperate with the government.

While Agent Larsen was truthful in saying that CHS-1 had a "criminal history" that statement did not even begin to advise the court who CHS-1

was for the important task of truly assessing credibility.  In total, Elisens has *fourteen (14)* known criminal convictions spanning twelve years and includes a federal conviction for threatening to kill multiple people by use of an explosive device----the very plot he supposedly wanted to thwart by providing information to agents.  While Agent Larsen did not actually provide false information in the Affidavit regarding CHS-1's criminal history,  the fact that Elisens has threatened and been convicted on multiple occasions with offenses involving threats to kill would be a fact that any judge assessing the credibility of any confidential informant would want to know.  Had the Court been advised of the true nature and extent of Mr. Elisens' criminal history, the information provided by Mr. Elisens in support of the Search Warrant surely would have been considered in a different manner than as represented by Agent Larsen.

There is no reasonably likelihood that Agent Larsen was not privy to the character and true criminal history of Mr. Elisens.  During the investigation of Mr. Varnell and prior to the Search Warrant being sought as CHS-1 being a primary source of information, Agent Larsen participated in a number of meetings attended by Agent Barry T. Black and representatives of the Western District of Oklahoma United States Attorney's Office.  One of these such meetings occurred on June 6, 2017.  (Exhibit 10)  It just so

happens, that in 2010, Agent Barry Black had been the Affiant in the previous federal prosecution of Elisens and was thus intimately aware of Mr. Elisens' previous threats, references to Timothy McVeigh, and his attempt to flee from law enforcement. (Exhibit 11)

2). Mental Health History:    Agent Larsen did not advise the Court that CHS-1 had a known mental health history ***at all***. Upon a search of open court records (which the FBI is not limited to), the government should have been aware of Mr. Elisens' previous claims of inpatient treatment (Exhibit 8) and the information provided upon his no contest pleas in CF-2010-, CF-2010-590, and CF-2010-1280 wherein it was stated that Mr. Elisens had been treated for over 5 years at COC-MHC-Norman, Bi-Polar (Type 2) rapid cycling w/ mixed PTSD, and Social Anxiety (Exhibit 9).     During the prosecution of Elisens in 10-CR-00343-C, the government was privy to information related to Mr. Elisens' Mental and Emotional Health as set forth in his Petition to Enter Guilty Plea (Exhibit 6) in addition to subsequent information (Exhibit 12, to be filed under seal).  After being released from imprisonment for his threat to throw a grenade into the Norman precinct in 10-CR-00343-C, Mr. Elisens was ordered to serve three years of supervised release, with special conditions assessed.  During Mr. Elisens' supervised release, further information was relayed to the government by receipt of

violation reports filed April 4, 2016, (Exhibit 13, to be filed under seal), July 14, 2016 (Exhibit 14, to be filed under seal) and December 7, 2016 (Exhibit 15, to be filed under seal).   Furthermore, Elisens himself told agents and the AUSA on January 226, 2017 that he had a mental health history and that was documented by the recording of that interview.

3). Substance Abuse History:   Agent Larsen did not advise the Court that CHS-1 had a lengthy substance abuse history ***at all***.   The government was also privy to information related to Mr. Elisens' history while on Federal Supervised Release (Exhibits 13, 14, and 15, to be filed under seal).

4). Promises made to Elisens:   Agent Larsen's assertion that CHS-1 was not promised anything in exchange for his cooperation is not consistent with the facts.

On an unknown date, but clearly after the new Cleveland County offense had been committed and without Mr. Elisens providing any information regarding Mr. Varnell, a conversation between Mr. Elisens and an agents with the FBI occurred in the presence of his federal attorney, Julia Summers.   It is doubtful the FBI agents knew they were being recorded, but a part of this conversation was recorded and it was provided by Mr. Elisens to the defense.   In the approximate 3 minute recording, there is discussion

about the issues in Cleveland County.   An unidentified agent "FBI-1" (believed to be Agent Brian Martin) tells Mr. Elisens:

> "So here's the deal –we can help you with a lot of that stuff— okay?  We would like to work with you, umm, if that is something that you think you would like to do.   We would be very friendly to you okay?  We would consider you somebody that was not just an asset, but someone very friendly to the FBI."

> And then, "Greg Mashburn, is the Cleveland County District Attorney.   He would be somebody that could assist with questions….with some of the questions—you would not go in front of Greg Mashburn, it would be one of us calling Greg Mashburn and discussing those issues and how would we go about taking care of this."

> To which Elisens replies:  "That would be awesome."

