IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,       )
                                )
     Plaintiff,                 )
                                )
     -vs-                       )   Case No. CR-17-239-D
                                )
JERRY DRAKE VARNELL,            )
                                )
     Defendant.                 )



* * * * * * *

TRANSCRIPT OF PROCEEDINGS

HAD ON FEBRUARY 12, 2019,

BEFORE THE HONORABLE TIMOTHY D. DeGIUSTI

U.S. DISTRICT JUDGE, PRESIDING

* * * * * * *



OPENING STATEMENT OF THE GOVERNMENT



Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

    Mr. Matt Dillon
    Assistant United States Attorney
    U.S. Attorney's Office
    210 West Park Avenue
    Suite 400
    Oklahoma City, Oklahoma 73102

    Mr. Mark R. Stoneman
    Assistant United States Attorney
    U.S. Attorney's Office
    210 West Park Avenue
    Suite 400
    Oklahoma City, Oklahoma 73102


ON BEHALF OF THE DEFENDANT:

    Ms. Marna S. Franklin
    Franklin Law Firm
    620 N. Robinson Ave.
    Suite 203
    Oklahoma City, Oklahoma 73102

    Ms. Vicki Z. Behenna
    MULINIX GOERKE & MEYER
    210 Park Avenue
    3030 Oklahoma Tower
    Oklahoma City, Oklahoma 73102

    Ms. Laura K. Deskin
    Attorney at Law
    400 North Walker
    Suite 230
    Oklahoma City, Oklahoma 73102

1                    **P R O C E E D I N G S**

2          (The following is an excerpt of the proceedings had on

3     February 12, 2019, containing only the Government's opening

4     statement:)

5               MR. DILLON:   Thank you, your Honor.

6          Good afternoon.   What happened in Oklahoma City was not

7     an attack on America, it was a retaliation.   Retaliation

8     against the freedoms that have been taken away from the

9     American people.

10         It was a wake-up call to both the government and the

11    people, an act done to show the government what the people

12    thinks of his actions.   It is also a call to arms to show that

13    there are still fighters among the American people.   The time

14    for revolution is now.   Jerry Drake Varnell.

15         On Friday evening of August 11, 2017, at approximately

16    8:00 p.m., as most people have finished eating their dinner,

17    the defendant, Jerry Drake Varnell, and Mark Williams were

18    busy loading hundreds of pounds of ANFO, which is anhydrous --

19    or ammonium nitrate fuel oil into tubs.

20         The defendant assisted in loading a thousand pounds in

21    these tubs into the back of a van.   The goal was starting to

22    be clear.   The goal was starting to be reached by Mr. Varnell.

23         After the fuel oil was loaded, it was wired and set to a

24    time-power unit.   At approximately 9:00 p.m., as many people

25    are getting ready for bed, the defendant, on the other hand,

1   begins taking dry runs to downtown Oklahoma City from Elk City

2   with Mark Williams to make sure that he knew the route he was

3   going to take, to make sure that he knew how to get to

4   BancFirst, to make sure there wasn't any roadblocks, anything

5   that could distract him.

6       At approximately 12:07 on August 12th, just after

7   midnight, the defendant leaves the Elk City storage building

8   again.  Mark Williams is following him in a truck, in case

9   anybody tries to stop him, that he could be a distraction.  He

10  would also be a getaway driver.

11      The defendant drove this van with this thousand-pound

12  bomb all the way, as the dry run showed, to downtown Oklahoma

13  City.  The plan was to park it in the loading dock and down an

14  alley for the BancFirst building.

15      Once he gets there, he has a problem.  There is actually

16  a car blocking the alley.  But the defendant would not be

17  dissuaded as he circled the block multiple times and waited

18  for his opportunity to pull in to BancFirst.

19      While he is driving around, he arms the time-power unit.

20  This is what would power and eventually detonate this

21  explosive device per instructions that he was given.  He wraps

22  the wires around the terminals.  He turns the phone on.  He

23  places the key in.  A green light activates.  He knows it's

24  ready to go.  And he pulls into the alley and he parks at the

25  loading dock, which is tucked somewhat underneath the

1    building.

2        Now that everything is armed and everything is ready to

3    go, he comes out from the alley and he jumps in the truck with

4    Mark Williams and they drive away.  They drive a few miles to

5    a safe location where they can view downtown.

