## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. CR-17-239-D |
| | ) | |
| JERRY DRAKE VARNELL, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL

The United States of America, by Mark R. Stoneman and Matt Dillon, Assistant United States Attorneys, moves this Court to deny defendant's Motion for Judgment of Acquittal (Doc. 247). In support of his motion, Jerry Drake Varnell re-urges arguments previously raised in his Motion to Dismiss the Superseding Indictment for Outrageous Government Conduct (Doc. 212) and in his oral motion for order of judgment of acquittal raised on February 21, 2019, after the government rested its case-in-chief during jury trial. This Court denied Mr. Varnell's motions on February 21, 2019. (Doc. 236). At the conclusion of oral arguments on Mr. Varnell's Rule 29 motion and his motion to dismiss for outrageous governmental conduct, this Court noted that Mr. Varnell was arguably already engaged in criminal conduct prior to the government's investigation. As but one example, this Court noted that Mr. Varnell's various comments to Brent Elisens on Facebook about bombing banks and attacking government officials arguably amounted to threats in violation of 18 U.S.C. § 844(e). In his current motion, Mr. Varnell makes only

one new argument.   He argues that his conduct prior to the investigation does not amount to true threats, and he argues therefore the government investigation amounts to outrageous governmental conduct because the government was not "interposing itself in an ongoing criminal enterprise" as discussed by the Tenth Circuit in *U.S. v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013).   However, the evidence and testimony showed Mr. Varnell's conduct prior to the investigation arguably did constitute true threats.   Moreover, Mr. Varnell's conduct prior to the investigation arguably violated a number of both state and federal laws and thus constituted an ongoing criminal enterprise.

When considering a motion for judgment of acquittal, the court "must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (internal quotation marks omitted) (quoting *United States v. White*, 673 F.2d 299, 301–02 (10th Cir.1982).   "We permit the [district] court to enter a judgment of acquittal only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id*. (internal quotation marks omitted).

The Tenth Circuit has declined to recognize the outrageous governmental conduct defense.  *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013) (declining to recognize the defense, but holding the defendants convicted of counterfeiting money and manufacturing methamphetamine would not have prevailed either way).   However, the Tenth Circuit has articulated the burden a defendant would be required to meet if the

2

defense were available. "[T]he relevant inquiry when assessing claims of outrageous government conduct is whether, considering the totality of the circumstances ... the government's conduct is so shocking, outrageous and intolerable that it offends the universal sense of justice." *United States v. Perrine*, 518 F.3d 1196, 1207 (10th Cir. 2008) (quoting *United States v. Garcia*, 411 F.3d 1173, 1181 (10th Cir.2005) (further quotation omitted)). "[A] defendant asserting the outrageous governmental conduct defense bears the burden of proving either '(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.'" *Dyke*, 718, F.3d at 1288 (citing *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (finding no outrageous governmental conduct where government "heavily involved in cocaine-smuggling plan" where defendants "had an extensive drug trafficking history"). "An outrageous conduct defense is of "narrow scope." *Perrine*, 518 F.3d at 1207–08 (quoting *United States v. Lacey*, 86 F.3d 956, 964 (10th Cir.1996)).

The Tenth Circuit did not articulate an analytical framework for the second option apart from the standard entrapment analysis. *Dyke*, 718, F.3d at 1288. "[A] successful entrapment defense exists when the government (1) induces the defendant to commit an offense that (2) the defendant was not predisposed to commit." *Id*. at 1291 (citing *United States v. Ford*, 550 F.3d 975, 982 (10th Cir. 2008)). "[I]f the government disproves either element then the entrapment defense fails." *Ford*, 550 F.3d at 982. "Simple evidence that a government agent solicited, requested, or approached a defendant to engage in criminal conduct, standing along, is insufficient to constitute inducement. Under the second element, predisposition exists if the defendant has an inclination to engage in the

illegal activity for which he has been charged, *i.e.*, that he is ready and willing to commit the crime." *Id.* (internal quotations and citations omitted).   "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Jacobson v. United States*, 503 U.S. 540, 548, 112 S. Ct. 1535, 1540, 118 L. Ed. 2d 174 (1992) (quoting *Sorrells v. United States,* 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932); *Sherman,* 356 U.S., at 372, 78 S.Ct., at 820; *United States v. Russell,* 411 U.S. 423, 435-436, 93 S.Ct. 1637, 1644-1645, 36 L.Ed.2d 366 (1973).   "Factual impossibility is generally not a defense to the crime of attempt, an intent-based transgression. What matters instead is the defendant's intent and the actions he took toward his objective."   *United States v. Becker*, 625 F.3d 1309, 1312 (10th Cir. 2010) (citation and internal quotations omitted).

