IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,          )
                                   )
      Plaintiff,                   )
                                   )
      -vs-                         )   Case No. CR-17-239-D
                                   )
JERRY DRAKE VARNELL,               )
                                   )
      Defendant.                   )


* * * * * * *

TRANSCRIPT OF PROCEEDINGS

HAD ON FEBRUARY 21, 2019,

BEFORE THE HONORABLE TIMOTHY D. DeGIUSTI

U.S. DISTRICT JUDGE, PRESIDING

AND A JURY

* * * * * * *


RULE 29 MOTION


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

        Mr. Matt Dillon
        Mr. Mark R. Stoneman
        Assistant United States Attorneys
        U.S. Attorney's Office
        210 West Park Avenue
        Suite 400
        Oklahoma City, Oklahoma 73102


ON BEHALF OF THE DEFENDANT:

        Ms. Marna S. Franklin
        Franklin Law Firm
        620 N. Robinson Ave.
        Suite 203
        Oklahoma City, Oklahoma 73102

        Ms. Vicki Z. Behenna
        MULINIX GOERKE & MEYER
        210 Park Avenue
        3030 Oklahoma Tower
        Oklahoma City, Oklahoma 73102

        Ms. Laura K. Deskin
        Attorney at Law
        400 N. Walker
        Suite 230
        Oklahoma City, Oklahoma 73102

# P R O C E E D I N G S

(The following is an excerpt of the proceedings had on February 21, 2019, containing the Rule 29 arguments and ruling of the Court:)

THE COURT:  All right.

Ms. Behenna.

MS. BEHENNA:  Yes, your Honor.  Pursuant to Rule 29, the defense would move for a directed verdict.  With regard to the grounds, your Honor, I think that under the case law, the Court can find entrapment as a matter of law when the elements have been established of entrapment.

I think the evidence in this case, your Honor, is clear. And I want to start first with the -- I mean, obviously, we know that entrapment has two prongs.  It has an inducement prong and it has a prong to determine whether or not the defendant had a predisposition to commit the act.

And if I begin with the predisposition first, your Honor, I think the evidence in this case is clear that, other than the defendant's chatter in October and November of 2016, the defendant engaged in no conduct on his own to commit this crime.

I think that predisposition under *Jacobson*, that Supreme Court case, says that the Court or the jury, in determining predisposition, looks at the defendant's ready and willingness at the time the agent is first introduced into the activity.

And if that's the case, your Honor, if we look at the evidence that's been presented in this case, there is no evidence that the defendant had the ready, willingness, or even the capability of building any kind of bomb, needless to say an ANFO bomb.

I think the evidence in this case was clear that the defendant would not have been permitted to purchase any kind of explosive without having a license -- a permit or a license.

I think the evidence in this case is clear that even if the defendant had the desire to try to create explosives -- i.e., det cord, dynamite, and so forth -- it would have been extremely difficult for him to do that without having distilleries or other kinds of equipment to be able to create a homemade explosive.

The search agents said that they found no evidence of any of that type of material out on his property.  The point of that, of course, is important, your Honor, in trying to determine what his predisposition was.

Prior to April 24th, when the undercover first went out -- or even the first part of April after the undercover -- I'm sorry, not the undercover -- but the source, the informant, was engaged and encouraged by the government to be involved in this conduct and to make contact with Mr. Varnell, Mr. Varnell had made no attempt to create a team, had made no

attempt to try to get explosives by theft or creation on his own device.  He had made no other attempts at all that in any way suggested that he was predisposed to build a bomb.

As a matter of fact, on April 24th, when Mr. Elisens makes his first face-to-face visit with Mr. Varnell, Mr. Varnell tells him, "I've calmed down since then."

So if we look at his -- Mr. Varnell's predisposition at the time the government's agents were introduced into this, Mr. Varnell was engaged in absolutely no criminal activity.  None.  None.  Which is -- well, which leads now to the inducement part.

