IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,      )
                               )
    Plaintiff,                 )
                               )
    -vs-                       )   Case No. CR-17-239-D
                               )
JERRY DRAKE VARNELL,           )
                               )
    Defendant.                 )



* * * * * * *

TRANSCRIPT OF EXCERPT

OF PROCEEDINGS

HAD ON FEBRUARY 20, 2019

BEFORE THE HONORABLE TIMOTHY D. DeGIUSTI

U.S. DISTRICT JUDGE, PRESIDING

AND A JURY

* * * * * * *



TESTIMONY OF BARRY BLACK



Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

     Mr. Matt Dillon
     Mr. Mark R. Stoneman
     Assistant United States Attorneys
     U.S. Attorney's Office
     210 West Park Avenue
     Suite 400
     Oklahoma City, Oklahoma 73102

ON BEHALF OF THE DEFENDANT:

     Ms. Marna S. Franklin
     Franklin Law Firm
     620 N. Robinson Ave.
     Suite 203
     Oklahoma City, Oklahoma 73102

     Ms. Vicki Z. Behenna
     MULINIX GOERKE & MEYER
     210 Park Avenue
     3030 Oklahoma Tower
     Oklahoma City, Oklahoma 73102

     Ms. Laura K. Deskin
     Attorney at Law
     400 North Walker
     Suite 230
     Oklahoma City, Oklahoma 73102

# I N D E X

**PAGE**

EVIDENCE ON BEHALF OF THE GOVERNMENT:

BARRY BLACK
    Direct Examination by Mr. Stoneman . . . . .  04
    Cross-Examination by Ms. Behenna . . . . . . .39
    Redirect Examination by Mr. Stoneman . . . . .60
    Recross-Examination by Ms. Behenna . . . . . .67

CERTIFICATE OF REPORTER . . . . . . . . . . . . .70

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov – ph(405)609-5123

1           **P R O C E E D I N G S**

2           (The following is an excerpt of the proceedings had on

3    February 20, 2019, containing the testimony of Barry Black:)

4              THE COURT:  Good morning, ladies and gentlemen of

5    the jury.  Welcome back.

6         Government, are you ready to call your next witness?

7              MR. STONEMAN:  We are, your Honor.

8              THE COURT:  Please proceed.

9              MR. STONEMAN:  Government calls Barry Black.

10             THE COURT:  Sir, please come forward, stand in front

11   of the witness chair and be sworn.

12         (The witness was duly sworn.)

13             THE CLERK:  Please be seated.

14                         **BARRY BLACK,**

15   called as a witness herein, having been first duly sworn,

16   was examined and testified as follows:

17                      **DIRECT EXAMINATION**

18   BY MR. STONEMAN

19   Q    Good morning.  Please introduce yourself to the jury.

20   A    Good morning.  My name is Barry Black.

21   Q    And what do you do for a living?

22   A    I'm a special agent with the FBI.

23   Q    And what do your current duties involve?

24   A    I'm a bomb technician assigned to the Joint Terrorism

25   Task Force.

1  Q    Okay.  Did you have to have any specialized training to

2  become a bomb technician?

3  A    Yes.

4  Q    Can you describe for the jury some of the details of your

5  training?

6  A    Became a bomb technician in 1994 at the FBI's Hazardous

7  Devices School.  It's the only school in the nation that

8  certifies nonmilitary bomb technicians.  I've remained

9  certified since 1994.

10      Continued my training as a Weapons of Mass Destruction

11  Emergency Responder/Hazardous Materials Technician.  Training

12  at the Army's Aberdeen Proving Ground, the Navy's Advanced

13  Access and Disablement Center at Indian Head, the Armed Forces

14  Experimental Training Facility at Harvey Point Defense

15  Training Facility, the British counter IED school outside

16  London at the Felix Centre.

17      I am a certified bomb technician and master bomb

18  technician, master police instructor, adjunct faculty member

19  at the FBI Academy, where I teach a variety of counter IED

20  schools, to include large vehicle bomb post blast schools,

21  where we construct and detonate large vehicle-borne IEDs.

22  Witness their effects and teach post blast evidence

23  collection.

24      I've been deployed to 23 countries and six continents.

25  I've been a subject matter expert for the state department

1    drafting counter IED plans for foreign nations.  I've been a

2    lecturer at international counter IED symposium in the former

3    Soviet Union, the FBI academy, FBI headquarters, New Scotland

4    Yard, various universities, military and police academies

5    around the world.

6        I'm currently writing a research paper on alternate fuels

7    used in improvised explosives and was awarded the U.S. patent

8    for a counter IED tool as a co-inventor, which we gave to the

9    government and is being used throughout the country now.

10   Q    Very good.

11       Can you tell us, briefly, what was your initial role in

12   this investigation?

13   A    Part of my job is to provide advice and input as agents

14   gather information during the course of their investigations.

15   So in early 2017, a couple of the task force officers came to

16   me and asked if it was feasible and viable for an individual

17   to construct a large vehicle-borne IED -- a Timothy

18   McVeigh-type device, so a thousand pounds of ANFO -- using a

19   cellular phone as part of the firing system.

20   Q    And what did you advise the case agents at that time?

21   A    That is feasible and viable and relatively easy to do.

22   Q    Okay.  And as this investigation progressed, tell us a

23   little bit more about what your role became.

24   A    I was engaged in other matters, so several weeks went by,

25   several months went by.  The case agents came back to me with

1    more information that was a little troubling to me.

2    Q    And what was that information?

3    A    The subject of the investigation had a background in

4    electronics, was capable of assisting in the manufacturer of

5    that cellular phone firing device, had mentioned various

6    chemical-type synthesis exercises, had been experimenting with

7    homemade explosives, was knowledgeable about the nitrogen

8    content of oxidizers.

9        Those are the types of things that, if you're wanting to

10   build a device like that, you would need to know about.

11   Q    Can you tell us, as the investigation further progressed,

12   what did your role become?

13   A    Having a device of that size in the public domain

14   incorporating any kind of homemade explosives is a hazard both

15   to the public as well as to us as, you know, render-safe bomb

16   squad.  So we tried to shift away from any kind of improvised

17   component to commercial inert components.

18   Q    In other words, did you advise the case agents to allow

19   the defendant to provide any of the explosive materials

20   himself or something else?

21   A    No.  As I said, losing control of this kind of situation

22   can be hazardous, so I felt it was important that we know that

23   the components of any device that would be built would be

24   completely safe and inert.

25        MR. STONEMAN:  Could you pull up Government's

1    Exhibit No. 5, which has been previously admitted.

2    Q    (By Mr. Stoneman) Agent Black, we've pulled up

3    Government's Exhibit No. 5, which has been previously

4    admitted.

5         Do you recognize what's depicted in that photograph?

6    A    Yes.

7    Q    Can you tell us, how is it that you recognize that?

8    A    Those are the materials that I acquired and supplied for

9    this case.

10   Q    Okay.  So you acquired these and supplied them to the

11   case agents; is that correct?

12   A    Yes.

13   Q    Can you go ahead in your -- the government's exhibit

14   book, which should be in front of you, can you take a look at

15   Government's Exhibits 5 through 16, which have all been

16   previously admitted, and tell me if you recognize those?

17   A    Five through 16?

18   Q    Yes, sir.

19   A    (Witness complied.)

20        Yes.

21   Q    Okay.  And are those various items depicted in

22   Government's Exhibit No. 5?

23   A    Yes.

24   Q    Okay.  I would like to walk through those individually

25   with you, just have you describe for the jury what they are,

1    what their function was, how a person might acquire them

2    before we move on to another topic.

3             MR. STONEMAN:  So if you could pull up Government's

4    Exhibit No. 15.  We're going to work our way back.

5    Q    (By Mr. Stoneman) Tell us what we're looking at here.

6    A    That is the firing system, which is commonly known as a

7    Time and Power Unit, abbreviated as a TPU.

8    Q    And what's the purpose of a TPU in this context?

9    A    The Time and Power Unit serves, basically, as the brains

10   of a device like this that can be configured in a number of

11   different ways.  This one included a cellular phone, which was

12   described initially as what the subject of the investigation

13   wanted to use.

14   Q    And you describe it as the brains.  What sort of

15   electrical function does it really need to do?

16   A    So a device like this can be initiated electronically or

17   it can be initiated with something like a burning time fuse.

18   In this case, this provides an electrical signal to electric

19   blasting caps which start what is called the explosive train.

20   Q    And you say an "electrical signal."  Does that have to be

21   a certain data signal or just a flow of electricity?

22   A    No.  So in this case the phone is just a switch.  It's an

23   electrical switch.  So the phone receives a signal from any

24   other cell phone.

25            In this case, that electrical current that would usually

1  flow to the speaker or the vibratory motor just serves as a

2  switch to provide electrical power through the circuit into

3  the detonator.

4  Q    So to be clear, this is -- well, you described it as the

5  brains, but this device does not require a particular data

6  signal, just an electrical signal --

7  A    Correct.

8  Q    -- to power; is that correct?

9  A    Yes.

10  Q    Can you tell us what we're -- what this part is right

11  here (indicated)?

12  A    So that is a stereo jack plug, like used to be in the old

13  stereos.  That serves as another type of switch.  One of the

14  inherent problems with using a cellular phone as part of a

15  firing circuit is you may get a robocall or something like

16  that, that could accidentally detonate the device before you

17  are wanting it to detonate.

18       So that's simply another switch called the safe arming

19  switch.  That jack plug would have to be inserted into the

20  circuit so that the next time the phone was called the device

21  would detonate.

22            MR. STONEMAN:  Can you move back to Government's

23  Exhibit No. 14?

24  Q    (By Mr. Stoneman) So this -- what did you call it, a jack

25  plug switch?

