## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,                )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )        Case No. CR-17-239-D
                                         )
JERRY DRAKE VARNELL,                     )
                                         )
        Defendant.                       )

## <u>ORDER</u>

Before the Court is Defendant's Motion for Judgment of Acquittal [Doc. No. 247]. The United States filed a response in opposition [Doc. No. 249], and Defendant filed a reply [Doc. No. 252]. The matter is fully briefed and at issue.

## BACKGROUND

Defendant was charged in a two-count superseding indictment with attempting to damage by means of an explosive device the BancFirst office building in downtown Oklahoma City, Oklahoma, and attempting to use a weapon of mass destruction against any person and property at BancFirst, in violation of 18 U.S.C. §§ 844(i) and 2332a. [Doc. No. 121]. On February 4, 2019, Defendant filed a Motion to Dismiss the Superseding Indictment for Outrageous Government Conduct [Doc. No. 212]. The Court reserved its ruling on the motion until after the close of the government's case in chief. [Doc. No. 225]. On February 21, 2019, at the close of the government's case in chief, Defendant renewed his motion to dismiss and moved for a judgment of acquittal under FED. R. CRIM. P. 29(a). After hearing argument, the Court denied Defendant's motion for judgment of acquittal and motion to dismiss for outrageous government conduct. *See* Rule 29 Mot. Hr'g Tr. at

19-23 [Doc. No. 269 at 19-23].  On February 25, 2019, the jury returned a verdict of guilty against Defendant on both counts.  [Doc. No. 242].  Defendant now renews his motion for judgment of acquittal.

## DISCUSSION

When considering a Rule 29(c) motion, the Court "'must view the evidence, both direct and circumstantial, in the light most favorable to the government ….'" *United States v. Fuller*, 751 F.3d 1150, 1153 (10th Cir. 2014) (*quoting United States v. White*, 673 F.2d 299, 301-302 (10th Cir. 1982)).  The Court is not permitted to weigh the evidence or consider the credibility of witnesses. *Fuller*, 751 F.3d at 1153. Rather, the Court must "ask whether a rational trier of fact could find each element of the offense charged." *United States v. Thornburgh*, 645 F.3d 1197, 1205 (10th Cir. 2011).  Under this standard, the evidence supporting the conviction "'need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.'" *United States v. Erickson*, 561 F.3d 1150, 1158-1159 (10th Cir. 2009) (*quoting United States v. Burkley*, 513 F.3d 1183, 1188 (10th Cir. 2008)).  Accordingly, the Court may "enter a judgment of acquittal only if the evidence that defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Fuller*, 751 F.3d at 1153.

Defendant's arguments at the Rule 29 motion hearing were twofold: (1) Defendant urged the Court to find entrapment as a matter of law; and (2) Defendant asked the Court to dismiss the superseding indictment based on outrageous government conduct. Defendant's renewed motion focuses on the latter issue and raises one new issue: whether Defendant's conduct prior to the government's investigation constituted true threats under

18 U.S.C. § 844(e).[1]  The Court rules as follows.

## I.    Outrageous Government Conduct Defense

Although the Tenth Circuit has recognized the potential viability of the outrageous government conduct defense, it has not been presented under circumstances to reverse convictions based on such conduct.  *See, e.g., United States v. Dyke*, 718 F.3d 1282, 1285-1288 (10th Cir. 2013); *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994) (noting that the outrageous conduct defense "is an extraordinary defense that will only be applied in the most egregious circumstances").  A defendant asserting the defense "bears the burden of proving either '(1) excessive government involvement in the creation of the crime, or (2) significant governmental coercion to induce the crime.'"  *Dyke*, 718 F.3d at 1288 (*quoting Pedraza*, 27 F.3d at 1521).  In determining whether the government's conduct is outrageous, the Court must consider the totality of the circumstances.  *Pedraza*, 27 F.3d at 1521; *see also United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992).

Thus, the first step is to examine the government's conduct.  "[C]ause to worry exists only when the government 'engineers and directs the criminal enterprise from start to finish.'"  *Dyke*, 718 F.3d at 1288 (*quoting Pedraza*, 27 F.3d at 1521).  "By contrast, [the Tenth Circuit has] indicated that the government is free 'to infiltrate an ongoing criminal enterprise,' and 'to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity.'"  *Dyke*, 718 F.3d at 1288 (*quoting Mosley*,

---

[1]Defendant presents a narrow view of the Court's prior ruling.  Although the Court identified a possible § 844(e) violation, Defendant's conduct prior to the government's investigation arguably violated other state and federal statutes.