> Agent: "So, well, as time goes on, I'm telling you, we will work on that.  And we'll see if we can get things done that you are trying to get done."

Mr. Elisens: "Just let me know what you need me to do then."

(Exhibits 17, transcription; and Exhibit 17A, recording of conversation, to be filed conventionally).   It should further be noted that in this conversation, one agent says, "Those could be an issue" and Mr. Elisens replies that "they are gonna have a field day with me anyway just because of the mental health."   Elisens then advises agents of his computer expertise:

> "Well I mean here's the thing, like I am not on brag mode, I'm good with computers—I trained Maurie Boran for 6 years…." (Exhibit 17 and 17a)

It should further be noted that in this clip of conversation, there is no

mention of Mr. Varnell or any specific threats allegedly known to Elisens or that Elisens had advised agents of any specific threats at the time the recording was made.    It would further be reasonable to assume that at the time the recording was made, Mr. Elisens' was not in custody, otherwise he presumably would not have had access to a recording device.

Considering the recording provided by Mr. Elisens (Exhibits 17 and 17A), Agent Larsen's assertion that Elisens wasn't promised anything for his cooperation appears to be inaccurate and the information that Mr. Elisens was told that for his cooperation he would be deemed "very friendly to the FBI" and that the District Attorney in Cleveland County would be contacted on his behalf would certainly be the kind of thing the judge considering issuing a warrant would wish to know.

5).  False assurances of corroboration

From the very first reference regarding information from CHS-1, Agent Larsen withholds facts in the Affidavit from the issuing magistrate. Through discovery, it has been determined that on December 21, 2016, CHS-1 did not personally provide any information to the FBI;  however, on that date, an attorney allegedly provided this information to an AUSA by a source that at that time wished to remain anonymous.  It is also believed that information also included the fact the attorney did not know if the plot was

anything more than *aspirational*.    Thereafter, according to Agent Larsen's

Affidavit, CHS-1 began cooperating with the government in January, 2017.

According to Agent Larsen, CHS-1 advised in January 2017 that Mr. Varnell

was upset with the government and was seeking retaliation, Mr. Varnell was

in possession of firearms, and he desired to develop and arm a small militia

group. 4 Discovery received by the government indicates that January 26,

2017, Elisens advised that he had "screenshots" of Varnell making

statements.    The government then advised would need to be able to

authenticate the content of the "screenshots" so that it could be proven that

nothing was altered, tampered, edited, and determine the IP address from

where the message originated from, and obtain the "metadata" of the

messages.  Elisens then advised that "most" of the conversations between

himself and Varnell were saved to his laptop computer and cell phone

currently that were in his parents' custody, and it was agreed that the devices

would be provided for a "mirror image" to be made at a later time.

However, no discovery received by the government establishes that Elisens'

phone or laptop that supposedly contained these conversations was ever

recovered, imaged, or reviewed by law enforcement or Agent Larsen in

---

4 This information proved to be completely inaccurate as when the search
warrant for the residence of Mr. Varnell was conducted, weapons were
neither sought nor recovered in Mr. Varnell's possession.  Presumably by
the time the search warrant was sought, law enforcement believed this
information to be untrue as they did not seek the seizure of weapons in
the search warrant for the residence of Mr. Varnell.

order to determine that the contents of the "screenshots" weren't altered, tampered, edited, or even created by Elisens himself.

On March 3, 2017, Agent Schmitz reported that she spoke with CHS's attorney, to determine if CHS-1/Elisens had been release from federal custody.   Agent Schmitz reported that he was scheduled for release on July 3, 2017.   Also according to Agent Schmitz's report, ******* would be meeting with her client to discuss further cooperation and obtaining his laptop and/or phone from CHS' parents.  (Exhibit 24)

In paragraph 7, Agent Larsen indicated that on April 3, 2017, (which was nearly a month after his release from custody) Elisens "provided screenshots of four conversations strings he/she had with VARNELL." While CHS-1 may have stated the screenshots were of conversation made with Varnell, they are *not* identifiable as coming from Mr. Varnell as represented in the Affidavit:   *they have no name and they have no date.* (Exhibit 23)   Additional relevant information omitted by Agent Larsen was the fact that Elisens reported that on April 3, 2017, he believed that Mr. Varnell was "primarily in a defensive posture" and the fact that the screenshots were not corroborated by searching Elisens' laptop or cell phone although the government has suggested that the were reviewed on that date.