6        The defendant, not wanting to take a chance that his

7    phone could be traced, asked to use Mark Williams' burner, a

8    cell phone that he didn't think would trace back at least to

9    him.  And he dials the number that was given to him to

10   detonate the device.

11       There is a problem.  Nothing happens.  Again, not to be

12   dissuaded, he dials a second time.  Still nothing.  At night,

13   when he expects to see a thousand-pound explosion in downtown

14   Oklahoma City, nothing happens.

15       He dials a third time.  This time something does happen,

16   but it's not what he expects.  FBI agents and other law

17   enforcement officers surround the truck and arrest the

18   defendant and Mark Williams.

19       As the defendant has said, this was an attack on the

20   government, a retaliation, a wake-up call.  He wanted to show

21   people that the time for revolution was now.  And while the

22   defendant knew his plan, he knew his target, and he knew his

23   message, what he didn't know that night was that the person

24   that was with him, Mark Williams, was actually an undercover

25   FBI agent.

1     What he also didn't know was that someone he had known

2  since 2015, someone he confided in, someone that he thought

3  was like-minded, and someone that he had been speaking with

4  about doing exactly this thing, what he did not know that

5  night was that Brent Elisens had actually come forward to FBI

6  back in January and told them of Mr. Varnell's plan and his

7  desires to blow up a building.  Brent Elisens told FBI that he

8  didn't want that kind of violence on his conscience.  He had

9  to come forward.

10     As FBI would later discover, for 10 to 11 months prior to

11  the government even knowing the name Jerry Drake Varnell, the

12  defendant sent messages and made posts on Facebook.  The

13  messages described how he liked bombs, that they were cheaper

14  than bullets.  He believed that bombs were efficient.

15     He bragged about his chemistry background.  He described

16  how he could make bombs.  And to quote him:  "One cup of

17  gasoline, half a cup of powdered chlorine will incapacitate an

18  entire room.  In fact, I've learned enough chemistry over the

19  years to make a gas bomb out of anything.  And, yeah, brake

20  fluid is pretty nasty.  You can make bombs with them."

21     These are posted messages that he is sending in 2016.

22     But how do we get from the defendant attempting to

23  detonate a weapon of mass destruction three times -- how do we

24  get there from some online messaging?  This didn't happen

25  overnight, but it progressed quickly, nonetheless.

1        The defendant met Brent Elisens in 2015.  They shared a

2   common interest.  Computers.  They began speaking about

3   computers, computer programming.  They talked about

4   development of mobile applications and other ways that they

5   could put their computer skills to use.

6        Over the next year they continued to talk.  These were

7   online conversations.  The two had not actually met in person.

8   They talked about ways to make money, but they also talked

9   with each other as normal friends would.

10        They would make jokes, sometimes at the other person's

11   expense.  They would talk about other things going on in their

12   lives.  And they were talking about the world in which they

13   lived.

14        The defendant had met other people online, some of which

15   were through Brent Elisens, and he thought they also had some

16   common ideas together.  The defendant and Mr. Elisens, these

17   like-minded people, began chatting more online.

18        They would utilize Facebook and get into group messages.

19   They would talk about how they could make the world a better

20   place.  They shared the view that things would never change

21   without some help.

22        And by September of 2016, this group, including the

23   defendant, had begun discussing possibly moving to Missouri,

24   getting a piece of land up there, and starting a farm or

25   commune-type place.

1        This would be a place where these individuals all

2   possessed different skills that would help this new community.

3   It would be a place without capitalism.  People could barter

4   for goods and services.

5        The defendant and the others discussed how to share their

6   ideas.  They wanted a purpose that others could get behind.

7   They even planned to have a meeting in Norman in October of

8   2016 to discuss some of this, some of these members even

9   driving from out of state.

10       As can often happen though with a group with so many

11  different ideas, the group began to splinter.  Some started to

12  think that people in this group were seeing this opportunity

13  instead as a way to make money as opposed to getting away from

14  the capitalistic ideas that they had opposed.  Others didn't

15  think that people in the group were really serious about this

16  intention of starting over.

17       They also began to be suspicious about if the government

18  could monitor their communications, these messages that they

19  had been sharing back and forth.  Some thought just the idea

20  of being not antigovernment necessarily but antiestablishment,

21  that that would draw attention and possibly lead to bad

22  consequences.  So they decide that they want to look at

23  encrypted applications and other secure communications.