The Tenth Circuit "suggest[ed] at least a few guiding principles" as to "what constitutes 'excessive government involvement[.]'" *Dyke*, 718, F.3d at 1288.   The Tenth Circuit first examines the government's conduct.   "We have said, however, that cause to worry exists only when the government 'engineer[s] and direct[s] the criminal enterprise from start to finish.'"   *Id.* (citing *Pedraza*, 27 F.3d at 1521).   "[T]he fact that the government induces a defendant who is already engaged in a criminal enterprise to commit a new 'crime' subject to some additional criminal sanctions is not by itself enough to warrant relief.   Neither is it enough that the government offers supplies and expertise necessary to facilitate the new crime."   *Id.*

The Tenth Circuit "also take[s] into consideration the past and current criminal activities of the defendant," saying more aggressive law enforcement techniques are permissible against those who already have a history of engaging in related crimes than those without."   Id. at 1288-1289 (comparing *Pedraza*, 27 F.3d at 1522, with *United States v. Sandia*, 188 F.3d 1215, 1219-20 (10th Cir. 1999) (finding no outrageous governmental conduct even though agents conducted sting operation on defendant with no evidence of prior criminal history)).   The inquiry into the defendant's past and current conduct "is appropriate because what qualifies as outrageous governmental conduct depends on an appreciation of the 'totality of the circumstances' and is reserved 'for only the most egregious circumstances,' triggered only when the circumstances are, when viewed in whole, 'shocking, outrageous, and clearly intolerable.'"   *Dyke*, 718, F.3d at 1289 (citing *United States v. Mosely*, 965 F.2d 906, 910 (10th Cir. 1992) (finding governmental conduct not so outrageous as to merit dismissal despite excessive zeal on part of investigators who sold cocaine to addict defendant at low price).   Nothing in these cases seem to define criminal enterprise or criminal conduct when discussing a defendant's desire, plan, or goal to commit a crime.   Nor do the cases hold that the government must prove that a defendant has in fact already committed a crime prior to initiating a sting operation, much less prove each essential element.

Prior to the government's investigation, Mr. Varnell had clearly expressed his desire to bomb a building, including banks, and was attempting to solicit or form a conspiracy to bomb buildings and injure government officials.   On October 22, 2016, prior to the government knowing anything about Mr. Varnell's plans, Brent Elisens told Mr. Varnell

that Elisens planned on "going survival" and living "off grid."   Mr. Varnell responded, "I'm out for blood.   When militias start getting formed[,] I'm going after government officials when I have a team."   That same day, Mr. Varnell followed up the message by saying, "I finally have a chance to do something about how things are, I plan to do as much as I can.   I've been reading about the best places to find stuff to make bombs."   Mr. Varnell then sent a message stating, "When I'm able I'm going to do some Tyler Durden shit (referring to blowing up buildings).   The government is going to [expletive] burn with those who stand with it."   On October 29, 2016, before the government investigation, Mr. Varnell told Elisens on Facebook, "I believe I just found a like[-]minded guy."   Elisens asked Mr. Varnell, "like-minded how? like survival or team or both[?]"   Mr. Varnell responded, "*Team*[.]" (emphasis added).   Mr. Elisens testified that "team" meant someone who would act offensively against the government with Mr. Varnell.   On November 8, 2016, Mr. Varnell told Elisens, "I'm [expletive] done after this anonymous [expletive].   I need a team. Idc [(I don't care)] what happens with this election, it's time to bomb some [expletive] banks[.]"   Elisens told Mr. Varnell, "dude no, right now it's time to just go, I'M TELLING YOU[.]"   Mr. Varnell replied, "I'm not running away, I'm taking action. I need a team."   On November 20, 2016, Mr. Varnell sent a message to Elisens that he intended to use a recipe similar to that used in the bomb detonated on April 19, 1995, in Oklahoma City, Oklahoma.   Elisens told Mr. Varnell to "make sure all civilians and innocents and children are not in the building."   Mr. Varnell responded, "Well no [expletive] (expressing that Mr. Varnell agreed with Elisens' previous statement).   In addition to arguably being threats under 18 U.S.C. § 844(e), these statements suggest Mr.

Varnell was engaging in the solicitation of others to commit crimes of violence in violation

of 18 U.S.C. § 373(a).[1]   These statements are also evidence of Mr. Varnell's attempts

under 21 Okla. Stat. § 44 to form a conspiracy under 21 Okla. Stat. § 421 to damage

property and injure persons by means of an explosive device in violation of 21 Okla. Stat.