The government, through their agent, through the undercover, and through the case agent, induced every action Mr. Varnell took in this case.  Every single action.  They encouraged him to pick a date.  Time and time again, pick a date.  We need a date.

Pick a location.  He vacillated all over the place. Amarillo, Texas.  First started out in Washington D.C.  And, at the suggestion of the undercover and Mr. Elisens, landed on BancFirst.

At the request of the FBI and the encouragement, Mr. Varnell was asked to obtain a number of things:  A box truck.  He never did.  We need barrels.  Mr. Varnell never did.  We need you to get tape and gloves.  It was only when the FBI gave him the money and drove him to Walmart was he

even able to accomplish that.

The explosives that were used to build this inert bomb were all provided by the FBI.  The place to build the bomb was provided by the FBI.  Each of those things presents evidence of the government's inducement, i.e., and the defendant's entrapment to commit this crime.

Even before that, we know the evidence in this case, your Honor, was that Mr. Elisens was constantly encouraging and re-contacting.  It wasn't an information-gathering phase at all.  They were actively -- "they," the FBI and the undercover and their source -- were actively involved in inducing Mr. Varnell to take some action.

I think the evidence, your Honor, presents entrapment as a matter of law.  And under -- I believe it's -- well, I lost the case, your Honor.  It's either *Young* or it's *Wynn* -- I think it is *United States vs. Young*, which is a Tenth Circuit case -- the Court can find entrapment as a matter of law.

I understand if you don't that it becomes a jury question.  I get that.  But I think that when the government's conduct is so egregious, the Court can find entrapment as a matter of law.

The second point that we would make, your Honor, is to follow up on the brief that's previously been filed, and that is asking for a dismissal of this proceeding as a result of outrageous government conduct.  And I think it's all very well

briefed for the Court, and I'm not going to go into a lot of cases.  But I think it is significant.

Under *United States vs. Dyke*, the Tenth Circuit said: "Excessive government involvement in the creation of a crime and significant government conduct in coercing the inducement of the crime can amount to outrageous government conduct." And, your Honor, we absolutely have this in this case.

The fact that investigators and law enforcement introduced themselves into a situation where criminal activity is ongoing is totally appropriate for information gathering and to see what people who are involved in criminal activity are engaged in.  But the government cannot create a crime for the purpose of prosecuting that defendant.  And that's exactly what happened here.

The evidence that I've talked about before, your Honor, with regard to the various contact and re-contact of Mr. Varnell, the providing in every way every piece of evidence, every vehicle, every explosive device, the government provided all of that to Mr. Varnell.

If we look to Mr. Varnell's conduct and what the evidence has been in this case -- and that is Mr. Varnell's conduct from October/November of 2016 to the time the source is first introduced -- there is no action on behalf of Mr. Varnell to commit any crime.  It's just chatter.

And it might be alarming chatter, your Honor, but the FBI

has numerous resources.  They have spent thousands, probably

tens, maybe hundreds of thousands of dollars on this

investigation.

They had the ability to monitor.  They do it in every

case, monitor individuals that are out there in chat rooms to

see their intent.  They don't make the intent for the person.

They don't make the avenue for the person to commit the crime,

which is what they did in this case.

On top of all of that, I think the evidence is

uncontroverted that the government's agent routinely provided

marijuana for Mr. Varnell to smoke before he engaged him in

any conversation about any plan or any activity Mr. Varnell

intended to make -- or intended to take.

I understand it's difficult to control a source.  But

when you have a tape recording of the source bringing an

illegal substance to elicit incriminating statements from an

individual, I find that outrageous.  Maybe it happens once,

but it doesn't happen a second and third time.

The UCE in this case, your Honor, was absolutely

definitive he would never smoke marijuana with somebody who

was under investigation.

Your Honor, Mr. Varnell is very susceptible and highly

suggestible to taking action.  I don't know if it's a result

of his mental illness.  I don't know if it's the result of his

youth.  But the government cannot use that suseptibility to

create a crime and then prosecute him when he follows their
inducement.