*DIRECT EXAMINATION OF BARRY BLACK*

1   A     It's a stereo jack plug, yes.  You can see it there.

2   Q     Is this what we're talking about right here (indicated)?

3   A     Yes.

4   Q     Okay.  And, again, does that provide any sort of data

5   signal to the device or merely close the circuit?

6   A     No.  It simply closes the circuit that allows the

7   electrical energy to flow from the phone through the rest of

8   the circuit.

9   Q     And can you tell us, how complex is this Time Power Unit?

10  A     It's not complex.  The instructions were using a cell

11  phone in an IED or on the internet, for example.

12  Q     Okay.  And really inside that box is just an electrical

13  circuit with a battery?

14  A     Yes.  So in this particular device the cell phone

15  provides a signal through the circuit and allows a larger

16  battery to fire the detonators.

17  Q     Okay.

18         MR. STONEMAN:  Can you go back to 15 real quick

19  again?

20  Q     (By Mr. Stoneman) Can you tell us what I've circled

21  there?  What are those?

22  A     So those are simply stereo speaker connectors.  They

23  serve to provide the current from the power source down the

24  line to wires that are connected to those stereo speaker

25  connectors.

*DIRECT EXAMINATION OF BARRY BLACK*

1  Q    And one's red, one's black.  Does it matter which one is

2  connected to the wires?

3  A    No.

4  Q    Okay.  Is it fair to say anybody with some basic

5  electrical wiring or electrical knowledge could have

6  constructed this device?

7  A    Yes.

8  Q    Take a look at Exhibit No. 12, please, and tell us what

9  we're looking at here.

10  A    Those are two commercial detonators.  They are also

11  called blasting caps or initiators.

12  Q    And what purpose or what function do these serve with

13  this particular type of device?

14  A    There's a -- it's called the explosive train or the

15  explosive chain.  So this would be the first step in that

16  explosive series.  The orange and yellow wires you see there

17  would conduct the electricity from the Time and Power Unit,

18  down the copper wiring, into the detonators, which would cause

19  them to explode.

20  Q    And those orange and yellow wires, would those have been

21  connected to the red and black caps on the Time Power Unit?

22  A    Yes.

23  Q    So are they just receiving, again, just an electrical

24  current?

25  A    Right.  It's just a solid cord with just a copper wire.

1    Q    Okay.  So the Time Power Unit sends electrical current

2    through those cords.  And can you tell us -- let me do it

3    right here.  This silver cylindrical device --

4         MR. STONEMAN:  And if you can zoom into that.

5    Q    (By Mr. Stoneman) -- can you further describe what we're

6    looking at there?

7    A    That's the blasting cap, also called the initiator or

8    detonator.  It's generally an aluminum cylinder.  The green

9    part you see on the end is called the plug.  The orange and

10   yellow leg wires, as they are called, go into the base of the

11   detonator where there is a small bridge wire, much like the

12   filament in a light bulb.

13        So when the electrical current is carried by the leg

14   wires, it heats the bridge wire or filament, which is in the

15   base of the detonator.  And that's embedded in some very

16   sensitive explosives.  That small amount of current enables

17   those primary explosives to detonate.

18        And then as you get towards the bottom in this image,

19   there is what's called a base charge of another high

20   explosive, which has enough force to cause other explosives to

21   detonate.

22   Q    So, theoretically, in this explosive chain, this would be

23   the first component that would actually explode; is that

24   correct?

25   A    Yes.

*DIRECT EXAMINATION OF BARRY BLACK*

1  Q    And can you tell us, how can a law-abiding person acquire

2  one of these?

3  A    These are commercial detonators.  They can be acquired

4  lawfully with a permit or a license.  We have many cases where

5  detonators are actually improvised or acquired through

6  criminal means, either stolen or acquired from people who have

7  stolen them.

8  Q    So a non-law-abiding person could either steal these or

9  make them themselves?

10  A    Right.  You could make detonators.  They wouldn't look

11  exactly like this, but they serve the same function.  Or they

12  could be stolen or acquired.

13  Q    What kind of -- what kind of materials would a person

14  need to make an improvised detonator?

15  A    Commonly, currently materials -- high explosive known as

16  triacetone triperoxide is often used.  It's household

17  chemicals you can find in pool supply stores, hair supply

18  stores, you know, Walmart, Ace Hardware.

19  Q    Okay.  And, to be clear, these particular -- we've called

20  them alternately detonators.  Are they also called blasting

21  caps?

22  A    Yes.

23  Q    These particular detonators or blasting caps were inert.

24       And what does "inert" mean to you?

25  A    "Inert" means they will not function.  They look real,

1    feel real, weigh correctly, but they just will not explode.

2    Q    Okay.  And, again, what's the reason for providing inert

3    blasting caps in this investigation?

4    A    Any explosive we wouldn't want out in the public domain

5    for public safety.

6    Q    Take a look at Exhibit No. 9.  And what are we looking at

7    here?

8    A    Each one of those is called a detonating cord.  The

9    colors don't matter.  They are just different types of

10   detonating cord.  Detonating cord is a high explosive itself.

11   It's a high-explosive core wrapped in a nylon sheath.  You can

12   think of it as rope that connects different charges, except in

13   this case the rope explodes.

14   Q    Okay.  And in this particular device, how -- what do they

15   connect to on either end?

16   A    So in the explosive train or explosive chain, the

17   detonators would be connected to one end of the detonating

18   cord and the other end of the detonating cord would be another

19   explosive.

20   Q    And how would a law-abiding person acquire detonation

21   cord, or det cord?

22   A    Again, it's -- a law-abiding, you can acquire it as a

23   blaster in the explosive industry with a permit or a license.

24   Q    Otherwise, a person would have to steal these; is that

25   correct?

*DIRECT EXAMINATION OF BARRY BLACK*

1   A    Yes.

2   Q    Okay.  Is it feasible for a lay person to construct or

3   make homemade det cord?

4   A    It would be a laborious process.  The det cord for

5   multiple charges isn't necessary.  It's just a way to link the

6   charges together.  But you don't have to have it.  You can

7   just simply use other detonators.

8   Q    So, in other words, you can't -- it's very difficult to

9   make this yourself, but for the purpose of this device, this

10  is not even really necessary; is that correct?

11  A    Correct.

12  Q    And, to be clear, this detonation cord, or det cord, that

13  you provided was inert; in other words, it would not have

14  exploded?

15  A    That's correct.

16  Q    Take a look at Exhibit No. 7, please.  And tell us, what

17  are we looking at here?

18  A    Each of those is a different type of high explosive.

19  Q    And what purpose do they serve for this particular type

20  of device?

21  A    They would serve as what's known as a booster.  A booster

22  can be really any type of explosive, not one particular type.

23       So depicted here are two cartridges of dynamite, four red

24  cast boosters.  It's just a high explosive that's been cast in

25  the shape of a cylinder.

1      And then the four yellow or orange items at the bottom

2  are also cast boosters, just a smaller size.

3  Q    And to be clear here, what have I circled here at the

4  very top?

5  A    Those represent two cartridges of dynamite.

6  Q    And tell us again, in this type of device how would these

7  be -- what would they be connected to?

8  A    So using the detonating cord we saw previously, the

9  detonators would be attached to the detonating cord.  The

10 detonating cord would then be attached to these high-explosive

11 charges which would be used as a booster for the main charge.

12 Q    Okay.  The main charge in this case being what?

13 A    ANFO.

14 Q    Okay.  And we'll get to that in a minute.

15     How would a law-abiding person acquire dynamite or these

16 other types of explosive boosters?

17 A    Again, generally, with a permit or license.

18 Q    A non-law-abiding person, how could they acquire this or

19 something functionally equivalent to this?

20 A    These types of materials are stolen, but a booster can

21 also be made out of homemade explosives.

22 Q    Okay.  What type of materials would a person need to make

23 boosters sufficient to function as boosters in this type of

24 device?

25 A    Again, relatively common materials that you can find at

*DIRECT EXAMINATION OF BARRY BLACK*

1  pool supply stores, hair supply stores.

2  Q    And, to be clear, these boosters that you provided are

3  inert?

4  A    That's correct.

5  Q    Please take a look at Government's Exhibit No. 5, and

6  tell us -- tell us about this brown bag that I'm circling

7  here.

8  A    That's a bag that commercial ANFO is usually found in.

9  ANFO is an acronym, A-N-F-O.  It's a type of commercial

10  explosive.  It stands for ammonium nitrate fuel oil.  There

11  are many different kinds manufactured in many different

12  places.  This particular brand is called Austinite 15.

13  Q    And the jury has heard the term "ANFO" quite a bit in the

14  past few days.  I see under Austinite 15 the phrase "ammonium

15  nitrate fuel oil."  Is that where we get the term "ANFO" from?

16  A    Yes.

17  Q    It's an acronym?

18  A    It's just an acronym for ammonium nitrate fuel oil.

19  Q    And you mentioned, as we were discussing the previous

20  exhibit, this is the primary explosive for this type of

21  device?

22  A    It's referred to as the main charge.  Whatever the end of

23  the firing train would be that -- the last explosive would be

24  considered the main charge.

25  Q    Okay.  And tell us a little bit more about how a

*DIRECT EXAMINATION OF BARRY BLACK*

1  law-abiding person would acquire ANFO, ammonium nitrate fuel

2  oil.

3  A    Commercially, it's a tool that's used in the mining and

4  quarry industry.  It's designed to push and heave rock, for

5  instance.  So it's available commercially with a permit or

6  license.

7  Q    And how might a non-law-abiding person who wanted to get

8  their hands on some ammonium nitrate fuel oil, or ANFO,

9  acquire ANFO?

10  A    Without a permit or license, it can be stolen or can be

11  homemade, improvised.

12  Q    And tell us a little bit about the process of making ANFO

13  homemade.