965 F.2d at 911).  It is permissible for the government to suggest the illegal activity, provide supplies and expertise for the illegal activity, and to act as both supplier and buyer in the sale of illegal goods.  *Dyke,* 718 F.3d at 1288.

The next step is to consider the defendant's conduct before the government's intervention and to examine "how eagerly and actively the defendant himself participated in the current crime charged."  *Id.* at 1288-1289.  "[L]ooking to the defendant's predisposition, his past and current conduct, as well as the government's behavior, is appropriate because what qualifies as outrageous governmental conduct depends on an appreciation of the 'totality of the circumstances' and is reserved 'for only the most egregious circumstances,' triggered only when the circumstances are, when viewed in whole, 'shocking, outrageous, and clearly intolerable.'"  *Id.* at 1289 (*quoting Mosley*, 965 F.2d at 910).

## A.    Defendant's Conduct Before the Government's Involvement

Prior to the government's involvement, Defendant expressed on social media his desire to bomb buildings, including banks.  Further, he attempted to solicit others to assist in his plan.  Brent Elisens testified that he and Defendant met on Facebook in 2015.  They bonded over computer programming and software development ideas; they also discussed the upcoming 2016 presidential election.  In September 2016, the relationship evolved into a group chat with others about building a self-sufficient community that would not use money.  Defendant was to oversee protection and defense, *i.e.*, protecting the community from outside threats.  However, the plan fell apart.

Mr. Elisens quit participating in discussions with the group in late October 2016,

when it became apparent that the group's motives were different from his.  Mr. Elisens and Defendant, however, continued to talk separately on Facebook and through TextLock (a secure, encrypted messaging application).  Mr. Elisens testified that at some point his conversations with Defendant changed.  Mr. Elisens still wanted to escape society, but Defendant's thinking involved offensive attacks.  On October 22, 2016, Defendant sent a message in TextLock to Mr. Elisens stating, "I'm out for blood.  When militias start getting formed I'm going after government officials when I have a team."  Gov't Ex. No. 202 at 5.  Defendant also indicated that he had "been reading about the best places to find stuff to make bombs."  *Id.*

On October 23, 2016, when Mr. Elisens indicated to Defendant that he was "going on survival mode," Defendant responded in TextLock, "When I'm able I'm going to do some Tyler Durden shit.  The government is going to fucking burn with those who stand with it."  *Id.* at 11.  Mr. Elisens testified that Tyler Durden was the protagonist in the movie *Fight Club*, and Durden desired to blow up banks to erase people's debt.  In that same text conversation, Defendant told Mr. Elisens, "I've learned enough chemistry over the years. I can make a gas bomb out of anything.  If I ever need to hit up Walmart when SHTF, I'm going to the pool section first."  *Id.* at 13.

On October 29, 2016, before the government's investigation, Defendant told Mr. Elisens on Facebook, "I believe I just found a like[-]minded guy."  *Id.* at 19.  When Mr. Elisens asked Defendant to clarify "like-minded how … survival or team or both," Defendant responded "team."  *Id.*  On November 8, 2016, Defendant sent a message to Mr. Elisens in TextLock stating, "I'm fucking done after this anonymous shit.  I need a team.

Idc what happens with this election, it's time to bomb some fucking banks." *Id.* at 34. Mr. Elisens responded "no," and that it was time to "just go." *Id.* Defendant responded, "I'm not running away, I'm taking action. I need a team." *Id.*

When Mr. Elisens tried to deescalate the discussion, Defendant responded that "the time is now. An EMP gun is all that's necessary, no civilian casualties." *Id.* at 35. On November 20, 2016, Defendant indicated to Mr. Elisens that he was "going to go with what the okc bomber used. Diesel and anhydrous ammonia. I might have to make a distillery to process some stuff but that's a solid recipe." *Id.* at 37. Mr. Elisens responded by saying "make sure civilians … are not in the building," to which Defendant said, "Well no shit." *Id*. at 38.

Mr. Elisens testified that he absconded from federal supervision in late November 2016. His last contact with Defendant before absconding was November 26, 2016. *Id.* at 39. Mr. Elisens testified that he went to the Carson National Forest in New Mexico and stayed two to three days before returning to Oklahoma City. Upon returning to Oklahoma City, Mr. Elisens' supervised release was revoked, and he received a sentence of imprisonment for nine months.