Not included in the Affidavit that was that on April 4th, Elisens (referenced as FBI Confidential Human Source S-00082199) was given certain admonishments, including:  that he must abide by the instructions of the FBI and must not take or seek to take any independent actions on behalf of the US Government, and he is not authorized to engage in any criminal activity and has no immunity from prosecution for any unauthorized criminal activity.  (Exhibit 25)    While ordinarily that information may not be pertinent or relevant to a credibility or probable cause determination, in this case, Elisens engaged in criminal activity during nearly every face to face meeting he had with Mr. Varnell during the course of the investigation. Not just any activity, but activity that allowed Elisens to manipulate Varnell and the subject matter of the conversations contained with the Affidavit in support of probable cause.

On April 14, 2017, Elisens messaged Mr. Varnell, advising him that he (Elisens) had "a guy" who does well with chemicals, and asked Mr. Varnell, "When you going to invite me over for a blunt fool, I'll bring it." When Elisens speaks of the hassle involved with getting his driver's license reinstated, he asserts to Mr. Varnell they are "f****** Nazis."  (Exhibit 26) Also omitted is information that on April 23, 2017, Elisens (under Facebook alias "Steven James" asked Varnell if he had any candidates for his "team"

and Varnell's response was no.  Elisens then advised that *he* knew a couple. Elisens then asked Mr. Varnell, "So, how can we make the world better?" to which Mr. Varnell responds, "Idk." (I don't know).     Further, Elisens inquires, "like you said before there's gotta be a way" and Mr. Varnell's response is, "There's this drug I want to start selling to head shops." (Exhibit 27)

Agent Larsen in paragraph 9 of his Affidavit advises the Court that on April 24, 2017, CHS-1 met with Mr. Varnell at his residence.    This contact was consensually recorded by Elisens.  What is omitted by Agent Larsen is the fact that Elisens followed through with his earlier offer to bring over a "blunt" and Mr. Elisens furnished marijuana to Mr. Varnell, and engaged in bait conversation, which not only failed to corroborate Mr. Elisen's previous assertions and claims of Mr. Varnell being "out for blood", but *negated* them.    In the approximate two hour long drug induced conversation, there was no reference to weapons or firearms.    Mr. Varnell advised that the easiest way to achieve change in the United States was to become rich and then do something with the money.    When Elisens suggested that Russia was going to bomb the United States, Mr. Varnell's response was, "You can't f*** with the U.S., dude."    Elisens however continued by saying, "*But we can still fix it from the inside*."    After a long pause, Mr. Varnell's

response was not anything related to blowing up the Federal Reserve Building in Washington D.C. but rather, "Okay, doing what?"   Elisens: "I don't know man, the shit we talked about" to which Varnell responded, "I don't know man, I'm pretty f****** high right now."    Later, Elisens continues by asking if Mr. Varnell still wants to go through with "it," to which Mr. Varnell says that he's calmed down since the election and seems more hopeful since Trump won.   Elisens then continues to bait Mr. Varnell by saying that Trump is "just a figurehead" and mentions the cost of Trump's wall and compares it the number of starving people, and asked Mr. Varnell what he was going to do.   Mr. Varnell said he was pleased with Trump so far, and then changed the subject to *building a windmill*.   Elisens then inquired if Mr. Varnell "ever felt like he wasted his life."

In paragraph 10 of the Affidavit, Agent Larsen advised the Court that CHS-1 advised that Mr. Varnell continued to use encrypted applications (apps) and private Facebook messaging as part of his operational security mindset.  Again, Agent Larsen suggests to the Court that he could and did verify the source of encrypted message via "Textlock" as coming from Mr. Varnell, but again, the screenshot is undated, and unnamed with no corresponding text.  (Exhibit 28)

In paragraph 11, Agent Larsen again describes a recorded meeting between CHS-1 and Mr. Varnell with a female present, taking place on May 10, 2017.   Agent Larsen does not advise the court that prior to this encounter, Mr. Elisens was admonished by Agent Brian Martin to "not smoke any botanicals *in that car*" that was being supplied by the government for him to drive to Sayre.   But Agent Martin also advised, "however you want to do that, I don't give a s***."  (Exhibit 29, to be filed conventionally, starting at approximately 13:20)    Elisens again takes marijuana to Mr. Varnell for their meeting, and the recording reflects Mr. Varnell saying to Elisens "I love your blunts" to which Elisens replies, "Thanks, man."    Elisens and Varnell proceed to get high, which again, is not disclosed by Agent Larsen.   While there is mention of a four or five story building, the recording tone is soft and the actual conversation cannot be determined from listening.   Mr. Varnell however, can be heard saying, "Oh, f*** I'm stoned.   You, you always get me like bonged in the, always." (Exhibit 30)

In paragraph 12, Agent Larsen again describes a recorded meeting between CHS-1 and Mr. Varnell with a female present, taking place on May 17, 2017.   Again, Elisens brings marijuana to the meeting but this fact and the fact that the individuals get high is again not disclosed to the Court.