24       They also decide that if there is anything important or

25  bad to talk about, that they should probably even do that in

1    person.

2          The defendant and Mr. Elisens started using a mobile

3    application called TextLock.  TextLock enabled a user to enter

4    a message into this application.  They would also enter a pass

5    phrase, hit encrypt, and it would come up with an

6    unintelligible string of letters, numbers, characters.  That

7    person would then just copy that message and then send it to

8    somebody else via just a regular text message, Facebook

9    Messenger, some other communication method.

10         The person on the receiving end, as long as they knew the

11   pass phrase, they would reverse this process.  They would copy

12   this encrypted message, they would put it back into TextLock,

13   type the pass phrase, hit decrypt, and then the message would

14   come through.

15         The defendant and Mr. Elisens actually became quite fond

16   of this application.  They started using it more and more.

17   And they actually pulled away from the group as a whole and

18   they were communicating more in a message forum just between

19   the two of them.

20         Mr. Elisens continued to discuss a survivalist-type idea

21   to get out of society, to get back to a land.  He just wanted

22   to get away from everything that was going on right then.  But

23   in the middle of October, he decided that he actually wanted

24   to leave soon, sooner than the others had originally been

25   thinking.

1      There was a meeting scheduled for October 23rd of 2016,

2  as we previously said.  They wanted to discuss their ideas.

3  The entire group were going to drive in for this and meet in

4  Norman.

5      The defendant wasn't going to be able to attend that day,

6  but he had asked that some of his thoughts be shared.  He had

7  taken the time to -- according to him, to read, and he put

8  some of his thoughts down in writing, first in messages.

9      And what he told Mr. Elisens:  "If Hillary Clinton won

10  the election, there would be war."  To be clear, Mr. Varnell

11  was not a van of President Trump either.  He simply weighed

12  his options and believed one was the lesser of two evils.  He

13  thought President Trump winning would weaken the government

14  but that if Hillary Clinton won, there would be war.

15      Mr. Elisens told Mr. Varnell that he was going to farm

16  status.  He didn't want to be around for this, meaning he was

17  not going to go to Missouri.  He is going to go off grid.  He

18  is going to not have -- take any money with him, no amenities.

19  He is leaving everything behind.  He asked the defendant to go

20  ahead and delete his messages since he was going to take off.

21      Mr. Varnell responded though, very specifically and

22  swiftly, and he said that he was, quote, out for blood and,

23  quote, when militias start to get formed, he was going after

24  government officials when he had a team.

25      The defendant told Mr. Elisens via an encrypted message

1    that he, quote, finally had the chance to -- I'm sorry -- he

2    finally had the chance to do something about how things are.

3    He planned to do as much as he could.

4        The defendant stated that he had been reading about the

5    best places to find stuff to make bombs.  The defendant also

6    said that he believed that the farm idea was naive.

7        The next day the defendant shared these thoughts that he

8    had put onto paper by e-mailing Mr. Elisens.  He described his

9    belief that the country was a powder keg and that there would

10   be a backlash either by the government or the people.

11       He believed there would be a Civil War before any foreign

12   country would invade the United States.  The defendant,

13   however, believed that people were hungry for change.

14       He told Mr. Elisens that he believed the Russians --

15   their attempt to influence the election was really nothing

16   more than a way to accomplish their goal.  They wouldn't have

17   to invade because the reason to invade would be done away with

18   when the people rose up and destroyed the government

19   themselves.

20       The defendant told Mr. Elisens that he believed that they

21   were long overdue for a Civil War.  Mr. Elisens also told

22   the defendant -- or I'm sorry -- Mr. Elisens told the

23   defendant that he wanted to live in peace and in the blue and

24   green of the outdoors.

25       He didn't want this talk of Civil War.  He didn't want to

1   be part of it.  He knew he also believed that it was very

2   possible that it would happen, but he wanted to be off on his

3   own when this happened.

4          Mr. Varnell responded, though, and said that if things go

5   down and you, Mr. Elisens -- if you go live in your own world,

6   I will have no respect for you.

7          Mr. Varnell then sent Mr. Elisens an encrypted message

8   stating that "When I'm able, I'm going to do some Tyler Durden

9   shit.  The government is going to fucking burn with those who

10  stand with it."