§§ 1268.3 and 1767.1(A)(6).[2]

---

1      Solicitation is defined as, "Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or *threatened use of physical force against property or against the person of another* in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct…"   18 U.S.C. § 373 (emphasis added).

2      21 Okla. Stat. § 1761.1(A) also makes it a felony for any person to willfully or maliciously:

> (4) [m]anufacture…transport, or possess any explosive, the component parts of an explosive, an incendiary device, or simulated bomb with knowledge or intent that it or they will be used to unlawfully kill, injure or intimidate any person, or unlawfully damage any real personal property; or

> (8) [m]anufacture, sell, deliver, mail or send an explosive, incendiary device, or simulated bomb to another person; or

> (9) [w]hile committing or attempting to commit any felony, possess, display, or threaten to use any explosive, incendiary device, or simulated bomb.

21 Okla. Stat. § 44 criminalizes attempts to commit a crime:   A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

> (a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or,

> (b) when causing a particular result in an element of the crime, does anything with the purpose of causing or with the belief that it will cause such result, without further conduct on his part.

Mr. Varnell claims that the Court denied his motion on the basis that Mr. Varnell's prior communications "constituted a crime under 18 U.S.C. § 844(e)."   (Doc. 247 at 2). The Court actually said:

> "evidence of the defendant's statements in the fall of 2016 before the interception of the government's sting operation could certainly be characterized as illegal activity. For instance, 18 [U.S.C.] Section 844(e) prohibits using an instrument of interstate or foreign commerce to make a threat to destroy a building by means of fire or an explosive.   And certainly, by using the internet to communicate such a threat at the time to his Facebook friend, Mr. Elisens, at least it can be argued that the defendant was engaged in criminal activity."

See Transcript of Rule 29 Motion ("Tr."), pp. 21–22.   The Court clearly used the named violation as an example, not the sole basis of its ruling.   The Court concluded that it was "not convinced that the totality of the circumstances that the government's conduct is shocking, outrageous, and clearly intolerable."   *Id*. at 22–23.

Testimony from the FBI undercover employee (UCE) at trial showed that Mr. Varnell admitted to making and possessing homemade explosive devices in violation of 18 U.S.C. § 922(g) and 26 U.S.C. § 5861(f).[3]   Mr. Varnell also told FBI in his custodial interview that he had made homemade C-4 (composition 4 explosive).   Mr. Varnell had made previous statements on Facebook corroborating his knowledge of making destructive devices.   On September 18, 2016, prior to the government's investigation, Mr. Varnell stated on Facebook, "I like bombs. They're efficient. A simple mix of one cup gasoline and half a cup of powdered chlorine will incapacitate a large room." On September 18,

---

3      Mr. Varnell is a prohibited person due to his previous deferred sentence for domestic abuse by strangulation.   18 U.S.C. § 922(g); 21 Okla. Stat. § 644.

2016, Mr. Varnell also wrote on Facebook, "I minored in chemistry for a reason. Bombs are cheaper than bullets lol[(laughing out loud).]" On October 15, 2016, Mr. Varnell commented on a post saying, "Ya brake fluid[']s pretty nasty[.] [Y]ou can make bombs with it." On October 23, 2016, Mr. Varnell wrote on Facebook, "I've learned enough chemistry over the years, I can make a gas bomb out of anything. If I ever need to hit up Walmart when SHTF [[expletive] hits the fan)], I'm going to the pool section first. ;)[.]" Mr. Varnell's statements that he had made bombs are corroborated by his statements online regarding various recipes for making destructive devices.  Mr. Varnell also admitted to FBI that he had used the internet to learn how to make C-4 utilizing the Anarchist Cookbook and had researched ammonium nitrate.[4]  This history of criminal bomb making coupled with Mr. Varnell's attempts to recruit others to help him bomb buildings and attack government officials are evidence of an ongoing criminal enterprise.

---

[4]      "*The Anarchist Cookbook*, first published in 1971, is a book that contains instructions for the manufacture of explosives, rudimentary telecommunications phreaking devices, and related weapons, as well as instructions for home manufacturing of illicit drugs, including LSD…Its legality has been questioned in several jurisdictions. *The Anarchist Cookbook*, 13 March 2019, at 05:09 (UTC), https://en.wikipedia.org/wiki/The_Anarchist_Cookbook (internal citations omitted).