    May I have just a moment, your Honor?

        THE COURT:  Certainly.

    (Brief pause.)

        MS. BEHENNA:  That's all I have.

        THE COURT:  Thank you.

    Government, response?

        MR. DILLON:  Your Honor, if I may, I was prepared to
argue the first motion made here this afternoon.  Mr. Stoneman
was going to take up the previously filed motion that was
reserved.

        THE COURT:  That's fine.

        MR. DILLON:  When we look at predisposition, the
defense contends it was nothing more than chatter.  The
government respectfully disagrees with that.  I think that the
messages are clear.  I think it goes into another one of their
points where they say he had taken no steps.  In fact, the
defendant says, "I think I've found a like-minded person."

    And in that previous message from the fall, Mr. Elisens
had asked him, you know, "like survival or team?"

    And he said, "Team."  And he explained what that meant.
It was for a proactive offensive -- I can't remember the word
he exactly used, but it was to go do something.

    And as far as the calming down statement, the

recording -- or the records will speak for itself, but it's our belief that he doesn't say "I will calm down." He says, "It has calmed down." I think that's obviously in reference to the environment. He is referencing the post election.

But prior to the election, one of Mr. Varnell's very fears that he expresses to Mr. Elisens is that somebody would lose interest if there was inactivity. It's his fear that things will calm down and there would be inactivity, not that I'm over it.

As soon as he is engaged about the potential that there is somebody that could provide things for this, Mr. Varnell immediately responds that, you know, "Okay, you know, let's see what we can do," I think is how he stated it in the interview, or "That changes everything."

But there is also the messages again in, I believe, Government's 203 that reflect his response in the affirmative, not any unwillingness to do anything.

And this idea that predisposition is judged at the point that law enforcement makes contact, I agree once government makes contact, especially with a source, that person is an agent of the government from whether it was April 24th, whether it was March 17th, or even back in January when we first made contact. Government doesn't disagree that his actions, once he's working at that behest, are impugned on the government.

But the predisposition isn't limited -- and this idea of readiness and willingness doesn't mean that he has everything gathered up and he's ready to go.  The law is very clear that when it comes to entrapment, there is nothing wrong with agents of the government offering the opportunity, the means, sometimes it will be referred to as the facilities to effectuate a crime as long as the person was predisposed to it.

Entrapment is only meant to protect those who are truly innocent in their mind and had no desire to do this.  That's not what we have here and that's not what the evidence has shown.

When we -- the defense said that BancFirst was picked by the source and by the undercover.  Again, the messages are clear.  There is a question:  "Why BancFirst?"  It's picked by the defendant.

Materials, the barrels are obviously on the property, whether it was a trash can or other things exhibited, but he also stated he had a fear of using those because his -- they would -- it would be readily apparent that they were missing.

As far as the ammonium nitrate, he even says in the custodial interview that, Yes, we've got it, we put it on our fields.  You know, it wasn't found on August 12th.  I don't know if they're out.  I don't know what it is.  But, again, he says there's access.  So to say that there is no access on his

part, I believe, is a misstatement.

I understand that they want to argue about whether he would be willing to use those materials.  I think that's a different issue and probably just a jury question.

Ms. Behenna had also mentioned that the defendant was susceptible and suggestible.  I know that she kind of carved off back into the motion that was filed previously, but I think it goes inherently to both, is at this point, whether by brief, whether by testimony that's at trial, I don't think there is truly evidence that's been submitted to say that he is overly susceptible or suggestible to entrapment.

In fact, the only thing about any mental health that has been introduced at the trial stage has been that the FBI was aware of a previous allegation plus what he said in any of the recordings.

We don't believe -- we believe that the government has submitted sufficient evidence to allow the trial to continue and not have a directed verdict in the matter.

THE COURT:  All right.  Thank you, Counsel.

Mr. Stoneman.

MR. STONEMAN:  Thank you, your Honor.