14  A    It's very simple.  AN, the ammonium nitrate, is

15  fertilizer.  And to make an explosive, you need an oxidizer

16  and a fuel.  The ammonium nitrate serves as the oxidizer.

17  Then you simply add a fuel to it.

18      And it can be a number of different types of fuel.  It

19  could be diesel fuel, gasolene, motor oil, camp fuel.  But

20  it's just a mixture of the fuel and the oxidation.

21  Q    So ANFO -- premixed ANFO is -- you generally have to have

22  a license to purchase it.

23      Ammonium nitrate without the fuel, can a law-abiding

24  person purchase that without a license?

25  A    Yes.

*DIRECT EXAMINATION OF BARRY BLACK*

1   Q    And that's -- I think you said it's basically fertilizer?

2   Is that right?

3   A    Yes.

4   Q    Is that why these types of devices are commonly called

5   fertilizer bombs?

6   A    Yes.

7   Q    Is there a significant difference in the quality of the

8   ammonium nitrate a person might get if they purchased

9   fertilizer versus the type of ammonium nitrate in commercial

10  ANFO?

11  A    The commercial-grade explosives use what's called a

12  commercial grade ammonium nitrate.  It's still ammonium

13  nitrate, but it's milled in such a way where it has a larger

14  surface area.  It's more porous to more readily accept the

15  fuel.

16       An improvised ANFO, more generally, you will find

17  fertilizer grade just more readily available.  Same type of

18  material.  It just absorbs the fuel in a different way.

19  Q    Okay.  But if one were to just acquire fertilizer or

20  ammonium nitrate, add an appropriate amount of diesel to that,

21  would it essentially function the same way as commercial grade

22  ANFO?

23  A    Yes.

24  Q    Are there -- let's say a person did not want to buy

25  ammonium nitrate to mix up their own ANFO.

*DIRECT EXAMINATION OF BARRY BLACK*

1      Are there other ways to make ammonium nitrate rather than

2  just buying it?

3  A    You can make ammonium nitrate through a chemical process

4  known as nitration.  It involves the addition of nitric acid.

5  It's a chemical process.  In this country, ammonium nitrate is

6  readily available so it's just easier to buy it, but it can be

7  made.

8  Q    And that nitration process, what base chemical would you

9  have to nitrate?

10 A    Anhydrous ammonia.

11 Q    So if you had anhydrous ammonia and you had maybe a

12 distillery, you might be able to make ammonium nitrate?

13         MS. BEHENNA:  Your Honor, I'm going to object to

14 leading.  I've been letting this go for --

15         MR. STONEMAN:  I'll withdraw the question.

16         THE COURT:  Yeah.  And relevance.  Sustained.

17 Q    (By Mr. Stoneman) Okay.  And, to be clear, this ammonium

18 nitrate that you provided is inert; is that correct?

19 A    Correct.

20 Q    Take a look at Government's Exhibit No. 16, and tell us

21 what we're looking at here.

22 A    Those are the instructions for how to operate the TPU.

23 Q    And is that your handwriting?

24 A    Yes.

25 Q    Okay.  And the -- you include a phone number at the very

*DIRECT EXAMINATION OF BARRY BLACK*

1   bottom.  Was that the actual number for the phone on the Time

2   Power Unit?

3   A     So the phone on the Time and Power Unit that would have

4   sent the signal to the detonators.  I had the identical phone

5   with me so if anyone were to call that number at the bottom,

6   it actually rang to a phone that was with me.

7   Q     Okay.  I would like to talk about your role in this

8   investigation on or about August 12, 2017, the day of the

9   offense charged in this case.

10        Can you take a look at -- these have not been introduced

11  into evidence yet, but take a look at Government's Exhibits 17

12  through 30 and tell me if you recognize those.

13  A     Yes, I do.

14  Q     And can you describe what those pictures depict?

15  A     The early morning hours of the 12th of August, I was

16  asked to go to the BancFirst building and inspect a van that I

17  found located there.

18  Q     And do those photographs depict that van and the insides

19  of it?

20  A     Yes.

21  Q     Do they appear to accurately depict what's in the

22  photographs?

23  A     Yes.

24        MR. STONEMAN:  Your Honor, I'd move to admit

25  Government's Exhibits 17 through 30.

1          THE COURT:  Any objection?

2          MS. BEHENNA:  No, your Honor.

3          THE COURT:  They're admitted.

4          MR. STONEMAN:  Can you pull up Government's

5    Exhibit 17.

6    Q    (By Mr. Stoneman) Tell us what we're looking at.

7    A    That is looking west in the alley that's to the north of

8    the BancFirst building and perpendicular to the alley.  To the

9    south is an enclosed loading dock just beneath BancFirst.  And

10   the van was located in the loading dock.

11   Q    And I have circled something on the exhibit.  Is that the

12   van?

13   A    Yes.

14   Q    Take a look at Government's Exhibit No. 18.  What are we

15   looking at here?

16   A    That's a picture of the van in the alley with the doors

17   open.

18   Q    Okay.  And we see some brown objects kind of on the

19   floorboard.

20          MR. STONEMAN:  Can you zoom into that?

21   Q    (By Mr. Stoneman) Can you tell us what those are?

22   A    Those are the empty Austinite 15 bags which I had

23   previously provided.

24   Q    Take a look at Exhibit No. 19.  And do those appear to be

25   the same bags depicted in Government's Exhibit 18?

*DIRECT EXAMINATION OF BARRY BLACK*

1    A    Yes.

2    Q    Take a look at Government's Exhibit 20, and tell us what

3    we're looking at here.

4    A    Right in the back of the van were seven plastic

5    containers, four of these -- I guess maybe 2-by-2-foot --

6    plastic totes were in a line behind the driver's seat.  And

7    that's an image of those totes.

8    Q    Okay.  And we see in this blue tote, or blue tub,

9    something in the middle kind of peeking out.  Can you tell us

10   what that is?

11   A    That's a cast booster, and the green part is the

12   detonating cord.

13   Q    Okay.  Government's Exhibit 21, tell us what we're

14   looking at here.

15   A    Again, that's another image of the square containers that

16   were right behind the driver's seat.  You see three of them

17   there.

18   Q    Okay.  And the orange cord kind of going into the -- into

19   the white substance, can you tell us what that is?

20   A    That's the inert detonating cord.

21   Q    Okay.  And did you -- during your processing of this

22   evidence, did you pull that out to see what was attached to

23   the det cord?

24   A    Yes.

25   Q    And what was it?

*DIRECT EXAMINATION OF BARRY BLACK*

1    A     One of the boosters.

2    Q     Twenty-two.  And this -- your responses be the same to

3    this exhibit as the last -- previous two?

4    A     Yes.

5    Q     All right.  Government's 23, does this appear to be

6    another of the tubs?

7    A     Yes.

8    Q     Government's 24, would this be another one of the tubs?

9    A     Yes.  There were three trashcans right behind the

10   passenger's seat, and that's one of them.

11   Q     Okay.  And Government's 25 and 26, are those the other

12   two trash tubs?

13   A     Yes.

14   Q     Please take a look at Government's 27.  What are we

15   looking at here?

16   A     On the passenger seat, when I opened the van in the

17   alley, was that black object.  It was a cloth or shirt

18   covering the TPU.

19   Q     Okay.  Go to 28, please.

20   A     That's a picture of the shirt once I removed it with the

21   Time and Power Unit visible, and you can see the leg wires

22   trailing off behind it.

23   Q     Okay.  And Government's 29?

24   A     Another image of the TPU.

25   Q     Okay.  And Government's 30?

*DIRECT EXAMINATION OF BARRY BLACK*

1  A    That's an image of the detonating cord leading to the

2  rear of the van with the detonators taped to seven links of

3  the cord.

4  Q    Okay.  Based on your viewing of the contents of the van,

5  did the device appear to have been assembled in a viable

6  fashion?

7  A    Yes.

8  Q    And when I say "viable fashion," what does that mean to

9  you?

10  A    Had the components been live, it would have detonated.

11  Q    Okay.  And is there -- was there only one way to

12  construct this device in a viable fashion?

13  A    No.  It can be constructed several ways.  This is one

14  way.

15  Q    Take a look at Government's Exhibit No. 31, and tell me

16  if you recognize what's depicted in that.

17  A    In the book?

18  Q    Yes.

19  A    That's the cellular phone I had on my person from August

20  11th through August 12th.

21  Q    And what significance, if any, does this have to you?

22  A    The device was designed to function when the cellular

23  phone that was a part of the Time and Power Unit received a

24  phone call from any call -- or from any number.  That phone

25  was called twice after I inspected the TPU.

*DIRECT EXAMINATION OF BARRY BLACK*

1  Q    Okay.  And it was called -- do you recognize the number

2  that called it?

3  A    Yes.  That 757 number was one of the numbers I was told

4  that the undercover agent and the subject had.

5  Q    Now, the jury has heard testimony that the defendant

6  dialed the number three times.  It appears --

7          MR. STONEMAN:  -- well, before we move on, I move to

8  admit Government's Exhibit 31, your Honor.

9          THE COURT:  Any objection?

10          MS. BEHENNA:  No objection.

11          THE COURT:  It's admitted.

12  Q    (By Mr. Stoneman) Based on the screenshot we have here,

13  it only indicates two missed calls.

14      Do you have an explanation for any discrepancy between

15  previous testimony that the defendant dialed it three times

16  versus what's displayed on the phone?

17  A    Yes.

18  Q    What is that?

19  A    I had set up an observation post at the Skirvin Hotel

20  across the street, which gave me advantage of the approach and

21  the alley itself.  After the van was delivered, I was asked to

22  go inspect the status of the Time and Power Unit.

23      So I left the Skirvin across the street, inspected the

24  TPU and the device, went back to the observation post.  As I

25  was in the elevator in the interior of the hotel, the phone

1  rang once.