Mr. Elisens testified that after he was sentenced he communicated his concerns about Defendant to his attorney in December 2016. In January 2017, Mr. Elisens and his attorney met with FBI agents. Mr. Elisens testified that he did not ask for any relief from his federal sentence, and that he did not receive any credit for his cooperation with the government. He was released from federal custody on March 17, 2017 and agreed to meet with FBI agents again concerning Defendant. Mr. Elisens and Defendant began

6

communicating again on Facebook on March 18, 2017.  Gov't Ex. No. 203 at 1.  Mr. Elisens testified that his first post-release meeting with FBI agents was on March 31, 2017.

The evidence[2] supports a finding that prior to the government's involvement in January 2017 Defendant engaged in conduct and made statements that could be characterized as illegal activity.  For instance, 18 U.S.C. § 844(e) prohibits a person from using an instrument of interstate or foreign commerce to make a threat to damage or destroy a building by means of fire or an explosive.  Arguably, Defendant violated this statute by using the Internet to communicate with Mr. Elisens his threats to bomb banks.

Defendant argues that courts have interpreted § 844(e) as prohibiting only "true threats," requiring the Court to find that Defendant transmitted "a communication for the purpose of issuing a threat or with knowledge that the communication will be viewed as a threat."  *Elonis v. United States*, 135 S.Ct. 2001, 2004 (2015); *see also United States v. Viefhaus*, 168 F.3d 392, 395-396 (10th Cir. 1999).  The Tenth Circuit in *Viefhaus* defined "threat" as the "declaration of intention, purpose, design, goal, or determination to inflict punishment, loss, or pain on another, or to injure another or his property by the commission of some unlawful act."  *Viefhaus*, 168 F.3d at 395.  "It is not necessary to show that defendant intended to carry out the threat, nor is it necessary to prove he had the apparent ability to carry out the threat."  *Id.* at 395-396.  Rather, the "*question is whether those who hear or read the threat reasonably consider that an actual threat has been made*."  *Id.* at 396 (emphasis in original).  The Tenth Circuit clarified in *United States v. Heineman*, 767

---

[2] The Court's discussion of the evidence is not intended to serve as a complete rendition of all evidence admitted at trial.

F.3d 970 (10th Cir. 2014), that following the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343 (2003), the government must prove in any "true-threat" prosecution that the defendant intended the recipient to feel threatened. *Heineman*, 767 F.3d at 975. In other words, the speaker wants "the recipient to believe that the speaker intends to act violently." *Id.* at 978. "In determining whether words were uttered as a threat, the context in which they were spoken must be considered." *United States v. Leaverton*, 835 F.2d 254, 257 (10th Cir. 1987).

The Court finds that Defendant's statements to Mr. Elisens in the fall of 2016 could constitute true threats. Certainly, Mr. Elisens viewed them as threatening because he communicated his concerns about Defendant to his attorney and subsequently to the FBI. An argument could be made that Defendant wanted Mr. Elisens to believe that Defendant intended "to act violently." *Heineman*, 767 F.3d at 975. When viewing the statements in the context in which they were made, many of the statements were made by Defendant in response to Mr. Elisens' statements that he wanted to run away and escape society. Although Defendant contends that Mr. Elisens was like-minded in his beliefs, the Court disagrees. The evidence shows that Defendant is the one who initiated the discussion about bombs. Gov't Ex. No. 202 at 5. When Mr. Elisens said he wanted to live his "life in peace," Defendant said he wanted "to do some Tyler Durden shit." *Id.* at 11. Further, Mr. Elisens attempted to deescalate the bomb discussions several times in the fall of 2016.

On November 11, 2016, when Defendant said he needed a team and it was "time to bomb some fucking banks," Mr. Elisens responded, "dude no, right now it's time to just go. I'm TELLING YOU." *Id.* at 34. Defendant responded, "I'm not running away. I'm

8

taking action. I need a team." *Id.* Mr. Elisens attempted to change Defendant's mind by telling him that there would be a government shutdown, and "the first wave is not for us to fight, please trust me … get out of the way for now." *Id.* at 35. Defendant responded with his text about the EMP gun and no civilian casualties. *Id.* Mr. Elisens again urged Defendant to "drop everything" and to come with him. *Id.* Defendant responded that he would wait and see what happened with the election. *Id.* Following the election, Mr. Elisens texted Defendant about the election results and indicated that it was "excellent" that Donald Trump had won. *Id.* Mr. Elisens then told Defendant that he planned to go "wilderness" on February 3, 2017. *Id.* at 37.