27

In paragraph 13, Agent Larsen referenced that on May 24, 2017, CHS-1 engage in private message contact with Mr. Varnell via Facebook Messenger utilizing "TextLock."   Agent Larsen asserts in his Affidavit that during this communication, Mr. Varnell indicated he wanted to target BancFirst instead of his original target of the Eccles Federal Reserve Building.   Agent Larsen asserted that CHS-1 asked why Mr. Varnell had selected BancFirst, with Mr. Varnell's response being, "Well I don't wanna kill a bunch of people[.]"   When questioned as to which BankFirst, Mr. Varnell's response was "Idk."

*For the first time during this investigation*, the "TextLock" screenshots provided by Elisens (Exhibit 31) are accompanied by corresponding screenshots that include "Jerry Drake Varnell" as a sender of the encrypted messages to an unidentified user, presumably Elisens. (Exhibit 32).

Disturbingly, the information Agent Larsen provided in his affidavit is inaccurate as Elisens *reversed* the content of the conversation.  Although the TextLock screenshots appear to match statements made by an individual named "Jerry Drake Varnell", in chronological order, the conversation actually flowed as follows:

"Jerry Drake Varnell":                              encrypted

| | |
|---|---|
| Unidentified Facebook Messenger: | wrong pw |
| | Ummmm bruh you fat fingered it |
| "Jerry Drake Varnell": | well I don't want to kill a bunch of people (Exhibit 31, var_000037) |
| Unidentified Facebook Messenger: | thought that was understood dude. what was the first message then? |
| "Jerry Drake Varnell": | BancFirst? (Exhibit 31, var_000035) |
| Unidentified Facebook Messenger: | which one though?  Like local or the main one?  also when I texted you super late the other day the professor can drive me next Thursday when he's back. (Exhibit 31 var_000039) |

The full text of the conversation that prompted the "BancFirst?" response either was not provided to Agent Larsen by Elisens, or it hasn't been disclosed in discovery.  However, it is clear that the person identified as "Jerry Drake Varnell" *did not* indicate he wanted to target BancFirst **instead of** the Eccles Federal Reserve Building as set forth in the Affidavit for Search Warrant.  There is nothing to suggest that BancFirst was selected *because* he didn't want to kill a bunch a people, but the message provided was that "Jerry Drake Varnell" indicated that "*well I don't want to kill a bunch of people*" with the proceeding conversation unrecovered by agents. Without having the benefit of knowing what question was asked, "Jerry Drake Varnell's" response was, "Well I don't wanna kill a bunch of people[.]"     While this information is inconsistent with the unidentified

screenshot provided by Elisens on April 3, 2017, "*I'm out for blood.  When militias start getting formed I'm going after government officials when I have a team*" (Exhibit 23), there is nothing to suggest that agents ever did anything to corroborate Elisens' claims by either obtaining Elisens' phone, laptop, or records of Elisens' Facebook to provide any authenticity to the earlier supposed messages, although Agent Larsen represented that corroboration of CHS-1's information was conducted in his affidavit. (Exhibit 1, page 3, paragraph 4).

The omission of facts material to a magistrate's determination of probable cause constitutes a misrepresentation or a misstatement because it interferes with the ability of the magistrate to consider the "totality of circumstances," as required by *Illinois v. Gates*, 462 U.S. 213 (1983).  The 10th Circuit described this concept in the case of *Stewart v. Donges,* 915 F.2d 572, 582-583 (10th Cir. 1990), as follows:

> Prior to the time of plaintiff's arrest in this case, the Tenth Circuit has not addressed whether the standards of *Franks* governed omissions as well as affirmative misstatements. However, several of the other circuits had indicated that the "deliberate falsehood" and "reckless disregard" standards of *Franks* applied to material omissions, as well as affirmative falsehoods . . . (citations omitted).  Therefore, we hold that at the time defendant submitted his affidavit and arrested plaintiff, it was a clearly established violation of plaintiff's Fourth and Fourteenth Amendment rights to knowingly or recklessly omit from an arrest affidavit information which, if included, would have vitiated probable case.