11         For anyone who doesn't know Tyler Durden, he is the

12  protagonist in a book and a movie called *Fight Club*.  In this

13  story, the narrator of the story, he is bored with his life

14  and he doesn't like the idea that he is having to conform to

15  social norms, to buy what other people tell him to buy.

16         And this evolves to the point that he meets his own altar

17  ego.  He meets his own split personality.  And they begin an

18  underground fight club.  But eventually this fight club morphs

19  into an anarchist-type club --

20             MS. FRANKLIN:  Your Honor, may we approach?

21             THE COURT:  You may.

22         (The following proceedings were had at the bench outside

23  the hearing of the jury:)

24             MS. FRANKLIN:  Your Honor, I don't know where the

25  government is going with this opening statement, but we have

1    not been provided with any discovery regarding a summary of

2    *Fight Club*, the presentation that *Fight Club* is going to be

3    presented to this jury.  He is basically describing a movie

4    that's not evidence in this case, and I would object.

5         MR. DILLON:  It's in the footnote of the original

6    complaint affidavit, I believe, and the search warrant

7    affidavit.

8         MS. FRANKLIN:  The fact that a movie was referenced

9    in an affidavit does not give a factual basis to say what the

10    protagonist is, what the whole history of the movie was, what

11    happened in the movie.

12         MR. DILLON:  It was also testified to at grand jury

13    by Agent Larsen, which has been turned over.

14         THE COURT:  Here is the real question.  The real

15    question is:  Are you intending to put on some evidence during

16    your case-in-chief that's going to explain your references to

17    this -- to this movie?

18    Anything you say in opening statement is going to, for

19    the most part, with very few exceptions, be backed up by

20    something you are going to present during the evidence of the

21    case.  So that's the question.

22         MR. DILLON:  Much like we're doing here to explain

23    what is meant when he says, "I will do some Tyler Durden

24    shit," we will present and go through Agent Larsen, Brent

25    Elisens, or both, what Tyler Durden is and what that means.

1            THE COURT:  What was meant by that reference?

2            MR. DILLON:  Yes.

3            THE COURT:  Well, in that case, the objection is

4    overruled.

5        And just let me generally caution all counsel.  Let's

6    make sure that the remainder of your opening statement is tied

7    to something you are going to present in evidence.

8        You do the same.

9        And let's avoid objections that slow down the case when

10   clearly there is reference in the documents -- I mean, I have

11   seen it, I have read about it -- to this notion of *Fight Club*

12   and the reference to this individual.  And I think it's fair

13   for counsel to explain it as long as he's going to have a

14   witness who is going to say something about it during

15   testimony.

16       So the objection is overruled.

17       Anything else, Counsel?

18           MR. DILLON:  Yes, your Honor.  I apologize.  I meant

19   to bring it up before we began our opening, but while we are

20   here the government would invoke the rule.

21           THE COURT:  I usually do that after opening

22   statement.

23           MR. DILLON:  Because we are going into such detail,

24   part of our issue is that they have listed his mother and

25   father as potential witnesses, who are in the courtroom.

1       We would also ask for a specific admonishment, because I

2  believe at least one of the sisters is in here, that they

3  understand they can't go repeat to mom and dad what they hear.

4  That goes for the defendant and for any other people in here.

5           THE COURT:  Okay.  Well, I mean, like I said, I

6  typically invoke the rule after opening statement, but I'm

7  happy to do it now.

8       I am not going to single out any particular people.  I am

9  just going to invoke it the way I normally do and give the

10 instruction I normally give.

11          MS. FRANKLIN:  Your Honor, regarding Mrs. Varnell,

12 offer to the Court that there is -- we would request an

13 exception be given to her based on a number of factors.

14      First of all, we have -- there is a guardianship in place

15 due to Mr. Varnell's mental status, that she is a legal

16 guardian of him.  And I think the fact that just because she

17 is a witness -- Mr. Varnell here is a younger defendant.  This

18 is a very serious case.  And I believe having the moral

19 support of someone such as his mother is very important to

20 him.

21      Regardless of the fact that she would be the best

22 evidence of his background and characteristics, the fact that

23 she is a witness, I think, would ultimately deprive him of

24 having the support system that he needs in the courtroom.

25      Also, given the fact of his mental condition, I think it

1  would be a comfort of him to know that she was here and able

2  to see what was going on as his legal guardian.