"The book was published in the early 1970s with this warning: 'Read this book, but keep in mind that the topics written about here are illegal and constitutes a threat. Also, more importantly, almost all the recipes are dangerous, especially to the individual who plays around with them without knowing what he is doing. *Use care, caution, and common sense.* This book is not for children or morons.'"  *Documentarian Says 'Anarchist Cookbook' Author Was Filled With Remorse*, April 3, 20174:53 PM ET, https://www.npr.org/2017/04/03/522474967/documentarian-says-anarchist-cookbook-author-was-filled-with-remorse.   "It has also been linked to the Columbine shooting and the Oklahoma City bombing, as well as other acts of violence."  *Id.*

Mr. Varnell bases much of his argument on the incorrect conclusion that his statements do not equate to true threats because he did not "intend the recipient of his speech to feel threatened" and did not have the means to carry out his threats.   (Doc. 247 at 5 & 7).   The evidence does not support this statement by Mr. Varnell as to his true intent and is in direct conflict with trial testimony.   "[T]he statement itself must be one that a reasonable person in the circumstances would understand as a declaration of intention, purpose, design, goal, or determination to inflict [bodily injury] on another." *United States v. Heineman*, 767 F.3d 970, 972 (10th Cir. 2014) (internal quotation marks omitted). "And it is not necessary to show that defendant intended to carry out the threat, although the threat must be a serious one, as distinguished from words as mere political argument, idle talk or jest."  *Id.* at 972–973. (internal quotation marks omitted).  *Elonis v. United States*, — U.S. —, 135 S.Ct. 2001, 192 L.Ed.2d 1 (2015), does not convert a general intent statute that mixes speech and conduct into a specific intent one. *See United States v. Lynch,* 2018 WL 706491 (10th Cir. Feb. 5, 2018) (dealing with intimidation of a flight attendant).   Defendant's apparent lack of means to carry out his threats to assassinate the President of the United States was relevant only insofar as it suggested that his threats were not genuine, and did not preclude prosecution for knowingly and willfully making any threat to take the life of, to kidnap, or to inflict bodily harm upon the President of the United States. *United States v. Dutcher*, 851 F.3d 757 (7th Cir. 2017).   Mr. Varnell's proposition also ignores the obvious fact that his intended target was a building, not an individual.

Mr. Varnell also claims that his statements could not be a threat because they were not directed at anyone other than "like-minded believers."   (Doc. 247 at 5).   "This court

has not required that true threats be made directly to the proposed victim." *United States v. Martin*, 163 F.3d 1212, 1216 (10th Cir. 1998) (holding that the fact that the defendant did not directly communicate a threat to a federal officer did not preclude a violation of making threats to such officers pursuant to 18 U.S.C. § 115) (citing *United States v. Crews,* 781 F.2d 826, 829, 832 (10th Cir. 1986) (holding that threats against the President made to a psychiatric nurse violated § 871); *United States v. Welch,* 745 F.2d 614, 616, 620 (10th Cir. 1984) (upholding § 871 conviction of defendant who communicated threats against the President to mental health employees and then to secret service agents)); *see also United States v. Raymer,* 876 F.2d 383, 391 (5th Cir. 1989) (stating that "actual receipt" of the threat is not an element of a § 115 offense); *United States v. Wheeler*, 776 F.3d 736, 744-45 (10th Cir. 2015) (holding exhortations to others to commit violence can amount to true threats).   In *Martin*, an individual told FBI that the defendant had made threats against a detective's life.   *Martin*, 163 F.3d at 1213.   The individual made several recordings for the FBI in which the defendant stated that he would "unload six bullets into [the detective's] brain."   *Id*.   Mr. Varnell made statements concerning blowing up banks and "I'm out for blood.   When militias start getting formed[,] going after government officials when I have a team."

Mr. Varnell was also incorrect in his assumption that Elisens was a "like-minded individual" to the extent that he was in support of Mr. Varnell's desire for violence as shown by trial testimony.   "We consistently have held that whether a defendant's statement is a true threat or mere political speech is a question for the jury."   *United States v. Viefhaus*, 168 F.3d 392, 397 (10th Cir. 1999).   The Court further held that even if a

threat was conditional (no bombing would happen if action was "taken against the government by all white warriors"), a defendant's statement could still constitute a threat supporting conviction for a violation of 18 U.S.C. § 844(e).

Mr. Varnell argues that the government manufactured the crimes for which he was convicted.   (Doc. 247 at 7).   However, the evidence and testimony at trial show otherwise.   Elisens testified that Varnell proposed bombing the Federal Reserve Board Building (Eccles building).   On cross, defense counsel pointed out that Elisens appeared to be the first to mention the Eccles building in Facebook chats with Mr. Varnell. However, Elisens pointed to records of a voice call the two men had on Facebook, the contents of which were not recorded.   When Elisens sent Mr. Varnell GPS coordinates to the Eccles building, Mr. Varnell appeared to know that he should not view the coordinates on a traceable device even though Elisens did not tell him the coordinates were for the Eccles building.   This corroborates Elisens testimony that the two men had previously discussed the Eccles building as a possible target.   No testimony or evidence controverted Elisens assertion that Mr. Varnell was the first to propose the target.   Additionally, Mr. Varnell was the first person to name BancFirst as a target as shown by messages and his admission to FBI.