Ms. Behenna has argued today that the outrageous conduct meriting dismissal in this case would include Mr. Elisens' smoking of marijuana with the defendant.  I would just, as a preliminary matter, point out that that was not raised in her

motion to dismiss for outrageous governmental conduct.
However, obviously, the Court can still consider that.

Obviously, the government does not -- did not and does
not condone Mr. Elisens' personal marijuana use or his
marijuana use with the defendant.  I would note, however, that
the evidence presented to the jury during the course of this
trial seems to suggest, to the extent that Mr. Varnell got
high with Mr. Elisens, he frankly seemed less inclined to want
to discuss the conduct for which he was charged today.  So, if
anything, that seemed to mitigate any suseptibility.  And, as
Mr. Elisens testified, people generally don't get high on
marijuana and want to bomb things.

It has not -- we have not -- it was not appropriate for
us to discuss this in front of the jury.  However, to the
extent it was raised in the motion, I would like to discuss
briefly some of the more serious allegations in Mr. Varnell's
motion to dismiss, that being that the government took
advantage of his alleged mental illness.

And just would like to supplement the record and, as an
officer of the court, advise your Honor that our office,
during the early stages of this investigation, was advised by
persons close to the 2013 investigation that Mr. Varnell had
attempted to raise mental health, and particularly
schizophrenia, as a defense to the charges in his 2013 case.

Ms. Franklin referenced what she -- I think she called a

severe schizophrenic episode happening in 2013.  We have not heard any evidence of that yet in this trial.  But the government was informed that Mr. Varnell was found to have been malingering in 2013 by a psychologist that he, himself, hired.  And I don't know how early it was in the investigation, but it was during the investigation.

MS. BEHENNA:  Your Honor, can I stop right there?  That's not even in evidence.  I don't even know why we're talking about that.  The Court is to consider the evidence that's presented, so I object to this entire argument.

THE COURT:  Well, certainly with respect to the Rule 29 motion --

MS. BEHENNA:  Yes, your Honor.

THE COURT:  -- the Court is to consider the evidence that's been presented.  I think counsel is now going over to the outrageous conduct motion and addressing things that were either raised directly or inferred in the motion and brief that you filed.

That's my understanding of his argument.

MR. STONEMAN:  That is correct, your Honor.  And I'm not asking you to consider what I'm talking about now for purposes of trial or purposes of a demurrer in this case.

But we were provided eventually a copy of that psychological evaluation where the psychologist, that Mr. Varnell had hired back in 2013, found and, based on the

aggregate of his evaluations, believed that Mr. Varnell is very likely malingering, which is common in individuals who are accused of crimes.

It is believed that Mr. Varnell meets the diagnostic criteria for malingering and polysubstance abuse.  And the public hearing of his change of plea, which occurred March 31, 2014, that previous --

MS. BEHENNA:  Your Honor, again, this is so outside the record.  And I've looked at my motion briefly.  I haven't read it cover to cover while he has been talking, but I don't remember any argument about that.

MR. STONEMAN:  Your Honor --

THE COURT:  Counsel.

MR. STONEMAN:  I'm sorry.  The argument in the brief was that the government had some awareness that Mr. Varnell was a paranoid schizophrenic and that word -- phrase "paranoid schizophrenic" was repeated throughout his motion.  And it was alleged that we knew or had some reason to know and that we took advantage of that.

And so to the extent that they believe that what we knew about his alleged schizophrenia is relevant to how outrageous or not outrageous our conduct is, what we knew about his alleged schizophrenia is relevant.

And I would advise the Court that at the plea hearing the District Court for the state -- or for the County of Custer

here in Oklahoma inquired of counsel:  Okay -- this is, quote:
Okay.  Now, tell me -- refresh my memory.  I've got this
evaluation.  And what is the function of that evaluation?
Speaking of the psychological evaluation.