2       There were other civilians in the hotel, so I didn't

3  really feel I could give the execute order with them in the

4  elevator with me.  I went up to the 11th floor where our post

5  was, and as I exited the vehicle I got a second call.

6  Q    You said, "Exited the vehicle."

7  A    I'm sorry.  Exited the elevator.

8  Q    Okay.

9  A    So I was in the elevator during the rest of the time.

10 Q    Okay.  Take a look at Government's Exhibits 32 through

11 34, and tell me if you recognize what's depicted in those.

12 A    Yes.

13 Q    And what is depicted in those?

14 A    After I recovered the van and took it to a secure

15 location where it was stored and searched.

16 Q    Okay.  These -- what is depicted in these?

17 A    So Exhibit 32 is an image of the empty bags recovered

18 from the back of the van --

19           THE COURT:  Why don't you go ahead and offer them,

20 Counsel.

21           MR. STONEMAN:  Move to admit 32 through 34, your

22 Honor.

23           THE COURT:  Any objection?

24           MS. BEHENNA:  No objection.

25           THE COURT:  They're admitted.

1           THE WITNESS:  So Exhibit 32 were the bags that were

2   recovered from the back of the van, which were empty.

3   Q    (By Mr. Stoneman) Okay.  Thirty-four -- or 33.

4   A    Thirty-three is what's called the firing train.  It's the

5   detonating cord connected to the boosters.  The boosters were

6   in each of the seven tubs.

7   Q    Okay.  And 34?

8   A    Thirty-four is an image of the junction of the seven

9   pieces of detonating cord with the blasting caps taped to

10  them.  I had coiled up the leg wires just to include them in

11  the photograph.

12  Q    And, to be clear, even though it was constructed, as you

13  say, in a viable fashion, due to the inert nature of the

14  components, could this device have ever caused an explosion?

15  A    No.

16  Q    You told the jury about your extensive training and

17  experience and your training of others.  However, in your

18  experience and training, is this a particularly complicated

19  device?

20  A    No.

21  Q    Does this device require any specialized knowledge to

22  construct?

23  A    No.

24  Q    And is the information necessary to design and construct

25  this device readily available to lay people?

1          MS. BEHENNA:  Your Honor, I object.  That's been

2    asked and answered several times.

3          THE COURT:  I'll let him ask it one more time.

4          THE WITNESS:  Yes.  This is available.

5    Q    (By Mr. Stoneman) Okay.  And where is that information

6    available?

7    A    The internet and in printed materials.

8    Q    Okay.  Agent Black, were you involved in a test to

9    demonstrate what a similar device would have done had the

10   materials or components been volatile?

11   A    Yes.

12   Q    And where was that test conducted?

13   A    At an Army installation at Fort Riley, Kansas.

14   Q    And do you recall approximately when that was conducted?

15   A    I believe the 10th of August.

16   Q    Okay.  Go ahead and take a look in your book at

17   Government's Exhibits 35 through 45 and tell me if you

18   recognize those.

19   A    I do.

20   Q    And what -- what do those photographs depict?

21   A    Images of the test at Fort Riley, Kansas, as well as

22   images of the van I recovered in the alley.

23          MR. STONEMAN:  Your Honor, move to admit Exhibits

24   No. 35 through 45.

25          THE COURT:  Any objection?

*DIRECT EXAMINATION OF BARRY BLACK*

1          MS. BEHENNA:  Your Honor, we stand on our previous

2     objection.

3          THE COURT:  Okay.  Stand by.

4     (Brief pause.)

5          THE COURT:  For the reasons previously stated by the

6     Court, that objection will be overruled.  They're admitted.

7          MR. STONEMAN:  Could we pull up Government's

8     Exhibit 35.

9     Q    (By Mr. Stoneman) Agent Black, tell us what we're looking

10    at here.

11    A    That is a white van in which we constructed a

12    thousand-pound ANFO device.  And the vehicle to the left is

13    known as a witness vehicle.  It's there for scale and to

14    demonstrate the force of a blast like this.

15    Q    Okay.  Is this the same white van that the defendant used

16    the night of August 12, 2017?

17    A    No.  This is a different van.

18    Q    Okay.  And can you tell us a little bit about the --

19    before we get into the similarities, tell us about the

20    differences in this test, in this scenario, from the device

21    used by the defendant.

22    A    Obviously, these use live explosives.  It was a thousand

23    pounds of commercial ANFO arrayed in seven plastic containers

24    in the rear and the same weights and same configuration as the

25    device I recovered in the alley.  It was -- used boosters,

*DIRECT EXAMINATION OF BARRY BLACK*

1   detonating cord, and detonators.

2   Q    I can see from the photograph that the windows of this

3   target vehicle and actually the witness vehicle have been --

4   appear to already be removed.  Why is that?

5   A    This is a military range, and for range safety we

6   mitigate how much debris is left on the range.  Different

7   ranges have different requirements, such as the glass be

8   removed, fuels and oils be removed to try to mitigate the fire

9   damage and the environmental hazard.

10  Q    Okay.  Take a look at Government's Exhibit 36, and tell

11  us what we're looking at here.

12  A    Those are pictures.  The picture on the left is the

13  vantage of the van I recovered in the alleyway.  The picture

14  on the right is an image of the van used in the test shot,

15  which shows the similarities in configuration.

16  Q    And, obviously, the van on the left that the defendant

17  used has kind of swing -- double swing open doors, and the one

18  on the right has a single lift door.

19       Does that, based on your training and experience, create

20  any appreciable difference in the result?

21  A    None.

22  Q    Take a look at -- actually, while we're here on 36, tell

23  us what's similar.

24  A    So the van I recovered in the alley had the empty ANFO

25  bags in the rear, four plastic containers, each containing a

*DIRECT EXAMINATION OF BARRY BLACK*

1  hundred pounds of ANFO along the left behind the driver's

2  seat.  Then the three larger trashcans on the right behind the

3  passenger's seat, each containing 200 pounds of ANFO.

4       The image on the right, the test image, again has the

5  empty ANFO bags in the rear, four plastic tubs with a hundred

6  pounds of ANFO each arrayed behind the driver's seat, three

7  trashcans full of 200 pounds of ANFO apiece right behind the

8  driver's seat -- I'm sorry -- the passenger's seat.

9  Q    Take a look at 37 -- Government's Exhibit 37.  What are

10 we looking at here?

11 A    The image on the left is one of the trashcans with the

12 ANFO, det cord, and booster recovered in the alley.  The image

13 on the right is the trashcans arrayed in the test vehicle.

14 Q    And other than the color of the tubs, is it fair to say

15 the difference here is that the explosive materials on the

16 BancFirst are inert and the explosive materials on the Fort

17 Riley test are volatile?

18 A    Yes.

19 Q    Okay.  Take a look at Government's 38.  What are we

20 looking at here?

21 A    The image on the left represents three of the four square

22 tubs that were behind the driver's seat in the van -- that

23 were located in the van recovered in the alley.

24      The image on the right are three of the four tubs arrayed

25 behind the driver's seat in the test vehicle.

*DIRECT EXAMINATION OF BARRY BLACK*

1   Q    Okay.  And take a look at Government's 39.  What's

2   depicted here?

3   A    That's an image of the range that provides a vantage of

4   the test vehicle, the van on the right, and then the witness

5   vehicle on the left.

6   Q    Okay.  And we've talked about some of the similarities

7   between this bomb and the inert bomb used by the defendant.

8        The inert bomb you have testified, and the jury has heard

9   that it was designed to be activated by a Time Power Unit

10  with -- by a cell phone call.

11       Did you use the same type of activation device in the

12  Fort Riley test?

13  A    No.  For our safety and under range requirements, we

14  initiated the device by using what's called shock tube.

15  Q    Okay.

16  A    It gives us absolute control over the device so there is

17  no chance of an errant phone call or strike signal.

18  Q    When you say "errant phone call," what are you referring

19  to there?

20  A    If we had used a Time and Power Unit with a cellular

21  phone, if there was a wrong number called or a robocall, the

22  device would have functioned outside our control.

23  Q    Okay.  Take a look at Government's Exhibit No. 40.  What

24  are we looking at here?

25  A    These are images of the blast.

1   Q     And are these -- these are both from Fort Riley?

2   A     Yes.

3   Q     And what --

4         MR. STONEMAN:  Ms. Hadrava, can you focus in on the

5   image on the right?  Can you get a little bit more at the top?

6   Q     (By Mr. Stoneman) Agent Black, I am going to kind of

7   point to this image right -- or this part of the image right

8   here (indicated) that I'm pointing at.  And I don't know if

9   the jury can see that.

10        Can you describe what I'm pointing at here?

11  A     Yes.  So at the instant of detonation, the explosive

12  material is converted into a tremendous volume of gas, and it

13  creates a tremendous spike in pressure.

14        So there are basically three effects in an explosion like

15  this.  The thermal effect, which you see here, is a fireball.

16  It's very brief but very intense.  What's known as the

17  fragmentation effect, which is the vehicle coming apart at a

18  very rapid speed.

19        But most of the work is done by the change in pressure.

20  Tremendous change in ambient pressure.  There is a void

21  created at the point of detonation, and the atmosphere

22  begins to -- is compressed and begins to rush out at

23  supersonic speeds.

24        That blurry image that you see that was highlighted

25  previously is the leading edge of what's called the positive

1   pressure phase, known as the shock front.  It's a highly

2   compressed area of air that delivers a hammer blow to the

3   environment.

4       And then following that is the trailing edge of that

5   positive pressure phase, which delivers a great deal of

6   damage.

7       This all happens in a small fraction of a second, in

8   milliseconds, so we use special photography to capture this

9   image.

10      Once that positive pressure phase dissipates over space

11  and time, begins to slow down, it begins to rush backwards to

12  fill in that void that was created at the se- -- time of the

13  explosion.  That's known as the negative pressure phase.