On November 20, 2016, Mr. Elisens sent Defendant an encrypted text which showed the latitude and longitude for the Eccles Federal Reserve Building in Washington D.C.[3] *Id.* Defendant indicated he would check it out on a different phone because Google tracks those types of things. *Id.* Defendant then responded in encrypted text his plans to use the same recipe that Timothy McVeigh used in the bombing of the Murrah Federal Building. *Id.*

The Court finds based on these conversations that Mr. Elisens could reasonably consider Defendant's threats to be actual. Mr. Elisens was not "consistently and continuously represent[ing]" to Defendant that he shared Defendant's beliefs in the fall of

---

[3] Although it appears from the Facebook conversation that Mr. Elisens sent Defendant the GPS coordinates, there is no reference in the encrypted text conversation that the coordinates are to the Eccles Building. It appears that the two discussed this location previously because Defendant did not have to ask Mr. Elisens what the numbers represented. Further, Defendant appeared to know that he should not view the coordinates on a traceable device.

2016.  [Doc. No. 252 at 4].  Rather, Mr. Elisens' beliefs were contrary to Defendant's.  The evidence shows that Mr. Elisens wanted to escape society in the fall of 2016 and ultimately did for a few days when he absconded to New Mexico, while Defendant was planning offensive attacks against the government.  It is certainly plausible that Defendant intended Mr. Elisens to believe that Defendant intended to act violently.  Each time Mr. Elisens suggested he was going to run away, Defendant responded with his plans to build a bomb and his need for a team.  Moreover, it appears that in the fall of 2016 Defendant had a specific target in mind, *i.e.,* the Eccles Building.  *See, e.g., Viefhaus*, 168 F.3d at 396 (the defendant crossed the threshold from political rhetoric to a criminal threat when he stated that 15 cities would be bombed).

Further, prior to the government's involvement, Defendant posted statements on Facebook corroborating his knowledge of making bombs.  On September 18, 2016, Defendant stated on Facebook, "I like bombs.  They're efficient.  A simple mix of one cup gasoline and half a cup of powdered chlorine will incapacitate a large room."  Gov't Ex. No. 209.  On October 15, 2016, Defendant commented on a post, "Ya brake fluid [is] pretty nasty you can make bombs with it."  Gov't Ex. No. 207.

Moreover, Defendant's statements could be characterized as evidence of his attempts to solicit others (including Mr. Elisens) to commit crimes of violence or to form a conspiracy to damage property by means of an explosive device.  *See, e.g*., 18 U.S.C. § 373(a); OKLA. STAT. tit. 21, §§ 44, 421, 1268.3, and 1767.1.  On October 23, 2016, Mr. Elisens indicated to Defendant that he wanted to live his "life in peace."  Gov't Ex. No. 202 at 11.  Defendant responded, "If things go down and you go live in your own world I

will have no respect for you." *Id.* Later in that same Facebook conversation, Defendant made the statement that he had sufficient chemistry knowledge to make a gas bomb out of anything, and that his first stop would be the pool section in Walmart. *Id.* at 13. Defendant then suggested to Mr. Elisens, "Let's do a million man March. Like V for vendetta." *Id.* Mr. Elisens testified that this statement was about the movie *V for Vendetta*. In the movie, the protagonist, V, wearing a Guy Fawkes mask, encourages the people of Britain to help him blow up Parliament on the anniversary of Guy Fawkes Night.

On October 24, 2016, Defendant told Mr. Elisens on Facebook, "I can't do it alone." *Id.* at 15. Mr. Elisens responded by saying, "I'm abandoning everything for the sake of everyone." *Id.* Defendant responded, "Respect," and later in that same conversation indicated to Mr. Elisens that the two needed to have their own meeting. *Id.* On October 29, 2016, Defendant indicated to Mr. Elisens that he had found a like-minded guy for their team.[4] *Id.* at 19. On October 30, 2016, Defendant suggested November 5 as a possible date for him and Mr. Elisens to complete the "new anonymous attack." *Id.* at 20. Mr. Elisens testified that the significance of November 5 was, again, tied to the movie *V for Vendetta* and the portrayed plan to blow up Parliament. Defendant also suggested using a new secured text messaging application if their "plans come to fruition." *Id.* at 22.

On November 8, 2016, Defendant indicated to Mr. Elisens on Facebook that he wanted to have a "decent" conversation and suggested the two use TextLock. *Id.* at 34. The encrypted messages between the two on that date show that Defendant had abandoned

---

[4] Mr. Elisens testified that "team" meant forming a militia, going on the offensive, and going after government officials.