Under *Franks*, when a statement is held to be made with reckless disregard for the truth, the affidavit's false material is set to one side, and the remaining content is tested for probable cause. *Id* at 156. This procedure is unworkable for an omission, however, so instead of setting the material to the side, the omitted truths are inserted, and probable cause is then tested. *Stewart v. Donges*, 915 F.2d 572, 583.

## *II. The Warrant was Overbroad*

Apart from the *Franks* issue, the warrant itself was unconstitutionally overbroad. "The Fourth Amendment states unambiguously that 'no Warrant shall issue, but upon… particularly describing the place to be searched, and the persons or things to be seized." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Particularity is required because the Constitution "abhors" general warrants. *Id.* In *United States v. Leary*, 846 F.2d 592, 605 (10th Cir. 1988), the Tenth Circuit invalidated an in particular warrant: "The fourth amendment requires not only that the warrant sufficiently specify the evidence to be seized, but also that the scope of the warrant be limited to the specific areas and things for which there is probable cause to search."

Here, the affidavit and the warrant required Facebook to disclose to the government information related to the Facebook account dating back to February 26, 2010. This information is far broader than the claims in the

Affidavit that Mr. Varnell communicated through Facebook from the dates

sets forth in the Affidavit, which is limited to 2017.   The Fourth

Amendment requires particularity sufficient to avoid general "rummaging"

and "strictly limits the discretion of the officer executing the warrant."  This

warrant, by requiring Facebook to disclose everything related to the account

since February 26, 2010, was overly broad in that the information required

was untethered to the crime being investigated and did nothing to constrain

the government's discretion in searching or seizing information, as revealed

by the sheer volume of Facebook records disclosed to the defense.  And like

other warrants, overbroad Facebook warrants fail particularity:

> "The Facebook warrants are another matter. They required disclosure
> to the government of virtually every kind of data that could be found
> in a social media account. . . . And unnecessarily so. With respect to
> private instant messages, for example, the warrants could have limited
> the request to messages sent to or from persons suspected at that time
> of being prostitutes or customers. And the warrants should have
> requested data only from the period of time during which Moore was
> suspected of taking part in the prostitution conspiracy. Disclosures
> consistent with those limitations might then have provided probable
> cause for a broader, although still targeted, search of Moore's
> Facebook account. That procedure would have undermined any claim
> that the Facebook warrants were the internet-era version of a "general
> warrant." *United States v. Blake*, et al, 868 F.3d 960, 974 (11 Cir.
> 2017)

The same is true here.  The government could have limited its request to

communications and messages, or the issuing magistrate could have so

limited it.   But here neither the government nor the issuing magistrate

limited the request and the result was a general warrant that allowed a "generalized, exploratory rummaging" through Mr. Varnell's digital property. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). This warrant was overbroad. Facebook functions are severable; the messaging or other communication content could have been provided without all of the other information, such as uploaded videos and photos or other sites that were visited. The warrant was overbroad because it allowed the government to rummage through every type of information in the account for the last seven (7) years, without regard to the purpose of the search, which is exactly what the Fourth Amendment was designed to prevent. All evidence seized pursuant to a general warrant must be suppressed. *Cassady v. Goering*, 567 F.3d 628 at 638 (10th Cir. 2009).

<u>CONCLUSION</u>

The classic admonition in *Boyd v. United States*, 116 U.S. 616, 635, 6 S.Ct. 524, 535, 29 L.Ed. 746 (1886) is worth repeating:

> "It may be that it is the obnoxious thing in it mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of the courts to be watchful for the constitutional

right of the citizens, and against any stealthy encroachments thereon." *Boyd* at 635.

In this case, the United States Magistrate who issued the Facebook search warrant would have reached a different probable-cause determination if he had been fully informed of the true facts revealed herein.  The Defendant's burden to prove the invalidity of the search warrant has been met and suppression of evidence obtained with the warrant is the appropriate remedy due to the fact that the affiant knew the information was false or would have been known to be false except for reckless disregard of the truth. *Leon*, 468 U.S. at 923 (citing *Franks*).   For the reasons stated, Mr. Varnell asks this Court to exclude from trial any evidence obtained by the government pursuant to this warrant.

Respectfully submitted,


s/Marna Franklin
Marna Franklin, OBA #17148
Franklin Law Firm, P.C.
620 North Robinson Avenue,
Suite 203
Oklahoma City, Oklahoma    73102
Telephone:   (405) 239-2454
Facsimile:    (405) 605-2284
mfranklin@demandproof.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2018, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECR registrant:

Matt Dillion and Mark Stoneman, Assistant U.S. Attorneys.


s/Marna Franklin
Marna Franklin