3           THE COURT:  Are you going to call her as a witness?

4           MS. FRANKLIN:  It is our intent to call her as a

5  witness, but --

6           MS. BEHENNA:  Your Honor, if I can just follow up on

7  that.

8           THE COURT:  Go ahead.

9           MS. BEHENNA:  It's not like she is presenting facts.

10  It's not like she knows anything about this.  She is providing

11  background to the jury about who he is, the fact that there is

12  a guardianship.

13     So it's more historical information.  It's not a typical

14  fact witness that normally the rule of sequestration is

15  invoked for.

16           THE COURT:  Now, you said a minute ago that she is

17  the guardian?

18           MS. FRANKLIN:  There is a legal guardianship.  And

19  it's my Exhibit No. 100, your Honor.

20           THE COURT:  Is it of the person and of his property

21  or --

22           MS. FRANKLIN:  It's of Mr. Varnell.

23           THE COURT:  Okay.

24           MR. DILLON:  Your Honor, if we could -- I know of no

25  exception for parent or guardian.

 1            THE COURT:  Right.

 2            MR. DILLON:  She has made public statements refuting

 3    statements that were in the affidavit by the source, making

 4    statements of what occurred during the investigation that she

 5    says she witnessed and that her husband witnessed.

 6        There is -- the defendant has been found competent.  They

 7    have not raised an insanity issue.  This talk about because of

 8    his mental condition, I truly know of no evidence that says

 9    that he needs his mother's support more than any other

10    defendant.

11            THE COURT:  Is -- do you all have -- on your defense

12    side, do you have any objection to invoking the rule right

13    now?

14            MS. FRANKLIN:  I would request that it remain not

15    invoked until after the conclusion of opening statements.

16            THE COURT:  Okay.  So here is what I'm going to do.

17    I am going to follow my usual practice.  I am going to invoke

18    the rule after opening statements.

19        I have concluded the rule is going to apply to

20    Mrs. Varnell.  There is -- unless you establish more of a

21    necessity for her to be in the courtroom -- you know, if you

22    can do that, I will listen to it.  But as of right now, it's

23    going to apply to her.  Okay?

24        All right.  Thank you.

25        (The following proceedings were had in open court:)

1          THE COURT:  Government, please proceed.

2          MR. DILLON:  Thank you.

3      The conclusion of *Fight Club* ends where the protagonist,

4  Tyler Durden, has set explosives, homemade explosives, in a

5  van below bank buildings and other financial institutions to

6  reset everybody's count -- their debit count to zero, to start

7  over.

8      So when the defendant says, "I am going to do some Tyler

9  Durden shit," you will hear testimony of what that meant, what

10  Tyler Durden is and is known to be.

11      The defendant tells Mr. Elisens also that he's had --

12  he's learned enough chemistry over the years that he could

13  make a gas bomb out of anything and that when -- that he will

14  hit up Walmart when -- and he writes -- SHTF, which you will

15  hear means "when shit hits the fan," and that he is going to

16  be in the pool section first.

17      About a week later, on October 29th of 2016, Mr. Varnell

18  tells Mr. Elisens that he believes that he has just found a,

19  quote, like-minded guy.  Mr. Elisens asks if he means

20  like-minded like survival or team or both.  Mr. Varnell

21  responds "team."  Mr. Elisens will tell you that he took that

22  to mean somebody that could help him on this course of

23  destruction.

24      Over the next few days, Mr. Varnell tells Mr. Elisens

25  that he would like to hack an emergency broadcast system and

1  send out that message that he had written.  He believed that

2  they could be, quote, the new Anonymous attack.  Anonymous is

3  just a non-centralized group of hackers that are known for

4  adopting Guy Fawkes masks.  He was an individual who attempted

5  to blow up Parliament back on November 5th of 1605.

6      And this becomes relevant, as you will hear, because the

7  defendant tells Mr. Elisens also that if they could pull this

8  off on November 5th, they would be legends.

9      On November 8th of 2016, Mr. Varnell messages Mr. Elisens

10 again and tells him that he has forgotten the TextLock

11 password and that he wanted to have a decent conversation with

12 him.  Mr. Elisens gives him some hints of what those passwords

13 are and Mr. Varnell figures it out and he sends an encrypted

14 message.