Mr. Varnell complains that the government provided all the materials for the bomb. (Doc. 247 at 8-9).   However, the testimony at trial by the UCE and Special Agent Barry Black explained why they did not want Mr. Varnell to provide any major components for the bomb.   Agents did not want Mr. Varnell putting himself or others in actual danger by acquiring or using volatile materials, especially given his prior admissions that he had made

bombs in the past.   Furthermore, providing Mr. Varnell with the opportunity, means, or facilities to commit the crime does not amount to entrapment or outrageous governmental conduct.   *Jacobson v. United States*, 503 U.S. 540, 548 (1992).

Mr. Varnell finally argues that his alleged mental illness renders the government's investigation into him outrageous.   (Doc. 247 at 13).   However, the evidence and testimony showed that Mr. Varnell had previously intended to use his alleged mental illness as a defense if he were ever caught.   Prior to the government investigation, evidence shows Mr. Varnell told others on Facebook, "If they arrest my literally autistic, schizophrenic [expletive] for terrorism, the media and my lawyer would rape them in the [same expletive]."   After his arrest, someone accessed Mr. Varnell's Facebook account and deleted this post.   Mr. Varnell's mother testified that she accessed his account but denied deleting this post (although admitting to deleting another post).   Mr. Varnell's mother testified that Mr. Varnell's attorneys also accessed his account during the period the post was deleted.

Mr. Varnell called Dr. Shaun Roberson to testify in his case-in-chief.   Dr. Roberson had evaluated Mr. Varnell to determine whether his mental condition rendered him susceptible to entrapment.   Dr. Shaun Roberson relied in part on research from Dr. Frumkin.   Dr. Roberson admitted that Dr. Frumkin did not believe Mr. Varnell was schizophrenic.   On cross-examination, Dr. Roberson testified that Mr. Varnell's alleged schizophrenia was not a factor on how susceptible he was to suggestibility or compliance with what others asked him to do.   Dr. Roberson testified that when tested for suggestibility, Mr. Varnell's score did not show him to be unusually suggestible.   Dr.

Roberson testified that Mr. Varnell rated higher than average for compliance.   However, that compliance rating was based on a test that utilizes a self-reporting questionnaire, the purpose of which was obvious to most people answering the questions.[5]   In other words, Mr. Varnell knew that the purpose of the questionnaire was to determine how compliant he was, and he rated himself toward the top of the scale (18 out of 20).[6]   Normal subjects score 9.0 and alleged false confessors score 14.3.   Mr. Varnell's parents also rated him toward the top of the scale for compliance when answering the same questionnaire (19 of 20).   Dr. Roberson admitted on cross-examination that he had likely administered the questionnaire to Mr. Varnell's parents incorrectly.   Dr. Roberson characterized suggestibility and compliance as personality traits with no correlation to Mr. Varnell's alleged schizophrenia.   Dr. Roberson also admitted that his report incorrectly stated that Mr. Varnell's ability to hold and process information "was a clear weakness, scoring below 90% of the normative group" when Mr. Varnell actually scored average.   Assuming Mr. Varnell does suffer from schizophrenia, a reasonable jury could conclude that his mental illness was not relevant to whether or not Mr. Varnell was entrapped and does not render the government's actions in this case as outrageous conduct.

## Conclusion

For the reasons stated above, this Court should deny the defendant's Motion

---

[5]     One question asked if the defendant, in his youth, did what his parents told him to do.

[6]     On August 15, 2017, Mr. Varnell's parents released a statement to the media describing Mr. Varnell as "extremely susceptible to different types of ideology."

For Judgment of Acquittal.

Respectfully submitted,

ROBERT J. TROESTER
First Assistant United States Attorney

s/ Mark R. Stoneman
MARK R. STONEMAN
Assistant U.S. Attorney (OBA 22730)
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma    73102
(405) 553-8782 (Office)
(405) 553-8888 (Fax)
Mark.Stoneman@usdoj.gov

s/ Matt Dillon
MATT DILLON
Assistant U.S. Attorney (OBA 19326)
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma    73102
(405) 553-8782 (Office)
(405) 553-8888 (Fax)
matthew.dillon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Marna Franklin and Vicki Behenna, attorneys for Mr. Varnell

s/ Matt Dillon
Assistant U.S. Attorney