Mr. Seth Adams, who was Mr. Varnell's attorney, said, and
I quote:  We thought we might have a not guilty by reason of
insanity plea, Judge.  But because of the evaluation, we no
longer do.  It's as simple as that.

And I offer that again, Judge, not for purposes of this
trial but for purposes of the allegation that Mr. Varnell has
raised, that the government should have known that he was,
quote, a paranoid schizophrenic, when, in fact, what we knew
was that he tried to avoid prosecution on a very serious
violent felony crime in 2013, had hired his own psychologist,
who said he was malingering.

THE COURT:  All right.  Ms. Behenna, page five of
your motion and brief, in the middle of the page, talking
about the facts of the underlying case, you say, "Several
months later, the government, in pursuit of a prosecution,
inserted itself into non-criminal conversations with a
paranoid schizophrenic."

So you have at least raised that issue in your motion.

MS. BEHENNA:  Your Honor, I understand that.  But I
am just saying the substance of this entire argument is so far
outside the evidence.  What we do know and what's been

presented in this case is that in March of 2017, the FBI had

some evidence that Mr. Varnell was schizophrenic, allegedly,

or might possibly be schizophrenic.

THE COURT:  And he is commenting now on the nature

of that evidence and what came out of that underlying -- I

guess it was a Custer County case; is that right?

MR. STONEMAN:  Yes, your Honor.  Mr. Varnell --

THE COURT:  You brought it up in your motion so I am

going to listen to him.

MS. BEHENNA:  All right.

THE COURT:  I mean, I might not rely on anything he

is saying right now, but I'm going to let him say it.

Go ahead.

MR. STONEMAN:  And, really, that's the extent of

what I have to say, your Honor.  As an officer of the court,

that was our understanding of the nature of his alleged mental

illness is that he had previously attempted to avoid

prosecution and failed.

And we submit that that's relevant for purposes of the

argument that they have made, which I would submit is the most

serious allegation, that we took advantage -- knowingly took

advantage of a paranoid schizophrenic, which is just not true.

As to the other allegations in Mr. Varnell's motion

regarding the supplying of the materials and the knowledge to

build this device, the government stands on our previous

pleading that those are what then Judge Gorsuch described as
pre-prosaic stuff for sting operations.

And we submit that, under the totality of the
circumstances, this defendant had made statements that he
wanted to blow up banks.  He made statements that he was
looking for a team.

He made statements -- prior to the government knowing who
he was, he made statements that he had found another
like-minded person.  And we still don't know who that person
is.  We don't know what -- we don't know how he contacted that
person.

In Mr. Varnell's motion, he describes those words as,
quote, mere fantasy.  And, your Honor, there are certain
crimes where maybe it is appropriate to do what Mr. Varnell
suggested, that we monitor, that we wait, and wait and see
what happens.

And this is not -- this is not a person who is claiming
that he's going to cheat on his taxes.  This is a person who
has said, I want to blow up banks.  The time is now.  Where is
my team?

And we submit that the government was under -- should not
be under any obligation to just assume that those are --
that's just mere fantasy.

And, based on that and our brief, we submit that this
Court should deny Mr. Varnell's motion to dismiss.

THE COURT:  All right.  Thank you, Counsel.

Well, first, with respect to the Rule 29 motion, in considering a motion for judgment of acquittal, the Court views the evidence in the light most favorable to the government.

Judgment of acquittal is proper only if the evidence and inferences therefrom are insufficient to permit a rational trier of fact to find the essential elements of the crimes -- the crime or crimes beyond a reasonable doubt.

In determining such a motion, the Court does not assess the credibility of witnesses.

Under this standard, the motion is denied.

The Court is of the view that sufficient evidence has been presented regarding the defendant's stated desire to use explosives against property and persons, specifically banks; the defendant's actions, in concert with others to act on that desire; the defendant's participation in building what he believed to be an explosive device, as well as evidence regarding his previous experience in making homemade explosives; and the defendant's actions to attempt to detonate what he believed to be an operative explosive device.