14      It's still higher than ambient pressure, lasts about four

15  times as long, and that also creates load and drag forces on

16  the environment.

17  Q   You mentioned that the positive pressure requires both

18  space and time to dissipate.  This test was obviously

19  conducted at a field in Kansas.

20      What effects would -- what effect on the shock front or

21  the positive pressure phase of this explosion would it have if

22  this explosion had occurred in the alleyway where Mr. Varnell

23  parked the van?

24  A   Confined explosions, whether it was rigid structures,

25  such as concrete walls, brick walls, serve much like an echo

*DIRECT EXAMINATION OF BARRY BLACK*

1   chamber.  That positive pressure phase, the shock front, if

2   you will, is reflected when it impacts rigid structures.

3        And the studies show that the instant pressure, the

4   regular pressure generated at the point of the explosion, can

5   be exponentially modified.  So the reflected pressures can be

6   two, four, eight, as high as 13 times the incident pressure.

7   Q    Go ahead and take a look at Government's Exhibit 42 --

8   I'm sorry -- 41, and tell us what we're looking at here.

9   A    Again, that's another vantage at that instant of

10  detonation.  Near visible is the thermal effect, or fireball.

11  And you can see the fragmentation effect depicted as well.

12       Those large pieces are parts of the van that are

13  traveling out at significant speeds.

14  Q    Okay.  Take a look at Government's Exhibit No. 42.  What

15  is this?

16  A    It's where the van was.  The van was completely

17  destroyed.  It left only a crater that was roughly

18  13-feet-by-15-feet by 2-to-2-and-a-half-feet deep.

19  Q    Okay.  Government's Exhibit No. 43, what is this?

20  A    That's part of the witness vehicle, the vehicle that was

21  next to the van.  It was basically blown into three large

22  pieces.  This piece was located roughly 75 feet from its point

23  of origin.

24  Q    Government's Exhibit 44, what's this?

25  A    That's a second large part of the witness vehicle, the

*DIRECT EXAMINATION OF BARRY BLACK*

1    one that was parked next to the van.  And it was recovered, I

2    think, about 162 feet from its point of origin.

3    Q    Government's Exhibit 45?

4    A    Again, part of the witness vehicle that was next to the

5    van.  It was recovered over 200 feet away from its point of

6    origin.

7         MR. STONEMAN:  May I have a moment to confer, your

8    Honor?

9         THE COURT:  Certainly.

10        (Brief pause.)

11   Q    (By Mr. Stoneman) And do we have any actual photographs

12   of the pieces of the test van?

13   A    There were photographs taken.  We recovered -- the

14   terrain limited our search, but we found pieces of the van

15   over a thousand feet away.

16   Q    Okay.  Agent Black, based on your training and

17   experience, had the device Mr. Varnell attempted to use been

18   volatile -- in other words, had those component materials not

19   been inert -- what damage, if any, would it have done to the

20   BancFirst building?

21   A    I believe it would have effectively destroyed it as well

22   as the building to the north.

23   Q    Okay.

24        MR. STONEMAN:  Pass the witness, your Honor.

25        THE COURT:  Cross-examination?

1      MS. BEHENNA:  Yes, your Honor.

2                **CROSS-EXAMINATION**

3  BY MS. BEHENNA

4  Q    Agent Black, I believe that you were involved in the

5  investigation of McVeigh and Nichols; is that right?

6  A    Yes.

7  Q    And I believe that you testified earlier that the bomb

8  that McVeigh and Nichols prepared in downtown Oklahoma City

9  was an ammonium nitrate fuel oil bomb detonated by det cord

10  and dynamite and maybe a two-minute fuse was used to actually

11  begin the detonation process.  Is that right?

12  A    I believe that's so, yes.

13  Q    Okay.  And so all bombs need an ignition source; right?

14  Dynamite or blasting cap or something?

15  A    Yes.

16  Q    Okay.  Now, your involvement in this investigation began

17  when?

18  A    I believe the first contact I had was January 2017.

19  Q    Okay.  Because you said during your direct examination

20  that many weeks and months went by before you were contacted

21  again.  I assume to provide the material for this inert bomb?

22  A    As I recall, there were discussions between the initial

23  time I was contacted as other information became available

24  concerning the viability of what was being planned.

25  Q    Okay.  But there were several weeks or months in between

*CROSS-EXAMINATION OF BARRY BLACK*

1    this January 20th date, when you were initially contacted, and

2    the time that you began obtaining the components to make this

3    bomb, right, in June?

4    A    Yes.  That's correct.

5    Q    All right.  And your involvement in this investigation

6    during that period of time was what, just wait and see what

7    happened?

8    A    Early on it was to advise whether the information was

9    even viable or credible.  And as it became more apparent that

10   something was going to happen, it's part of my job to, for

11   public safety, ensure that we provide the inert materials.

12   Q    Sure.  And I assume the information that you are talking

13   about that was becoming available was the information being

14   provided by Brent Elisens?

15   A    My contact was with the task force agents and officers.

16   Q    All right.  Did you know that Brent Elisens was the

17   source in providing information to the FBI?

18   A    I found that out later.

19   Q    You are familiar with Brent Elisens, are you not?

20   A    Yes.

21   Q    I think you were the investigating FBI agent when he was

22   prosecuted in September of 2015 -- or 2010, I'm sorry.

23   A    That's correct.

24   Q    Were you familiar --

25            MS. BEHENNA:  Well, can I have Government's Exhibit

CROSS-EXAMINATION OF BARRY BLACK

1  202.37, please.

2  Q    (By Ms. Behenna) Were you given any information about the

3  content --

4          MS. BEHENNA:  And just the bottom part, Karen, blow

5  it up.

6  Q    (By Ms. Behenna) Were you given any information about the

7  content of the discussion Mr. Elisens was having with

8  Mr. Varnell?

9  A    No.  Other than just generic phrases such as the

10  thousand-pound device.  I have not seen this.

11  Q    You have not seen this --

12  A    No.

13  Q    -- message?

14  A    No.

15  Q    And this message, I believe, says that he was going to

16  go -- Mr. Varnell texting said that he was going to go with

17  what the Oklahoma City bomber used, diesel fuel, and I think

18  it says anhydrous ammonia; right?

19  A    That's what it says.

20  Q    I just want to be clear that anhydrous ammonia was not

21  used in the Oklahoma City bombing, was it?

22  A    No.

23  Q    What about acetone?  Was acetone used in the Oklahoma

24  City bombing?

25  A    I don't believe so.

*CROSS-EXAMINATION OF BARRY BLACK*

1  Q    Is acetone used to make an ammonium nitrate bomb?

2  A    Can be used in the detonators or the boosters if those

3  are improvised.  Acetone is one of the components of

4  triacetone triperoxide I mentioned earlier.

5  Q    And, again, that's quite a process for somebody to make

6  that on their own; is that right?

7  A    It's not very complex.  We have encountered those before,

8  like at the OU bombing in '05.

9  Q    Well, let me ask you this.  Is there any information that

10 you received during the course of this investigation from the

11 case agent that Mr. Varnell had the knowledge and wherewithal

12 to be able to actually make and acquire acetone to make an

13 ammonium nitrate bomb?

14 A    I was told that he had been experimenting with homemade

15 explosives, but I didn't know what kind.

16 Q    And what kind -- okay.

17      C-4.  That's completely different than an ANFO bomb;

18 right?

19 A    C-4 is different than ANFO, yes.

20 Q    Okay.  And, I guess, back to my original question, the

21 Oklahoma City bomber did not use acetone; right?

22      I mean, they had det cord.  They had det cord and

23 blasting caps.

24 A    We know what was stolen during that case.

25 Q    That's right.

*CROSS-EXAMINATION OF BARRY BLACK*

1    A    We don't know exactly what was used, but we --

2    Q    Fair enough.

3    A    -- know what was stolen and presume that the stolen

4    materials was used.

5    Q    Which was det cord and blasting caps?

6    A    Yes.

7    Q    And you talked about needing wiring or somebody could

8    make det cord by using a copper wire, but it was a pretty

9    laborious process; right?

10   A    No, ma'am.  I said making detonating cord, that doesn't

11   require the copper wire.  Those are two different things.

12   Q    Okay.

13   A    Those are detonators that require the copper wire.

14   Q    Thank you.  And I mixed that up.

15        But, you're right, the red and yellow leg wires on the

16   blasting caps is a copper wire?

17   A    Correct.

18   Q    All right.  But it has to be affixed to a detonation

19   source in order to be able to conduct that energy to the -- to

20   dynamite or a blasting cap; is that right?

21   A    Some type of power source, yes.

22   Q    Right.  Okay.

23        What about matches?  Were matches used in the Oklahoma

24   City bombing?

25   A    We believe that McVeigh initiated that device with a

CROSS-EXAMINATION OF BARRY BLACK

1   burning time fuse, so he would have had to have matches or

2   lighters or something.

3   Q    One match.  Were hundreds of matches used?  Do you know?

4   A    I don't know.

5   Q    All right.  Did you review any reports that were being

6   prepared during the course of your involvement in this

7   investigation?

8   A    No.

9   Q    Were you aware at any point during the investigation that

10  Mr. Varnell might be suffering from schizophrenia?

11  A    No.

12  Q    Now, I believe it was on June 22nd you were asked to

13  obtain some inert -- that means nonexplosive material; right?

14  A    I would have to look at the date, but I did make that

15  request, yes.

16  Q    Okay.  And, just to be clear, you provided the Austin

17  power cast boosters?

18  A    Austin powder, yes.

19  Q    Thank you.

20       And the gel matchsticks, which would be dynamite; right?

21  A    Yes.

22  Q    The det cord and the bags of inert ANFO?

23  A    Yes.

24  Q    All right.  And you provided that material to the

25  undercover in this case; correct?