11

his plan of an anonymous attack. *Id.* Defendant told Mr. Elisens, "[I]t's time to bomb some fucking banks." *Id.* As evidenced *supra*, Mr. Elisens attempted to de-escalate the conversation, but Defendant was not easily thwarted. *Id.* He reiterated to Mr. Elisens that he was going to act, and he needed a team. *Id.* at 34-35. A week or two later, they discussed the GPS coordinates for the Eccles Building in Washington D.C. *Id.* at 37.

## B.      Defendant's Participation in the Current Crime Charged

The Court has also looked at "how eagerly and actively" Defendant himself participated in the current crimes charged. *United States v. Dyke,* 718 F.3d, 1282, 1289 (10th Cir. 2013). Mr. Elisens messaged Defendant on Facebook on April 14, 2017 and told Defendant he had "a guy who does well with chemicals." Gov't Ex. No. 203 at 15. The two met at Defendant's house on April 24, 2017. Two days later, Defendant stated, "Let me work out some chemistry with the ammonia your dude has … Guess I'm making ammonium chloride." *Id.* at 25.

On May 9, 2017, Defendant indicated his unhappiness with President Trump. *Id.* at 31-32. Mr. Elisens and Defendant met at Defendant's house on May 17, 2017. Their conversation was audio recorded. Gov't Ex. No. 102. During this face-to-face meeting, Defendant discussed plans to put 1,000 pounds of ammonium nitrate in a rental van, park it somewhere, and use a remote trigger or timer to activate the explosive device. Defendant suggested writing a program to send a ping to the detonation device from a burner phone. The two discussed obtaining the ammonium nitrate from Mr. Elisens' friend (referred to as "the professor") and the price. They discussed other components of the destructive device. Finally, Defendant expressed that he had "always thought about data centers" as a potential

target.  Gov't Ex. No. 102.

On May 25, 2017, Mr. Elisens sent Defendant a link on Facebook to the five largest data centers in the world and asked Defendant why he wanted to bomb a data center.  Gov't Ex. No. 203 at 36.  Defendant responded that he would "rather do a BancFirst data center. And a data center because we want to send a message but not kill a bunch of people."  *Id.* at 37.

On June 1, 2017, Defendant, Mr. Elisens, and the FBI undercover employee ("UCE") met at a restaurant in Elk City, Oklahoma.   This was Defendant's first conversation with the UCE.  The conversation was recorded.  Gov't Ex. No. 104.  After eating at the restaurant, the three rode in a vehicle back to Defendant's residence in Sayre, Oklahoma.  During the drive, Defendant said that he had made C-4 on a past occasion.[5]  *Id.* Defendant said he did not want "to kill a bunch of people," but that something needed to be done.  *Id.*  The UCE indicated that he could obtain the ANFO (explosive material) if Defendant wanted it, but that if Defendant did not want to move forward than "no harm, no foul."  *Id.*  Defendant indicated that he was thinking about attacking a data center, and he talked about finding a target that was not heavily protected by the government.  *Id.* Defendant discussed plans to rent a van with a fake ID.   *Id.*   The UCE testified that Defendant had told him that *Fight Club* was one of his favorite movies, and that Defendant

---

[5] The United States asserts, and Defendant does not challenge, that Defendant was a prohibited person under 18 U.S.C. § 922(g) due to his previous deferred sentence for domestic abuse by strangulation.  Gov't Resp. [Doc. No. 249 at 8]; *see also* 18 U.S.C. §§ 921(a)(3)(D), 921(a)(4).

liked the idea of coordinating different detonations to reset the economy.

On June 15, 2017, Defendant and Mr. Elisens discussed the idea of BancFirst as a potential target.   Gov't Ex. No. 105.   On June 26, 2017, the UCE met Defendant at Defendant's house, and the two rode together to a restaurant in Elk City.   The conversation was recorded.   Gov't Ex. No. 108.   They discussed obtaining a fake ID to rent a vehicle; using a storage facility in El Reno to build the bomb; how they would transport the bomb; using a burner phone; the timing of the detonation – during non-business hours to minimize loss of life; and using 1,000 pounds of ANFO.   *Id.*   The UCE testified that during this conversation the UCE showed Defendant pictures on his cell phone that depicted the explosive grade ammonium nitrate and blasting caps.   The UCE reminded Defendant that he did not have to move forward with the plan.   *Id.* A couple of weeks later, Defendant texted the UCE stating that he had a couple of barrels for use in constructing a bomb.   Gov't Ex. No. 67 at 8.