15     He says:  "I am fucking done with this Anonymous shit.  I

16 need a team.  IDC" -- meaning I don't care -- "what happens

17 with this election.  It's time to bomb some fucking banks."

18     Mr. Elisens tells him it's time for him to just go get

19 off the grid.  Mr. Varnell says that he is not going to run

20 away but he is going to take action.

21     The defendant sends another encrypted message that says:

22 "I need a team."

23     Mr. Elisens, again, tries to persuade the defendant that

24 his, quote, first wave -- this first wave is not for them.  He

25 asks him to trust him and to leave with him.

1          The defendant tries to convince Mr. Elisens that the
2    people need a sign, even if there is something less serious
3    like an EMP, so there is no casualties.
4          Mr. Elisens, again, asks the defendant, Come with me
5    instead.
6          The next morning Mr. Varnell learns that Hillary Clinton
7    had lost the election.  However, undeterred by this, on
8    approximately November 20th, the defendant sends an encrypted
9    message to Mr. Elisens stating:
10    "I think I'm going to go with what the OKC bomber used,
11    diesel and anhydrous ammonia.  I might have to make a
12    distillery to process some of this stuff, but it's a solid
13    recipe."
14          Mr. Elisens, still planning on leaving town, tells
15    Mr. Varnell in an encrypted message:  "Make sure all the
16    civilians and innocents and children are not in the building."
17          The defendant simply and openly responds:  "Well, no
18    shit."
19          Mr. Elisens leaves town on approximately November 27,
20    2016.  Over the next few months, Mr. Varnell continues to post
21    about his feelings towards the government and how nothing had
22    changed in the wake of the election.
23          In the meantime, Mr. Elisens has actually returned to
24    Oklahoma.  Mr. Elisens during this time had actually been on
25    supervised release.  He was being supervised, essentially like

1    a term of probation or parole, somewhere where he has to check

2    in with an officer and has to get permission to do certain

3    things, including leaving the state.

4        Mr. Elisens goes to court and is sentenced to a term of

5    incarceration in the county jail.  It was after he had been

6    sentenced that, through his attorney, Mr. Elisens decides that

7    he needs to notify somebody about what Mr. Varnell is wanting

8    to do, his desire to bomb a building.

9        At first Mr. Elisens didn't even want to be identified.

10   He simply wanted this information passed to law enforcement

11   anonymously.  Eventually, though, Mr. Elisens decides that he

12   will meet in person with agents and tell them what he knows.

13   He wants to prevent the defendant from following through with

14   this plan that he's been aware of.

15       In January of 2017, FBI, for the first time, meet with

16   Mr. Elisens.  This is the first time that Mr. Elisens provides

17   details about Mr. Varnell, his desire to form a team, to bomb

18   a building, and to send a message to the government.  This is

19   the first time that there is any government involvement in

20   this case.  January of 2017.

21       Mr. Elisens gives details concerning the text

22   conversations.  He tells FBI how him and Mr. Varnell met, the

23   plan for the group to start the farm in Missouri, and

24   Mr. Varnell's more recent plan to bomb a building.

25       He tells them that Mr. Varnell wants to bomb the Federal

1   Reserve Building in Washington D.C.  Mr. Varnell wanted to do

2   something similar to what happened in Oklahoma City.

3   Mr. Elisens tells FBI that he sent a message back to the

4   defendant saying, As long as there's no casualties.  He says

5   Mr. Varnell agreed.

6       Mr. Varnell told agents that he had saved screenshots

7   though of some of these messages and that he still had them at

8   home on his computer.

9       Mr. Elisens finished his time in the county jail.  And in

10  March of 2017, he begins to re-establish contact with -- I'm

11  sorry -- Mr. Elisens had finished his time and he begins to

12  reinitiate contact with Mr. Varnell.

13      On March 31st, FBI, again, meet with the defendant and

14  his attorney, and they talk more specifically about what

15  information Mr. Elisens had and what he had been told.

16      At that time they're also provided copies of these

17  messages.  These messages included the message of "I'm out for

18  blood" and "when militias start getting formed, I'm going

19  after government officials."

20      He shared the one that said, "I'm going to go with what

21  the OKC bomber used."  He shared the message that Mr. Varnell

22  had written about his concerns that the country had become a

23  powder keg and it was primed for Civil War.