And all this, applying the standard that I just announced, could be viewed to be consistent with a repeated motive of the defendant of wanting to send a message that would wake up the people of the country and possibly lead to

some type of antigovernment uprising.

So, for these reasons, including the reasons cited by counsel, the Court denies the Rule 29 motion.

Having said that, the Court believes that, as it stands now, the defendant is entitled to an entrapment defense instruction.  And, as it stands now, the Court intends to give such an instruction at the appropriate time.

Turning to the motion that the Court reserved ruling on until it could hear the government's evidence in its case-in-chief -- and that's the motion to dismiss because of outrageous government conduct -- the Court has reviewed all the papers that have been filed, of course, as mentioned, and I've also heard the evidence so far.

The defense of outrageous government conduct -- and I use that category of "defense" broadly because counsel recognize in the briefing that this is an argument that perhaps has not been fully embraced by the Tenth Circuit, but I think the circuit has made clear that under the right circumstances it's available.  Apparently, the circuit hasn't been presented with those circumstances yet.

But I have particularly noted the cases of *United States vs. Dyke*, 718 F.3d 1282, Tenth Circuit 2013, and *United States vs. Pedraza* 27 F.3d 1515, Tenth Circuit 1994, for guidance.  Primarily, I looked to *Dyke*.  In that case, the circuit says that, although there is no precise definition or test for this

defense, the defendant must show either excessive government involvement in creation of the crime or significant government coercion to induce the crime.

The circuit in Dyke goes on to explain that the first stop in this determination is to examine the government's conduct.  The Court says that cause to worry exists only when the government engineers and directs the criminal enterprise from start to finish.

It says, quote:  By contrast, we have indicated that the government is free to infiltrate an ongoing criminal enterprise and to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity.

It goes on to say, quote:  Moreover, we have said the government can suggest the illegal activity, can provide supplies and expertise for the illegal activity, and can act as both supplier and buyer in sales of illegal goods.

The Court notes that the evidence of the defendant's statements in the fall of 2016 before the inception of the government's sting operation could certainly be characterized as illegal activity.

For instance, 18 United States Code Section 844(e) prohibits using an instrument of interstate or foreign commerce to make a threat to destroy a building by means of fire or an explosive.

And, certainly, by using the internet to communicate such a threat at that time to his Facebook friend, Mr. Elisens, at least it can be argued that the defendant was engaged in criminal activity.

Thus, the government using means to induce the defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity seems to fall within the parameters of what was discussed in the *Dyke* case.

The Court is also mindful that the Court in *Dyke* said that neither had it examined only the defendant's prior conduct before the government's intervention.  It says, quote: Our cases have often looked as well to how eagerly and actively the defendant himself participated in the current crime charged.

Finally, the Court in *Dyke* notes that the circuit's existing cases, quote:  Suggest that looking to the defendant's predisposition, his past and current conduct, as well as the government's behavior, is appropriate because what qualifies as outrageous government conduct depends on an appreciation of the totality of the circumstances and is reserved for only the most egregious circumstances triggered only when the circumstances are, when viewed in whole, shocking, outrageous, and clearly intolerable, end quote.

So applying these concepts and this guidance from what the Court believes to be the most recent case from the Tenth

Circuit explaining the outrageous government conduct defense,
the Court is not convinced -- excuse me, bear with me -- the
Court is not convinced that the totality of the circumstances
here lead to a conclusion that the government's conduct is
shocking, outrageous, and clearly intolerable.

Therefore, the motion to dismiss for outrageous
government conduct is denied.


(End of requested excerpt.)


CERTIFICATE OF OFFICIAL REPORTER

I, Christina L. Clark, Federal Official Realtime Court
Reporter, in and for the United States District Court for the
Western District of Oklahoma, do hereby certify that pursuant
to Section 753, Title 28, United States Code that the
foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.


Dated this 15th day of March, 2019.


s/CHRISTINA L. CLARK_____
Christina L. Clark, RPR, CRR