*CROSS-EXAMINATION OF BARRY BLACK*

1  A    Yes.

2  Q    All right.  And when you sat down with the undercover,

3  did you explain to him how this ammonium nitrate fuel oil bomb

4  is built?

5  A    Yes.

6  Q    Okay.  Did you go through the process step by step?

7  A    Yes.

8  Q    And the reason for that is so that the undercover

9  employee would know how to make an ANFO bomb; right?

10  A    Right.

11  Q    Was there some concern, Agent Black, that if the

12  undercover didn't know how to make this bomb that Mr. Varnell

13  would not?

14  A    No.  The story for the undercover was that he had

15  assisted a blaster or quarrier that was the person that

16  provided the explosives, so he would naturally have some

17  background as to how to assemble it.

18  Q    And so he could direct Mr. Varnell --

19  A    No.

20  Q    -- if needed?

21  A    Just so he would know how.

22  Q    Have you seen the video of them building the bomb in the

23  storage unit?

24  A    I witnessed the first few minutes of that on

25  closed-circuit TV before I left for the Skirvin Hotel that

1    night.

2    Q    And you have not seen it since?

3    A    No.

4    Q    I believe Government's Exhibit No. 16 are the

5    instructions that you wrote and gave to the undercover in this

6    case; is that right?

7    A    Yes.

8    Q    Okay.  And you wrote pretty specific instructions about

9    how to detonate, for lack of a better term, or to start the

10   ignition source, the Time and Power Unit in this case; is that

11   right?

12   A    Yes.

13   Q    All right.  And, again, were those instructions -- did

14   you know that those instructions were going to be given to

15   Mr. Varnell?

16   A    I presumed they would be.

17   Q    Is that because the FBI was concerned that if Mr. Varnell

18   didn't know how to detonate a Time and Power Unit that he

19   wouldn't be able to do it?

20   A    The Time and Power Units are each unique in their

21   construction.  And in that it was provided to him, it would be

22   normal to provide instructions on how to use it.

23   Q    And it was provided to him -- we are talking about the

24   Time and Power Unit -- by the FBI?

25   A    Yes.

1  Q    Did you know that the FBI not only provided the inert

2  material that you've discussed already but provided the

3  barrels to Mr. Varnell in this case?

4  A    No.

5  Q    Did you know that Mr. Varnell was asked several times to

6  obtain barrels and he never did?

7  A    No.

8  Q    And it's important to have barrels in an ANFO bomb, is it

9  not, to hold the ANFO?

10  A    No.  This type of explosive doesn't require any kind of

11  confinement.

12  Q    But at least in this case, the FBI thought it was

13  important -- or at least the undercover thought it was

14  important that Mr. Varnell obtain barrels?

15  A    I'm not sure what the undercover thought.

16  Q    Okay.  And what about the van?

17      Did you know that Mr. Varnell had been asked several

18  times to obtain a van or a box truck or a trailer?

19  A    I remember discussions about the van.

20  Q    That he had been asked to obtain one?

21  A    Yes.

22  Q    And he didn't, did he?

23  A    I'm not sure how that came to be.  I just don't know.

24  Q    Did you know it was actually Mr. Elisens, at the

25  direction of the case agent, who obtained a van --

*CROSS-EXAMINATION OF BARRY BLACK*

1   A    No.

2   Q    -- to put this bomb in?

3   A    No.

4   Q    And the storage unit where the bomb was built, did you

5   know that the FBI provided that?

6   A    Yes.

7   Q    The black electrical tape that was necessary to tie the

8   det cord to the blasting caps, did you know that the

9   undercover gave money to Mr. Varnell so that he could purchase

10  that after he had failed to purchase electrical tape before

11  August 11th, when the plan was to make this bomb?

12  A    I wasn't privy to any of that that night.  I have since

13  learned that, yes.

14  Q    Did you know -- you talked during direct examination that

15  the time and power -- or the cell phone had been called two or

16  three times by Mr. Varnell --

17  A    Yes.

18  Q    -- right?

19       Did you know that he did that at the instruction of the

20  undercover?

21  A    No.

22  Q    And, of course, the op plan in this case was, once you

23  received the call on the cell phone that you had, that that

24  would start the initiation -- or begin the initiation of the

25  arrest of Mr. Varnell once he -- it was clear that he had

1  tried to detonate this inert bomb.

2  A    Yes.

3  Q    Is it fair to say, Agent Black, from what you know about

4  this investigation, that the only act Mr. Varnell did on his

5  own to obtain the bomb components, to build the bomb, to

6  detonate the bomb was calling the cell phone number that you

7  instructed him to call?

8  A    I'm sorry.  Would you repeat that question?

9  Q    I hope I can.

10     It's true, is it not, Agent Black, that the only action

11  Mr. Varnell took on his own was calling the cell phone number

12  that you provided to him?

13  A    That's not my understanding.

14  Q    And is your understanding obtained from your personal

15  knowledge or from the case agent in this case?

16  A    Well, from my case agent -- from the case agent and my

17  participation as I've outlined.

18  Q    During your direct examination you talked about these

19  materials, and I'm talking about the bomb components for an

20  ANFO bomb.  And you have extensive training, obviously, in WMD

21  and blast investigations.

22     Do you know whether or not in the United States since

23  1995 -- have there been any terrorist or illegal detonations

24  of an ANFO bomb?

25          MR. STONEMAN:  Objection.  Relevance, your Honor.

*CROSS-EXAMINATION OF BARRY BLACK*

1          THE COURT:  Overruled.

2          THE WITNESS:  I'm sorry.  Your question?

3   Q    (By Ms. Behenna) You're testing my memory here, Agent

4   Black.

5          Since 1995, have there been any terrorist or illegal

6   detonations of an ANFO bomb in the United States?

7   A    There was an incident in Times Square of an improvised

8   vehicle bomb, but I don't believe it contained ANFO.  And I

9   don't know of other instances where ANFO has been used since

10  1995 off the top of my head.

11  Q    And the reason for that, Agent Black, is because even

12  ammonium nitrate is highly regulated these days.  Isn't that

13  right?

14  A    I don't believe so.

15  Q    Okay.  Do you know that there are laws that are

16  enacted --

17          MS. BEHENNA:  May I have just a moment, your Honor?

18      (Brief pause.)

19          MS. BEHENNA:  May I have just a second?

20          THE COURT:  Certainly.

21          MS. BEHENNA:  Excuse me, your Honor.

22      (Brief pause.)

23  Q    (By Ms. Behenna) Well, before we get to the regulation

24  and the laws, let me ask you, after the Oklahoma City bombing,

25  were there a number of programs that were initiated here in

CROSS-EXAMINATION OF BARRY BLACK

1    the United States to make fertilizer stores aware if somebody

2    came in and tried to buy large amounts of ammonium nitrate?

3    A    We're not a regulatory authority, so I'm not sure of the

4    regulations.  But we do place a great deal of emphasis on the

5    "see something say something" type of provision.

6    Q    Exactly.  And there were a lot of programs -- the

7    "American security begins with you," that might be the "see

8    something say something."

9         And so I guess my point is that sellers of ammonium

10   nitrate were encouraged, I think by the ATF, to notify law

11   enforcement if they saw suspicious activity as it related to

12   somebody wanting to buy ammonium nitrate.

13   A    I presume that to be the case, but I don't know.

14   Q    Are you familiar with a law that was enacted in 2007 that

15   restricted the purchase of ammonium nitrate?

16   A    I'm not.

17   Q    You're not?

18   A    I'm not.

19   Q    If I represented to you that there was a law enacted

20   where the Secretary of the Department of Homeland Security

21   regulated the sale and transfer of ammonium nitrate after

22   March of 2008, would you have any reason to disagree with

23   that?

24   A    Again, I'm just not familiar with it.

25   Q    Even as part of your knowledge of explosives and bombs?

1  A    Right.  My end of it is the IED explosive component, not

2  so much the regulation --

3  Q    Okay.

4  A    -- of the components.

5  Q    Okay.  It's true, is it not, Agent Black, that

6  Mr. Varnell could not have purchased ammonium nitrate without

7  raising -- in the amounts of a thousand pounds -- without

8  raising suspicion?

9  A    I disagree.  With the agrarian nature of Oklahoma, large

10 purchases of fertilizer are frequent.

11 Q    Are you familiar with the Oklahoma law about someone who

12 wants to purchase ammonium nitrate?

13 A    I am not.

14 Q    Okay.  That they have to give their driver's license --

15 they identify themselves, show a driver's license, and what

16 they are using the ammonium nitrate for?  Are you aware of

17 those laws?

18 A    Again, I am not familiar with the regulation, no.

19 Q    And, again, all of that was done after 1995, to restrict

20 the easy access of somebody who wanted to do something bad to

21 ammonium nitrate; correct?

22 A    As far as I know.  I assume so, yes.

23 Q    All right.  It's also true, Agent Black, that Mr. Varnell

24 could not have gone in and purchased ANFO; right?

25 A    Not without a permit or a license.

1  Q    Right.  And the reason for that is that ANFO was

2  determined to be an explosive; right?

3  A    Yes.

4  Q    Okay.  And when we talk about these permits and licenses,

5  again, the federal government has regulated who can buy

6  explosives in order to protect people; correct?

7  A    Yes.

8  Q    All right.  And so it's clear that he could not have

9  bought ammonium nitrate fuel oil mixture, because that's

10  identified as an explosive; correct?

11  A    Yes.

12  Q    He could not have purchased blasting caps, because that's

13  identified as an explosive -- without a permit or a license;

14  correct?

15  A    Correct.

16  Q    All right.  Mr. Varnell could not have purchased det cord

17  without a license or a permit; correct?

18  A    Yes.

19  Q    Couldn't have purchased dynamite without a license or a

20  permit?