The UCE testified that Mr. Elisens had told investigators that he and Defendant had discussed two potential targets:   a BancFirst in Oklahoma City and an IRS building in Dallas.   The UCE and Defendant planned a "scouting trip" for July 13, 2017, to scope out these potential targets.   The UCE met Defendant at Defendant's house on that date, and they rode together to Oklahoma City.   During the trip, Defendant said that he did not want to execute the plan at the end of the month because the highway patrol would be out.   Gov't Ex. No. 109.

Upon arriving in downtown Oklahoma City, they walked around the block where the BancFirst building was located.   Gov't Ex. Nos. 61, 62, 63.   They discussed placing the

14

bomb in the alley next to BancFirst.  Defendant said, "I don't like it, but I'm sold on that access road."  Gov't Ex. No. 109.  Defendant indicated he was concerned about the security cameras.  Defendant emphasized that he wanted to "put a message on it and claim it" because he did not want ISIS taking credit for the bomb.  *Id.*  The UCE asked Defendant whether he still wanted to go through with the plan, and Defendant said, "fuck yeah."  *Id.* After scouting the location, the two met Mr. Elisens at a Braum's in Moore, Oklahoma. The UCE testified that the three talked about the BancFirst location, and Defendant made positive comments about the location.

From July 13 to August 11, 2017, the UCE and Defendant continued to send text messages to one another.  On August 10, 2017, Defendant sent Mr. Elisens the message he wanted to disseminate after the bombing.[6]  Gov't Ex. No. 204 at 14.

On August 11, the UCE met Defendant at Defendant's house.  They first went to a Wal-Mart in the Elk City/Sayre area to obtain gloves and electrical tape.  Defendant asked the UCE for money to obtain the items before Defendant went inside and purchased them. Counsel for the United States played portions of a video depicting Defendant and the UCE building the bomb at the storage unit in El Reno.[7]  Gov't Ex. No. 115.  The video showed

---

[6] "What happened in Oklahoma City was not an attack on America, it was retaliation. Retaliation against the freedoms that have been taken away from the American people.  It was a wake up call to both the government and the people.  An act done to show the government what the people thinks of its actions.  It is also a call to arms, to show people that there are still fighters among the American people.  The time for revolution is now." Gov't Ex. No. 204 at 14.

[7] Sometime during the construction of the bomb, Defendant sent a text to Mr. Elisens telling him "[i]t looks good."  Gov't Ex. No. 204 at 17.

Defendant unloading supplies into the storage unit, and the UCE and Defendant constructing the bomb in the back of a van.[8]  When the UCE showed Defendant the dynamite, Defendant replied, "the good stuff."  *Id.*  The UCE explained to Defendant how to arm and operate the timing power unit.  The UCE gave Defendant the keys to the van, and Defendant said he could not drive the van because he did not have a valid driver's license.  After some discussion, Defendant agreed to drive the van.

They made two mock runs in the UCE's vehicle to the BancFirst location in downtown Oklahoma City.  Around midnight, Defendant drove the van carrying the bomb from El Reno to downtown Oklahoma City, and the UCE followed behind in his own vehicle.   Upon arrival at BancFirst, there was a private security vehicle blocking the alley. Defendant circled the block several times until the alley cleared out.

After powering on the device, Defendant left the alley and got inside the UCE's truck.  They drove some distance away to an area where Defendant would be able to hear the explosion.  The video depicts Defendant and the UCE chatting calmly; Defendant is laughing.  Gov't Ex. No. 118.  Defendant asked for the UCE's burner phone, and he dialed the phone number to detonate the bomb.  When no explosion occurred, the UCE told Defendant to try the number again, and Defendant dialed it a second time.  *Id.*  Again, when there was no explosion, the two discussed the steps Defendant took to arm the device, and they reviewed the hand-written instructions.  Defendant dialed the number a third time.  *Id.*

Contrary to Defendant's assertion, this crime was not engineered and directed from

---

[8] The UCE testified that the materials he supplied were inert, and there was never a chance that the bomb would actually detonate.

start to finish by the United States.  Defendant had a clear vision of what he wanted to accomplish, including the location, his message, the necessary amount of ANFO, using a rental van to transport the bomb, and using a burner phone to activate the device. Defendant never deviated from his plan, nor was he easily deterred.  For instance, when the private security vehicle blocked the alley, Defendant circled the block until the alley cleared and he could park the van.  Moreover, Defendant dialed the number to the detonation phone three times when the device did not explode, as planned.