24      And there was also a screenshot where Mr. Varnell had

25  sent Mr. Elisens his address.  Now, again, these were messages

1   sent back in the fall, prior to Mr. Elisens coming forward to

2   the government.

3        FBI develops a plan that they need to understand if

4   Mr. Varnell is serious about this, and they corroborate what

5   Mr. Elisens has told them and does Mr. Varnell still intend to

6   go through with something like this?

7        As part of that plan, Brent Elisens agrees to actually

8   become an informant.  He is going to report to FBI, he is

9   going to report on conversations that he has with the

10  defendant.  And he is even going to utilize recording devices

11  to help document those conversations.

12       On April 24th, May 10th, and May 17th, they did exactly

13  that.  They met at Mr. Varnell's residence.  Those

14  conversations are recorded.  They also continue to have

15  communications online via Facebook, via TextLock.

16       After only three times of seeing Mr. Elisens ever,

17  Mr. Varnell agrees that on June 1st that he's going with

18  Mr. Elisens to go meet who he is introduced to as Mark

19  Williams.  They also call him "The Professor."  He doesn't

20  know that this is FBI trying to understand what he wants to

21  do.

22       They go to a restaurant.  But after they eat, they decide

23  it's going to be better if we talk in the car.  It will be

24  more secure.  There won't be people around.

25       Mr. Varnell told the undercover agent that he had made

1    homemade C-4 the last 4th of July and that his mother got mad

2    that he used it.  He stated that he followed the 3 Percenter

3    ideology on Facebook.  He talked about wanting to bomb data

4    centers, one reason being is that there's less security.  If

5    you go to somewhere like NSA, SWAT is going to swoop in on

6    you.

7        They talk about what it would take for a device to

8    actually function.  He also tells the undercover, "I'm a fan

9    of *Fight Club*.  I want to do something similar to that."

10        This was not the last time that he met with the

11    undercover, as you already learned.  The undercover employee,

12    Mark Williams, meets again with Mr. Varnell on June 26th.

13    They communicate online.  They text each other.  And they

14    agree to go scout target locations.

15        Mr. Williams had been presented to Mr. Varnell as

16    somebody who had access to explosives and that he could help

17    them accomplish what they were wanting to do if he still

18    wanted to do it.

19        Mark Williams tells Mr. Varnell, I need you to help pick

20    the target.  I need to know what we need to get.  And on July

21    13th of this past year, Mark Williams picks up the defendant

22    at his home and says, Where are we going?  The agent had

23    actually thought they were going to be going to Oklahoma City

24    and Dallas.  That's what had been previously arranged with

25    Mr. Varnell, sometimes using Mr. Elisens as his intermediary

1  of where potential targets were.

2      Mr. Varnell would discuss things that -- places that had

3  weaknesses to them, places that looked vulnerable.  They

4  discussed the IRS building outside of Dallas and a few other

5  locations.

6      But when he gets in the car with Mark Williams, to his

7  surprise, Mr. Varnell tells them, Let's head to Amarillo.

8  I've got a place there.

9      So Mark Williams, knowing that his coverage -- other

10  agents that are going to be monitoring him aren't prepared to

11  all of a sudden head west when they were heading east and

12  heading south, he says, Well, you also mentioned a place in

13  Oklahoma City.  Why don't we go check that place out first.

14      And they head downtown.  This is in the middle of the

15  day, about probably 2:00 p.m.  They walk around, they look at

16  buildings.

17      Mr. Varnell is not simply hiding, walking, and waiting

18  for the undercover to do something.  He tells him -- he tells

19  the undercover, when he sees a college sign above one of the

20  doors of one building, like, I don't want to do that.  Those

21  aren't people -- I don't want to hurt people.  There's college

22  students there.

23      And that is something that Mr. Varnell had maintained the

24  whole time.  I don't want to hurt people.  He was help

25  directing what this plan would be.  He was -- it was starting

1    to take shape.

2        They come across the BancFirst building.  It was

3    something that had been previously mentioned by Mr. Varnell.

4    They check out the alley, they see the loading dock and

5    realize not only is it something that's out of view, they can

6    park something underneath there, it won't be easily seen.  Not

7    that it's going to take long.

8        And then it's decided.  Mr. Varnell actually says, "We

9    ought to talk to Brent about this too," and they go meet with

10   him.

11       On the way back from this trip, the undercover asks

12   Mr. Varnell, What's the deal?  What's your motivation?  Why

13   are you wanting to do this?