21  A    Correct.

22  Q    Now, I believe you said in your direct examination that

23  somebody could steal these component parts.  Do you remember

24  that?

25  A    Yes.

*CROSS-EXAMINATION OF BARRY BLACK*

1    Q     But it's true, is it not, Agent Black, that a facility

2    that has explosives material is required to report to law

3    enforcement any thefts of explosives?

4    A     That's a requirement, yes.

5    Q     So the likelihood of Mr. Varnell being able to go out and

6    steal the explosive components for an ANFO bomb without that

7    information ever getting -- without the theft getting to law

8    enforcement is highly unlikely?

9    A     Not really.  As we mentioned, the Oklahoma City bombing,

10   the explosives were stolen there.  And there was a theft

11   report.  But until we searched for that theft report, the FBI

12   was unaware of the theft.

13   Q     Fair enough.

14         After 1995, in modern day, in 2017, it is highly unlikely

15   that a theft of explosive material would have occurred without

16   that information getting to the FBI; correct?

17   A     It requires that the organization that had the explosives

18   stolen actually file the report, which sometimes doesn't

19   happen.  And then that report would get filed with another

20   agency, not with the FBI.  But we have access to those theft

21   reports.

22   Q     Of course you do.

23         And a facility that has explosive materials and fails to

24   report, they take -- face pretty serious penalties if they

25   don't report a theft; correct?

*CROSS-EXAMINATION OF BARRY BLACK*

1   A    I am not familiar with the regulation, but, yes, I

2   believe so.

3   Q    Okay.  So your statement that you didn't want

4   Mr. Varnell -- you or the FBI didn't want Mr. Varnell to

5   provide the components and that's why you all -- you, the

6   FBI -- provided the components to build this inert ANFO bomb,

7   really there was no danger with all the rules and regulations,

8   Agent Black.

9   A    No.  I believe there was imminent danger, yes.

10  Q    Do you have any evidence to support that statement?

11  A    I am familiar with devices domestic --

12  Q    In this case.  In this case, do you have any evidence?

13  A    I only know what I was told by the task force officers

14  and agents regarding Mr. Varnell's intent, his statements

15  regarding homemade explosives, the type of device he wanted to

16  use, and how it was to function.

17  Q    And is that Task Force Officer Brian Martin?

18  A    I spoke with Task Force Officer Brian Martin and the case

19  agent, Eric Larsen.

20  Q    Did you know in an FBI report that Brian Martin said,

21  "Varnell does not have a job or a vehicle at this time.  The

22  threat has not been repeated and Mr. Varnell does not appear

23  to have the means to actually commit this act at this time"?

24  A    I haven't seen that report.

25  Q    And that's the task force officer that was highly and --

*CROSS-EXAMINATION OF BARRY BLACK*

1   very involved in this investigation; right?  Brian Martin?

2   A    One of the two, yes.

3   Q    With regard to the purchase or theft or making of ANFO,

4   Agent Black, do you have any evidence before the FBI got

5   involved in this case that Mr. Varnell had purchased, stolen,

6   or was making ANFO?

7   A    The only information I had was what I was told, that he

8   had experimented with homemade explosives.

9   Q    C-4.

10  A    I wasn't told that.

11  Q    So, again, the question is:  What information do you

12  have, personally, that Mr. Varnell was trying -- had

13  purchased, stolen, or was trying to make ANFO?

14  A    Only what I was told by the Joint Terrorism Task Force

15  officers.

16  Q    But it didn't have anything to do with making ANFO;

17  right?

18  A    Homemade explosives can include ANFO, so I didn't know

19  what they were talking about.

20  Q    Okay.  Prior to the time the FBI got involved in this

21  case, can you tell me what information you had that

22  Mr. Varnell -- or what evidence there was that Mr. Varnell had

23  acquired or was making det cord?

24  A    I'm sorry.  Repeat your question.  Before we were

25  involved?

1    Q    Before the FBI was involved and provided the components

2    to make this bomb, what evidence do you have that Mr. Varnell

3    had acquired or was making det cord?

4    A    None.

5    Q    Before the FBI got involved in providing the component

6    parts to this inert bomb, what evidence do you have that

7    Mr. Varnell had acquired or was making blasting caps?

8    A    Only the statement that he was making homemade

9    explosives.  And, again, I don't know what type that might

10   have been.

11   Q    Fair enough.

12        Prior to the FBI providing the components for this inert

13   bomb, what evidence do you have that Mr. Varnell had acquired

14   or was making a TPU, a Time and Power Unit?

15   A    I was told that he wanted to initiate the device with a

16   cellular phone and that he had electronics background and was

17   capable of assisting in making that type of firing device.

18   Q    Fair enough.  I didn't ask the question clearly enough.

19        What evidence do you have that he was acquiring, either

20   by theft or making, a Time and Power Unit?

21   A    I don't have any other information other than those

22   statements.

23   Q    Agent Black, have you ever been involved in an

24   investigation where the FBI, having information that somebody

25   was talking about or making threats to build a bomb or

*CROSS-EXAMINATION OF BARRY BLACK*

1  detonate a bomb -- have you been involved in instances and

2  investigation where the FBI goes out and talks to that person

3  initially to try to let them know that the FBI is aware of

4  their chats or their discussions and that they need to stop?

5  A    I don't do that in my capacity.  And I think it would be

6  a case-specific kind of thing.

7  Q    But it has happened before; correct?

8  A    I don't know.

9  Q    And it's possible for the FBI to monitor somebody in a

10  chat room to see how serious and whether they have the

11  capability to carry out a threat or build a bomb as they are

12  talking about online; right?

13  A    I believe we have the capability to monitor those

14  conversations, but I am not a computer person so I don't know

15  the details of that.

16  Q    No.  That's fair enough.  I understand.

17       The FBI also has the ability to do surveillance over

18  someone's property to see if they have any explosives on their

19  property or whether they've detonated explosives in the past;

20  correct?

21  A    Yes.

22  Q    Do you know if any of those things happened in this case?

23  A    I do not.

24       MS. BEHENNA:  I think I am almost finished.  If I

25  can have just a moment, your Honor.

1          THE COURT:  Certainly.

2      (Brief pause.)

3  Q    (By Ms. Behenna) It's true, is it not, Agent Black, that

4  the FBI targets criminal activity?  Correct?

5  A    Yes.

6  Q    They don't target people; correct?

7  A    People engaged in criminal activity.

8  Q    I understand that.  But you don't -- I mean, you don't --

9  the FBI doesn't make an assessment of somebody and targets

10 that person because they don't like them or they don't like

11 what their chatter is online; correct?

12 A    Right.  The investigations are open based on qualified

13 information.

14 Q    And criminal activity; correct?

15 A    Could be criminal activity, counterespionage, or

16 counterintelligence.

17 Q    Fair enough.  Fair enough.

18     I guess my question is, Agent Black, prior to the FBI

19 getting involved in this conversation and investigation -- and

20 I'm talking about March 17th, when Mr. Elisens began

21 initiating conversations with Mr. Varnell -- do you know what,

22 if any, criminal activity Mr. Varnell was engaged in prior to

23 that?

24 A    I was unfamiliar with the parameters of the case other

25 than the feasibility of the device, as I had mentioned before.

*REDIRECT EXAMINATION OF BARRY BLACK*

1          MS. BEHENNA:  Can I have just a moment, your Honor?

2          THE COURT:  Certainly.

3      (Brief pause.)

4          MS. BEHENNA:  I believe that's all I have, your

5  Honor.

6          THE COURT:  All right.  Thank you.

7      Redirect, government?

8          MR. STONEMAN:  Yes, your Honor.

9      Can you pull up 202.37.

10                    **REDIRECT EXAMINATION**

11  BY MR. STONEMAN

12  Q    Agent Black, Ms. Behenna asked you whether or not Timothy

13  McVeigh used anhydrous ammonia in the bomb -- the Oklahoma

14  City bomb.  And your answer was what?

15  A    I don't believe so.

16  Q    Okay.  And I don't know if you can read that.  Can you

17  read that, the statement in green?

18  A    I can.

19  Q    Can you go ahead and read it out loud?

20  A    "I think I'm going to go with what the OKC bomber used,

21  diesel and anhydrous ammonia.  I might have to make a

22  distillery to process some stuff, but that's a solid recipe."

23  Q    What is your understanding of anhydrous ammonia being

24  involved in any sort of recipe for an ANFO bomb, if any?

25  A    Anhydrous ammonia can be used to make ammonium nitrate,

1    which would be the oxidizer part of the diesel and oxidizer in

2    ANFO.

3    Q    Okay.  What other -- tell us about -- what do you know

4    about anhydrous ammonia, its availability, its uses?

5    A    It's commonly used in agriculture as a fertilizer.  And

6    through a chemical process called nitration, it can be made

7    into ammonium nitrate.

8    Q    Any other illicit uses for anhydrous ammonia?

9    A    I believe it's used in narcotics as well, but that's not

10   my forte so I don't know.

11   Q    Okay.  I wasn't quite clear.  Ms. Behenna asked you

12   whether a person can just, say, go to a store and buy some

13   ammonium nitrate fertilizer.  Is it your understanding that

14   they can or can't do that?

15   A    It is readily available, yes.

16   Q    And can you think of any reasons -- well, Ms. Behenna

17   asked -- indicated that buying ammonium nitrate in large

18   quantities might set off some red flags.

19        Can you think of any reason that a person might --

20   although it might be more difficult to make anhydrous

21   ammonia -- excuse me -- ammonium nitrate from anhydrous

22   ammonia, based on your training and experience, can you think

23   of a reason that a person might, rather than purchasing

24   ammonium nitrate directly, make it out of anhydrous ammonia?