The UCE reminded Defendant on numerous occasions that he did not have to go through with the plan.  Defendant had countless opportunities to abandon the plan on August 11 and in the months leading up to the crime.  Instead, he continued to meet and communicate with the UCE and Mr. Elisens regarding his plan.  Defendant constructed the bomb with the UCE in a hot storage unit in the middle of August.  This process took several hours.  Defendant participated in two mock runs with the UCE to Oklahoma City.

FBI Special Agent Eric Larsen testified, based on FBI surveillance, that Defendant and the UCE left the storage unit for about three hours on August 11.  During the three hours, they stopped at a car wash to wash out the back of the UCE's truck, at a gas station for Defendant to get cigarettes, another gas station for Defendant to obtain stomach medicine, and at a Whataburger for the UCE to pick up food.  Defendant stayed in the truck while the UCE went inside the restaurant.  Defendant could have walked away at any point. SA Larsen testified that Defendant had his cell phone, $97.00 in cash, and four debit cards on his person when he was arrested.  Defendant could have called someone for a ride; he had sufficient cash to secure a hotel room.  He was not dependent on the UCE for money

17

or for a ride home. *See, e.g., United States v. Mosley*, 965 F.2d 906, 913 (10th Cir. 1992) (emphasizing that the defendant "had several days to decide voluntarily whether to" participate in the crime).

In summary, Defendant fails to demonstrate that the government's conduct amounts to government creation of the crime or government coercion of Defendant's participation in the criminal activity. In making this determination, as discussed below, the Court has considered Defendant's mental health and the fact that Mr. Elisens, the government informant, supplied Defendant with marijuana on several occasions.

## C. Defendant's Mental Health

SA Larsen interviewed Defendant on August 12, 2017, shortly after Defendant's arrest. *See* Gov't Ex. Nos. 60, 119. Defendant indicated he had taken his mental health medication that day. SA Larsen believed that Defendant was "attentive" and "fairly normal" during the four to six-hour interview. Defendant immediately advised SA Larsen that he had been involved in planting a bomb near a bank.

Defendant generally described the components of the bomb and how it was constructed. He admitted to driving the van, circling the block because the alley was impeded, and activating the detonation device. He admitted to providing Mr. Elisens with a message to post after the bombing. He said if people thought that ISIS was responsible then they "would have done it for nothing." Gov't Ex. No. 119. He wanted "to wake the people up."[9] *Id.* In discussing the seriousness of the offense, Defendant admitted to SA

---

[9] This coincides with the language of the post-bombing message. *See* discussion *supra* at p. 15 and n. 6; *see also* Gov't Ex. No. 204 at 14.

Larsen that he was willing to risk the fact that his actions were against the law in order to wake up the American people. *Id.*

Defendant's mother, Melonie Varnell, testified that Defendant's last hospitalization for mental health problems was in 2013. She believed that since that time he had been taking his mental health medication. Ms. Varnell testified that she saw Defendant daily, and that if he had been suffering from severe delusions from January 2017 to August 2017, as his court-appointed guardian, she would have sought his hospitalization.

Dr. Shawn Roberson, a forensic psychologist, testified in Defendant's case in chief. Dr. Roberson was retained by defense counsel in August 2017 to evaluate Defendant's competency to stand trial. Dr. Roberson later conducted an evaluation concerning Defendant's level of suggestibility. Dr. Roberson opined based on Defendant's history and the evaluations conducted that Defendant has schizophrenia (multiple episodes, currently in full remission).

However, Defendant reported to Dr. Roberson that he had been compliant with his mental health medication for the last three to four years.[10] Although Defendant scored higher than average on the *Johnson* compliance scale, the Court notes that this self-reporting test was done by Defendant after Dr. Roberson was retained to specifically examine Defendant's level of suggestibility. Further, Defendant's score of 18 out of 20 is higher than that of false confessors, whose average score is 14.3.[11] Dr. Roberson also

---

[10] This is consistent with his mother's testimony that Defendant's last hospitalization was in 2013.

[11] Defendant's parents also took the test and collaborated on their answers, scoring

indicated that a schizophrenia diagnosis does not necessarily make a person more compliant; personality traits are separate from schizophrenia.  According to Dr. Roberson, Defendant scored average on the *Johnson* suggestibility scale, meaning there was no indication that he was overly susceptible to suggestion.

Further, evidence was presented that Defendant intended to use his mental illness as a defense if he was arrested.  Prior to the government's investigation, Defendant posted to Facebook on September 26, 2016, "If they arrest my literally autistic, schizophrenic ass for terrorism, the media and my lawyer would rape them in the ass."  Gov't Ex. No. 210.