14       He says, I don't think you understand my hatred of the

15   federal government.

16       Brent Elisens meets with Mr. Varnell a couple more times.

17   There were tasks that each person was supposed to do.

18       Mr. Varnell was supposed to get some tubs to put the ANFO

19   in.  He was also supposed to get a vehicle.  He said that he

20   could get a vehicle through some people he knew but that never

21   came to fruition.

22       He told the undercover that he had found some barrels to

23   use.  And Mr. Varnell also wanted to send a message when they

24   did this, partially because he wanted to make sure that some

25   other group, such as ISIS, didn't take claim for his acts.

1        So part of what he was supposed to do is write a message,

2   and Brent Elisens was going to figure out a way for this to be

3   broadcast on the internet or through the Emergency Broadcast

4   System, some way to get this message out.

5        The undercover meets with Mr. Varnell one more time.

6   They talk about finalizing this plan.  At no point did

7   Mr. Varnell seem dissuaded when they spoke with him.  In fact,

8   at least two times at that point he had been told:  If you

9   don't want to go through with this, that's fine.  This is your

10  deal.

11       Mark Williams tells him, I'm not even from this state.

12  This is on you.  But if you want to, I can help.

13       So then comes the day.  They decided on August 11th.  It

14  was a Friday.  He believed Mark Williams was driving in from

15  West Virginia.  He was utilizing the fact that Mark Williams

16  had a girlfriend here.  That was his cover story to have a

17  reason to come to Oklahoma.

18       But he had gotten materials from his friend in West

19  Virginia who worked at a quarry.  He was going to bring a

20  thousand pounds with him, det cord, blasting caps, everything

21  that was needed to do this.

22       He picked Mr. Varnell up a little after 6:00 p.m. that

23  night and he drove him to a storage building.  He asked

24  Mr. Varnell -- after they got out and they unloaded the

25  equipment, he would ask him, Do you know what this is?  And he

1    did.

2         He said, Do you know what to do with it?  He did.  Talked

3    about you stick the boosters down in the ANFO.  He said, You

4    just stick it right in there.  And this might be scary to

5    some, but it is that simple.

6         You will hear testimony of exactly how you build this

7    device and how they built it that night.  This device had been

8    designed by FBI in a fashion similar to what Mr. Varnell

9    described he wanted to do.

10        What Mr. Varnell did not know was, to make sure that

11   everything was safe, that these were substitute -- all these

12   items were substituted with inert items.  The det cord's not

13   going to blow, the blasting caps aren't going to blow, the

14   boosters aren't going to spark.  It's not going to happen.

15   But he doesn't know that as he's doing it.

16        And before they were picked up, he sent the message that

17   we began with.  It was a retaliation.  It was a call to arms.

18   That's the message that he wanted to send.

19        Through no part of this investigation are you going to

20   hear that there was an indication that Mr. Varnell was acting

21   strange, that he was not acting normal.  There are no reports

22   that he was off his medication.

23        In fact, to the contrary, in this trial there's not a

24   claim of insanity.  There's not a claim that he's incompetent.

25        What the evidence will show you is that the defendant had

1   a desire from as far back as October of 2016 at least to bomb

2   a building; that he had a message that he wanted to broadcast.

3   He wanted a revolution, he wanted a Civil War.

4        And the evidence will show you that he followed through

5   with this when he thought he had his team and that he had,

6   with these like-minded people, finally the ability to do it.

7        And the evidence will show you that his intent is clear

8   when he dials that phone three times to make sure that that

9   thousand-pound bomb had gone off on August 12th in downtown

10  Oklahoma City.

11

12                    (End of requested excerpt.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           CERTIFICATE OF OFFICIAL REPORTER

2  I, Christina L. Clark, Federal Official Realtime Court

3  Reporter, in and for the United States District Court for the

4  Western District of Oklahoma, do hereby certify that pursuant

5  to Section 753, Title 28, United States Code that the

6  foregoing is a true and correct transcript of the

7  stenographically reported proceedings held in the

8  above-entitled matter and that the transcript page format is

9  in conformance with the regulations of the Judicial Conference

10  of the United States.

11

12      Dated this 14th day of February, 2019.

13

14                              s/CHRISTINA L. CLARK_____
                                Christina L. Clark, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123