25   A    To avoid detection, if you have to provide ID or going to

1   a store and be recognized.  If you didn't want to buy it, then

2   you could make it.  It's just a difficult process given the

3   ready availability of ammonium nitrate here.

4   Q    All right.  And Ms. Behenna also asked you about the role

5   of acetone, if any, in composing -- or creating homemade

6   explosives.

7        And what's your understanding of the viability of acetone

8   as an ingredient in explosives?

9   A    Acetone is one of the ingredients used in making a highly

10  sensitive explosive that's commonly used by terrorists known

11  as triacetone triperoxide.  Acetone is one of the primary

12  components of making TATP.

13  Q    Where can a person get acetone?

14  A    It's readily available at hardware stores, paint stores.

15  Q    Do you need a license to buy acetone?

16  A    No.

17  Q    Do you even need to show your driver's license to buy

18  acetone?

19  A    No.

20  Q    Are you familiar with the process for constructing or

21  making C-4?

22  A    C-4 is a commercial military explosive not readily made

23  at home.  There is a version called poor man's C-4, which is

24  relatively easy to make --

25  Q    Okay.

1  A    -- and instructions are readily available.

2  Q    C-4 -- making homemade C-4, is that more complicated,

3  less complicated, or about the same complexity as constructing

4  an ANFO bomb?

5  A    Again, C-4 is a plastic explosive.  It would be very

6  difficult to make at home.  A poor man's C-4, as it's commonly

7  known, is very easy to make.

8  Q    Okay.

9  A    It's just a combination of two dry materials.

10  Q    Ms. Behenna asked you about the op plan, that it was the

11  operation plan to arrest Mr. Varnell immediately after he --

12  after he dialed the phone.

13      Is that your understanding of what was the plan, that

14  once he dialed the phone, that they were just going to arrest

15  him or did you need to look at something first?

16  A    So that night the IED would have been triggered by a

17  phone call to the TPU phone.  The identical phone was in my

18  possession.  So the plan was that once I received that call or

19  a call to that phone, which would have detonated the device, I

20  would notify the command post and the command post would

21  provide the execution order to arrest Mr. Varnell.

22  Q    Okay.  Ms. Behenna asked you about the need for barrels

23  or tubs, and you indicated that you didn't believe that those

24  would actually be necessary for this type of device to be

25  viable.

*REDIRECT EXAMINATION OF BARRY BLACK*

1    What other viable solutions could have made this bomb

2   explode without barrels?

3   A    High explosives like ANFO don't require confinement.  So

4   you could literally just stack the bags on top of each other,

5   introduce the booster, which is required to make that type of

6   explosive detonate.  So they don't require confinement.

7   Q    Okay.  And Ms. Behenna asked you whether or not certain

8   materials were used by Mr. McVeigh -- Timothy McVeigh in his

9   bomb in 1995, and you indicated you did or didn't know what

10  was -- exactly was used in that bomb.

11  A    We believe, during the course of that investigation, that

12  ammonium nitrate was purchased at a fertilizer feed store.

13  Nitromethane was the fuel used.  And then stolen explosives

14  from a quarry were used.  I believe it was Tovex, some det

15  cord, and blasting caps.

16  Q    Okay.  But do you know for sure exactly what he used in

17  that bomb?

18  A    We believe that was the configuration since that's what

19  was stolen, but it was all consumed in the detonation and

20  explosion, so --

21  Q    And you say "consumed."  You mean it was destroyed --

22  A    Destroyed.

23  Q    -- by the bomb?

24       Are you familiar with -- well, let's talk a little bit

25  about the knowledge required to make some of these components

1    at home.

2        You mentioned on direct -- or I may have mentioned on

3    direct that some of this information is available on the

4    internet.  Is that correct?

5    A    That is correct.

6    Q    Are you familiar with a book or writing called *The*

7    *Anarchist Cookbook*?

8    A    Yes.

9    Q    Okay.  What is that?

10        MS. BEHENNA:  Your Honor, I object.  There is no

11    evidence in this case about anybody having access to that

12    book, and I think it's irrelevant and highly prejudicial.

13        MR. STONEMAN:  Your Honor, may we approach?

14        THE COURT:  You may.

15        (The following proceedings were had at the bench outside

16    the hearing of the jury:) ***

17        MR. STONEMAN:  Your Honor, we anticipate, as part of

18    Mr. Varnell's interview post arrest, that he mentioned that he

19    had reviewed *The Anarchist Cookbook*.

20        MS. BEHENNA:  That is new to me.  I have never heard

21    that.  I guess we can ask the question after they play the

22    video of the confession, but I don't recall there being

23    anything like that.

24        THE COURT:  All right.  Well, that brings up one

25    point, I suppose.  I reviewed that video yesterday.  It's

*REDIRECT EXAMINATION OF BARRY BLACK*

1    lengthy.

2         Do you guys plan on playing that whole video?

3              MR. STONEMAN:  I will defer to Mr. Dillon.

4              THE COURT:  Do you plan on playing the whole video?

5              MR. DILLON:  We plan on playing the majority of it.

6    Obviously, at points they took breaks.  I believe there was a

7    30-minute break and 15- and 20-minute break.  There is four to

8    six minutes at the beginning that would obviously have no use

9    to us.

10        We're skipping over the portion on the consent to the

11   phone, which takes another ten minutes out of it.  We are

12   shaving what we can, but we think it's important due to his

13   words but also his demeanor during that time.

14             THE COURT:  Okay.  With respect to the issue at

15   hand, Counsel, if you want to go into it, I am going to accept

16   your representation that it's talked about during his

17   interview and that he says he's reviewed it.

18        If that is not borne out by the interview, then I'm going

19   to give the jury an instruction that I am striking all of the

20   testimony on this.

21        And, you know, this is redirect, so let's get to the

22   point.

23             MR. STONEMAN:  Yes, your Honor.

24             THE COURT:  Keep it narrow.  All right.

25        (The following proceedings were had in open court:)

1          THE COURT:  The objection is overruled.  Proceed.

2   Q    (By Mr. Stoneman) As I was saying, are you familiar with

3   a piece of writing known as *The Anarchist Cookbook*?

4   A    Yes.

5   Q    And can you tell the jury what that is?

6   A    There are a number of books and manuals that have been

7   published over the years that provide instruction on homemade

8   explosives, booby traps, and that type of thing.

9   Q    Okay.  And does that -- does *The Anarchist Cookbook*

10  contain recipes or instructions to make things like an ANFO

11  bomb or homemade poor man's C-4?

12  A    I believe it does.  It's a book -- and I'm not familiar

13  with its contents in its entirety, but, yes, those are the

14  common types of things.

15  Q    All right.

16          MR. STONEMAN:  May I have a moment to confer, your

17  Honor?

18          THE COURT:  Certainly.

19       (Brief pause.)

20          MR. STONEMAN:  No further questions, your Honor.

21          THE COURT:  All right.  Thank you.

22       Recross?

23          MS. BEHENNA:  Yes, your Honor.  Just briefly.

24                      **RECROSS—EXAMINATION**

25  BY MS. BEHENNA

1    Q    Agent Black, do you have any evidence that Mr. Varnell

2    had a distillery on his property where he had the

3    capability -- first of all, if he had -- well, if he had the

4    capability to distill anhydrous ammonia?

5    A    I don't have any information about that.

6    Q    Do you have any evidence that Mr. Varnell had the

7    capability on how to distill anhydrous ammonia and make

8    ammonium nitrate?

9    A    I don't have any information.

10   Q    Did you know, Agent Black, that Mr. Varnell never even

11   passed chemistry in college?  Did you know that?

12   A    No.

13   Q    Did you know that he tried it twice and had to withdraw

14   from chemistry --

15          MR. STONEMAN:  Objection, your Honor.

16   Q    (By Ms. Behenna) -- because he couldn't make --

17          MR. STONEMAN:  Objection.  Assumes evidence not --

18          THE COURT:  Say it again.

19          MR. STONEMAN:  She is testifying as to facts that

20   are not in evidence.

21          THE COURT:  And it exceeds the scope of redirect, so

22   it's sustained.

23   Q    (By Ms. Behenna) Do you have any evidence, Agent Black,

24   that Mr. Varnell was in the process of making explosives from

25   acetone?

*RECROSS-EXAMINATION OF BARRY BLACK*

1   A     Other than the statements I was provided, no.

2   Q     On this C-4; right?  That's it?

3   A     I wasn't told C-4.  It was just homemade explosives.

4   Q     Do you personally, Agent Black, have any evidence that

5   Mr. Varnell had the knowledge to put together an ANFO bomb?

6   A     I don't know what his knowledge is.

7              MS. BEHENNA:  May I have just a moment, your Honor?

8              THE COURT:  Certainly.

9              MS. BEHENNA:  I believe that's all I have.

10             THE COURT:  Government, may this witness be excused

11  permanently or subject to recall?

12             MR. STONEMAN:  Permanently, your Honor.

13             THE COURT:  Any objection, defense?

14             MS. BEHENNA:  No, your Honor.

15             THE COURT:  Sir, thank you for your testimony.  You

16  are permanently excused.

17

18                   (End of requested excerpt.)

19

20

21

22

23

24

25

```
1              CERTIFICATE OF OFFICIAL REPORTER

2

3       I, Christina L. Clark, Federal Official Realtime Court

4   Reporter, in and for the United States District Court for the

5   Western District of Oklahoma, do hereby certify that pursuant

6   to Section 753, Title 28, United States Code that the

7   foregoing is a true and correct transcript of the

8   stenographically reported proceedings held in the

9   above-entitled matter and that the transcript page format is

10  in conformance with the regulations of the Judicial Conference

11  of the United States.

12

13      Dated this 2nd day of July, 2019.

14

15                          s/CHRISTINA L. CLARK_____
                            Christina L. Clark, RPR, CRR
16

17

18

19

20

21

22

23

24

25
```