### D.    Defendant's Use of Marijuana

SA Larsen testified that Mr. Elisens was given four standard admonishments when he became an FBI confidential source.  This included an admonition against using drugs, and that Mr. Elisens would not be given immunity for any criminal behavior.  SA Larsen indicated that he did not review the tapes from Mr. Elisens' meetings with Defendant until late June or sometime in July 2017.  Thus, SA Larsen was unaware that Mr. Elisens was supplying and smoking marijuana with Defendant.   Once this discovery was made, SA Larsen reported Mr. Elisens' conduct to his supervisor and the United States Attorney's Office, and Mr. Elisens was admonished a second time.  SA Larsen advised that because the information Mr. Elisens was providing "was vital," the government decided to re-admonish Mr. Elisens and continue to allow him to operate as a source.

The Court notes that it was Mr. Elisens, on his own initiative, who provided

---

Defendant at a 19 out of 20.  Dr. Roberson admitted on cross-examination that he likely administered the questionnaire to Defendant's parents incorrectly.

Defendant with marijuana.  Further, evidence was presented that Defendant, aside from Mr. Elisens supplying him with marijuana, regularly abused drugs.  Dr. Roberson testified about his review of Defendant's mental health records.  Constant in all the treatment records was Defendant's chronic use of marijuana.[12]  There was also some reference in the treatment records to Defendant's use of synthetic marijuana.  Defendant also reported prior methamphetamine use to Dr. Roberson.  On May 10, 2017, Defendant reported to Mr. Elisens that he had just finished a two-day "dope binge."  Gov't Ex. No. 101.  Mr. Elisens testified that "dope" was methamphetamine.

Accordingly, the Court, having examined Defendant's past and current conduct, as well as the government's behavior, is not convinced that the totality of circumstances leads to a conclusion here that the government's conduct was so shocking, outrageous, and clearly intolerable as to violate "'the universal sense of justice.'"  *Mosley*, 965 F.2d at 910 (*quoting United States v. Russell*, 411 U.S. 423, 432 (1973)).

## II.     Sufficiency of the Evidence

Defendant asserts that the evidence was insufficient to support his convictions.  In viewing the evidence in the light most favorable to the government, and not weighing the evidence or considering the credibility of witnesses, the Court finds that sufficient evidence was presented for a rational trier of fact to find each element of the offenses charged.

Attempted use of an explosive device requires proof of the following elements:  (1)

---

[12] On June 26, 2017, Defendant told the UCE that he had just returned from Colorado where he and a friend had purchased marijuana.   Gov't Ex. No. 107.

the defendant attempted to damage or destroy a building by means of a fire or explosive; (2) the defendant acted intentionally or with willful disregard of the likelihood that damage would result from his acts; and (3) the building that the defendant attempted to damage or destroy was used in interstate or foreign commerce or was used in activity affecting interstate or foreign commerce.[13]  18 U.S.C. § 844(i).

Attempted use of a weapon of mass destruction requires proof of the following elements:  (1) the defendant knowingly attempted to use a weapon of mass destruction without lawful authority, and (2) the defendant knowingly did so against persons or property in the United States, and either such property is used in interstate or foreign commerce or in an activity that affects interstate or foreign commerce; or the offense, or the results of the offense, would have affected interstate or foreign commerce.[14]  18 U.S.C. § 2332a; *see also United States v. McVeigh*, 153 F.3d 1166, 1194 (10th Cir. 1998).

The trial evidence is discussed at length *supra* at pp. 4-18, and will not be repeated here.  As discussed, evidence was presented that Defendant constructed, delivered, and attempted to detonate what he believed to be an operative explosive device.  Further, based on his training and experience, FBI SA Barry Black testified that had the device been constructed with volatile materials, it would have destroyed the BancFirst building and the building next to it.[15]

---

[13] The parties stipulated to the third element.

[14] The parties stipulated that the interstate commerce element was met.

[15] SA Black participated in a controlled detonation of a similar device using live materials on August 30, 2017, at Fort Riley, Kansas.  *See* Gov't Ex. Nos. 35-45.

Accordingly, there was sufficient evidence from which the jury could conclude that Defendant was guilty of attempting to use an explosive device and attempting to use a weapon of mass destruction.

## CONCLUSION

Based on the foregoing, Defendant's Motion for Judgment of Acquittal [Doc. No. 247] is DENIED.

**IT IS SO ORDERED** this 29th day of July 2019.

_____
TIMOTHY D. DeGIUSTI
Chief United States District Judge

23