# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. CR-17-239-D |
| | ) | |
| JERRY DRAKE VARNELL, | ) | |
| | ) | |
| Defendant. | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

COMES NOW the plaintiff, United States of America, by Timothy J. Downing, United States Attorney for the Western District of Oklahoma, through Matt Dillon and Mark R. Stoneman, Assistant United States Attorneys, and presents to the Court this sentencing memorandum for the benefit and use of the court in fashioning a correct and appropriate sentence in this case.

The United States Probation Office (USPO) has computed Mr. Varnell's guideline calculation. The Probation Office stated in the revised final presentence report (PSR) [Doc. 280] that based on a total offense level of 43 and a criminal history category of VI, the guideline imprisonment range is life. PSR ¶ 86.

## INTENDED LOSS

USPO placed Mr. Varnell's base offense level at 33. PSR ¶ 37. Both offenses of conviction are governed by U.S.S.G. § 2K1.4. This section directs the Court to apply the greatest of four provisions. The highest base offense level specifically listed is 24.

However, § 2K1.4(a)(4) sets the base offense level at "**2** plus the offense level from §2B1.1 (Theft, Property Destruction, and Fraud)."  § 2B1.1(a) sets a base offense level of 7 if the offense of conviction has "a statutory maximum term of imprisonment of 20 years or more," which both offenses do.

§ 2B1.1(b) details specific offense characteristics.  Subsection (b)(1) directs that "[i]f the loss exceeded $6,500, increase the offense level" based on the chart provided.  Loss is the greater of actual loss or intended loss.  § 2B1.1, comment. (n.3(A)).  Intended loss means pecuniary harm "that the defendant purposely sought to inflict" as well as "that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."  *Id*. at comment. (n.3(A)(ii)).  "The court need only make a reasonable estimate of the loss."  *Id*. at comment. (n.3(C)).  The intended loss is based on "available information," taking into account factors such as "[t]he fair market value of the property unlawfully…destroyed; or if the fair market value is impracticable to determine or *inadequately measures the harm*, the cost to the victim of *replacing* that property."  *Id*. at comment. (n.3(C)(i)) (emphasis added).

The BancFirst building has a replacement value of $26,519,265.00 for the building and its contents, adding an increase of 22 to the offense level.  PSR ¶ 33.  The calculation of intended loss, however, does not end there.  Special Agent (SA) Barry Black, a master bomb technician with the Federal Bureau of Investigation (FBI), testified at trial that had the device that Mr. Varnell attempted to use not contained inert materials, the device "would have effectively destroyed [the BancFirst building] as well as the building to the north."  Transcript of Excerpt of Proceedings, Testimony of Barry Black, p. 38, lines 16–

22 (Attached hereto as Attachment 1). SA Black would testify, if needed, that the building to the north referenced in his testimony is the First National building.

As detailed in the government's objection No. 10, Richard Beck provided a conservative estimate of $300.00–$350.00 per square foot to rebuild the First National building utilizing a more economical glass "curtain wall." Mr. Beck noted, however, that to build even a glass building similar to the Devon tower would be approximately $375.00 or higher.[1] This would avoid the more costly features of the First National building such as granite, marble, aluminum, bank vaults, etc. The First National building comprises 1,000,000 square feet. This brings an increase of 28 to the base offense level in lieu of 22.

Had the explosive device detonated on any of Mr. Varnell's three attempts, the buildings would have been destroyed. Utilizing the First National's sale price of $23 million dollars, as suggested by the defense (PSR, Def. Reply to Gov.'s Obj. Nos. 10, 12, and 13), would inadequately measure the harm intended by Mr. Varnell's actions. First National would not have simply been put on the market for sale. It would have to be rebuilt. As stated, the replacement cost provided for that remedy are conservative figures, which weigh in Mr. Varnell's favor for the purposes of the guideline.

---

[1]     Mr. Beck was again contacted by FBI SA Black on October 3, 2019, in reference to defendant's reply to government's objection Nos. 10, 12, and 13, expressing that the defendant should not be held accountable for a replacement value of First National, based in part, for a replacement estimate given in 2019. Mr. Beck estimates that the conservative cost to rebuild First National, utilizing a glass curtain façade, would have been 7% lower than the $375,000,000.00 figure provided in 2019. Utilizing the 7% variance results in a replacement value between $270,000,000.00 and $325,000,000.00, or $348,750,000.00 in a manner similar to the Devon tower. This is still well above the $250,000,000.00 threshold for an additional 28 offense levels pursuant to U.S.S.G. § 2B1.1(b)(1)(O).

Mr. Varnell made his intended harm very clear on numerous occasions: "When I'm able I'm going to do some Tyler Durden shit. The government is going to fucking burn with those who stand with it." Gov. Ex. 202.11; "I'm fucking done after this anonymous shit. I need a team. Idc [I don't care] what happens with this election, it's time to bomb some fucking banks." Gov. Ex. 202.34; "I think I'm going to go with what the okc bomber used. Diesel and anhydrous ammonia. I might have to make a distillery to process some stuff but that's a solid recipe." Gov. Ex. 202.37; 05/09/17 7:32:08 AM, Mr. Varnell sends a Textlock message to CHS, "Fuck trump. Fuck monopolies. Shit needs to burn." Gov. Ex. 203.32; "NSA [National Security Agency]? I'd rather do a BancFirst data center. And a data center because we want to send a message but not kill a bunch of people." Gov. Ex. 203.37; 06/01/17; Mr. Varnell said he was looking for the most effective place to blow up, like "wipe out" a data center or several of them. Something without much security. Gov. Ex. 104; Mr. Varnell says he always had a "huge hard on" for Fight Club and that's "the kind of shit" he wants to do. Gov. Ex. 104; "Bank of America data center is vulnerable in Richardson texas" and "IRS dpt in Maryland looks pretty weak. It says they do most of their data shit there." Gov. Ex. 204.4; "What I've noticed is that there's a lot of vulnerable locations in Texas." Gov. Ex. 204.5; "I'm thinking we should do a couple buildings at once. Or right after another. In the span of a day." Gov. Ex. 204.5; "Well we're doing this in the name of freedom. So whichever locations that would hurt the government the worst." Gov. Ex. 204.5; Mr. Varnell says he wants a target that will cripple the government and say "you are a target." Gov. Ex. 108; and Mr. Varnell mentions sending a message because

"there's not much worth in doing it if nobody knows what the fuck you did...It could get easily blamed on Islam...Isis would try to claim it so fast." Gov. Ex. 108, 1:26:59.

Mr. Varnell wished to inflict the most amount of damage possible–to "cripple the government." Parking an explosive device in an alley would obviously cause damage to the adjacent building. Despite the defendant's claim, there is no requirement that Mr. Varnell know the value of the buildings, only that his intended actions would result in damage or loss. The amount of damage or loss that would have resulted from his intended actions. The correct increase in level pursuant to U.S.S.G. § 2B1.1(b) is 28.

## CONSCIOUS OR RECKLESS RISK OF DEATH OR SERIOUS BODILY INJURY

The defendant has objected to the specific offense characteristic of 2 levels for an offense which involved "the conscious risk of death or serious bodily injury." PSR, Def. Obj. to ¶ 37. The only stated basis for the objection is that the "presentence writer added an additional 2-level increase…[and] [n]o citation was provided for that 2-level increase." *Id*. This objection is incorrect. The PSR clearly references U.S.S.G. § 2B1.1(b)(16) for this increase. PSR ¶ 37. Additionally, the government adopts the response in the PSR as this increase is appropriately justified.

Mr. Varnell was abundantly aware that people could die as a result of his intended actions. On June 1, 2017, Mr. Varnell agreed with UCE that it was possible that people would likely be killed. Doc. 1, Gov. Ex. 104. On June 26, 2017, UCE reminds Mr. Varnell that there was a chance of someone dying. Mr. Varnell responds, "You go to break a couple of eggs to make an omelet." Doc. 1, Gov. Ex. 108. Mr. Varnell continues, "[t]hat's why

people don't do this shit, because you know, you got to be able to overcome that whole reality there." *Id*. On July 13, 2017, UCE discussed with Mr. Varnell the potential for employees or cleaning staff to be killed or injured during the bombing. Mr. Varnell acknowledged that he understood the risks. Doc. 1, Gov. Ex. 109.

"We join the Second and Ninth Circuits and hold that the government does not have to prove that the defendant was actually aware of the risk of serious bodily injury or death when seeking a § 2B1.1(b)(13) enhancement…We interpret the guideline to require the defendant to have been conscious of or reckless as to the existence of the risk created by his or her conduct. Generally, recklessness is an objective standard, and we interpret 'reckless risk' to describe objectively culpable conduct. We hold that a defendant's conduct involves a conscious risk if the defendant was subjectively aware that his or her conduct created a risk of serious bodily injury, and a defendant's conduct involves a reckless risk if the risk of bodily injury would have been obvious to a reasonable person." *United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011). As a result of Mr. Varnell's conduct, the 2-level increase pursuant to U.S.S.G. § 2B1.1(b)(16) is appropriately applied.

## VICTIM RELATED ADJUSTMENT

The defendant objects to the 12-level increase based on the victim related adjustment pursuant to U.S.S.G. § 3A1.4. PSR, Def. Obj. to ¶ 39. The government adopts the response of USPO. For the purposes of the guideline, a federal crime of terrorism is defined by 18 U.S.C. § 2332b(g)(5); that is an offense that– "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to *retaliate* against government conduct; and (B) is a violation of–(i) …844(i) (relating to arson and bombing

6

of property used in interstate commerce) [or] 2332a (relating to use of weapons of mass destruction)." (emphasis added).

"The terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation… it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered." *United States v. Mandhai*, 375 F.3d 1234, 1248 (11th Cir. 2004). Mr. Varnell's own words accomplish what is normally a difficult task–discerning an individual's intent.

On September 18, 2016, Mr. Varnell sent a message stating, "This country needs a revolution and the government needs to be weakened to give the people the courage to do it." Gov. Ex. 201.5. On October 21, 2016, Mr. Varnell sends a message stating, "I'm out for blood. When militias start getting formed I'm going after government officials when I have a team." Gov. Ex. 202.5. On October 22, 2016, Mr. Varnell sends the messages, "We are long overdue for a civil war," and "When I'm able I'm going to do some Tyler Durden shit. The government is going to fucking burn with those who stand with it." Gov. Ex. 202.11. On November 7, 2016, Mr. Varnell transmits an encrypted message stating, "I'm fucking done after this anonymous shit. I need a team. Idc [I don't care] what happens with this election, it's time to bomb some fucking banks." Gov. Ex. 202.34. On June 21, 2017, Mr. Varnell sends an encrypted message stating, "Well we're doing this in the name of freedom. So whichever locations that would hurt the government the worst." Gov. Ex. 204.5. On June 26, 2017, Mr. Varnell tells the UCE that he wants a target that will cripple the government and say "you are a target." Gov. Ex. 108.

In Mr. Varnell's message to be sent out after the attack, he states, "What happened in Oklahoma city [sic] was not an attack on America, it was *retaliation*. *Retaliation* against the freedoms that have been taken away from the American people. It was a wake up call to both the government and the people. An act done to show the government what the people thinks of its actions. It is also a call to arms, to show people that there are still fighters among the American people. The time for revolution is now." Gov. Exs. 204.14 and 69. (emphasis added). Mr. Varnell continues to vent about his perceived grievances against the federal government in his interview with FBI. Gov. Ex. 119.

There is no other motive than to "influence and affect the conduct of the government," through intimidation or coercion–a terrorist attack in downtown Oklahoma City. Mr. Varnell also meets the other means by specifically saying that he was doing this in "retaliation" by detonating a bomb to "show the government what the people thinks of its actions" and a "call to arms" for "revolution." There could not be a clearer showing of when the victim related adjustment pursuant to U.S.S.G. § 3A1.4 would apply.

## ACCEPTANCE OF RESPONSIBILITY

The defendant objects to the "lack of adjustment for acceptance of responsibility." PSR, Def. Obj. to ¶¶ 35 and 44. Mr. Varnell will qualify for acceptance of responsibility adjustment only if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Mr. Varnell bears the burden to prove by a preponderance of the evidence that he is entitled to the acceptance of responsibility adjustment. *United States v. Portillo-Valenzuela*, 20 F.3d 393, 394 (10th Cir. 1994). In order to qualify for the acceptance adjustment after going to trial, Mr. Varnell "must demonstrate that he only

disputed purely legal questions in going to trial and did not dispute material facts relating to his guilt of the charged offenses." *United States v. Herriman*, 739 F.3d 1250, 1257 (10th Cir. 2014)(affirming denial of acceptance adjustment for defendant who raised mental illness at trial where parties disagreed regarding facts relating to the mental condition and the effect of the mental illness at time of offense). Mr. Varnell has failed to meet this burden.

In determining that the defendant in *Garcia* would receive an adjustment for acceptance of responsibility, the district court "made a factual finding that:

> The defendant meets the criteria of Section 3E1.1(a) and will receive a two (2) level reduction for acceptance of responsibility.... The defendant admitted his involvement in the offense since his initial arrest and throughout the trial. *Further, the defendant has given the Government all the information he knows about the offense.* The Court finds it was appropriate for the defendant having presented an entrapment defense which admitted the underlying facts, to receive full credit for acceptance of responsibility."

*United States v. Garcia*, 182 F.3d 1165, 1171 (10th Cir. 1999) (emphasis added). The Tenth Circuit upheld another district court's decision to grant the § 3E1.1 adjustment to a defendant who went to trial. *United States v. Gauvin*, 173 F.3d 789, 806 (10th Cir. 1999). However, the Tenth Circuit subsequently clarified that its opinion in *Gauvin* "did not indicate that other sentencing courts would be obliged to reach the same conclusion on similar facts. In other words, giving other sentencing courts the same degree of deference, we might well uphold their decisions on similar facts to deny the acceptance-of-responsibility adjustment." *United States v. McGehee*, 672 F.3d 860, 877 (10th Cir. 2012) (affirming denial of acceptance adjustment where defendant did not stipulate to *all* factual

9

elements). The Court in *McGehee* noted that the defendant in *Gauvin*, by going to trial, was merely "challeng[ing]… the *applicability of the statute in question to his conduct*," and concluded that, "In sum, on these facts, where Mr. McGehee went to trial, did not stipulate to all of the factual elements of any count on conviction, and indeed held the government to its ultimate burden on each count, according appropriate deference to the district court, we conclude with not difficulty that the court did not err in denying Mr. McGehee an offense-level reduction for acceptance of responsibility." *Id.* at 878.

Mr. Varnell has consistently denied *facts* relevant to the jury's finding of guilt, not just the legal import of those facts. Here Mr. Varnell put the government to its burden. Unlike the defendant in *Gauvin*, Mr. Varnell was not merely challenging the applicability of the statutes to his conduct. He challenged the very facts of his conduct. In his objections to the PSR, Mr. Varnell points to his post-arrest interview with FBI as evidence that he has accepted responsibility for his crimes, saying, "At no point did [Mr. Varnell] deny his involvement in the offense since his initial arrest and through trial." PSR at 45. However, unlike the defendant in *Garcia* who provided the government with *all* the information he knew about the offense, Mr. Varnell denied FBI's request for access to his Textlock conversations with the CI. When FBI asked Mr. Varnell what sort of information a person would put in Textlock, Mr. Varnell admitted they would be things someone did not want the FBI to see. (Government's trial exhibit 119). In fact, during that same interview with FBI, Mr. Varnell denied (contrary to the evidence at trial) that any of the participants ever discussed blowing up any buildings until the UCE suggested it. Mr. Varnell even used different names for the CI and the UCE respectively when discussing them with the FBI.

Mr. Varnell continues to persist in quibbling about his various statements to the CI and the UCE regarding various possible targets and his intentions to destroy buildings. In his opening statement to the jury, Mr. Varnell said the jury would "hear evidence of his continued failure to act, his failures to take any initiative whatsoever." (Transcript of Opening Statement of the Defendant at 15). These continuing disputes are not over the law as applied to agreed-to facts; they are about the facts themselves.

Throughout trial, the keystone of his defense was not just the legal import of his alleged mental illness, but the underlying facts thereof. The extent of Mr. Varnell's mental illness was the topic of much dispute between the parties. Mr. Varnell, in his opening statement to the jury, said he was "not like a normal person" and that he is "affected daily by his severe mental illness that includes levels of paranoia." (*Id*. at 14). However, Mr. Varnell's own expert previously concluded, consistent with the government's factual theory, that Mr. Varnell's schizophrenia was in "full remission." While not going all-in on an insanity defense, Mr. Varnell's claims went to his factual intent, his mens rea, which he was challenging at trial. One of Mr. Varnell's chief complaints has been the factual element of his intent based on his mental illness. The government has always disagreed with the defense's allegations of the extent of Mr. Varnell's mental illness and the effects it had on his conduct at the time of the offense. In fact, the jury heard evidence that prior to government involvement, Mr. Varnell intended to use his alleged mental illness as a defense if he were arrested.[2] At trial and still today, Mr. Varnell denies that he actually

---

[2] The jury also heard testimony that someone with access to Mr. Varnell's Facebook account deleted some of his incriminating Facebook posts after his arrest.

wanted to commit the crimes for which he has now been convicted. These are factual disputes.

The Tenth Circuit affirmed a district court for finding that a similarly situated defendant did not accept responsibility for purposes of § 3E1.1 where the defendant had "not demonstrated that she *only* disputed purely legal questions in going to trial." *United States v. Battles*, 745 F.3d 436, 459 (10th Cir. 2014) (citing *United States v. Herriman*, 739 F.3d 1250, 1257 (10th Cir. 2014) (quotation omitted). In rejecting Ms. Battles' claim for a § 3E1.1 reduction, the district court observed that, "[i]n fact, she blamed much of the underlying conduct on others … [and did not] fall [] in the category of the rare case in which a defendant challenges all the government's allegations at trial and then also deserves an acceptance of responsibility credit." *Id*. at 458. Similarly, Mr. Varnell's consistent argument during and after trial has been to blame his conduct on others, such as the CI and the government. As the Tenth Circuit noted of Ms. Battles, Mr. Varnell's "circumstances fit the 'rule' rather than the 'exception[.]" *Id*. at 459. As such, Mr. Varnell has not met his burden of proving his entitlement to an acceptance of responsibility adjustment.

## CONCLUSION

Mr. Varnell's offense level should be calculated in the following manner:

Base Offense Level

    **§2K1.4(a)(4)**

    2 + the offense level from §2B1.1                         2

    **§2B1.1**

    (a) Offense has a statutory maximum term of imprisonment of 20 years or more     7

    (b)(1) If loss exceeds $6,500, increase the offense level
        (O)    More than $250,000,000.00               28

    (b)(16) Offense involved the conscious or reckless risk of death or serious bodily injury           <u>2</u>

                                                     <u>39</u>

Victim Related Adjustment

    **§3A1.4 Terrorism**                               <u>+12</u>

**Adjusted Offense Level (subtotal)**                      **<u>51</u>**

**Acceptance of Responsibility**                          **0**

**Total Offense Level (Ch. 5, Part A, Comment. N. 2)**     **<u>43</u>**

**Criminal History Category (§3A1.4)**                  **VI**

**Advisory Guideline Range**                            **Life**

The government respectfully requests this Court find that Mr. Varnell's guideline is as submitted above and impose a sentence which is sufficient, but not greater than

necessary, to achieve the purposes of sentencing, after consideration of the factors set forth above as they relate to 18 U.S.C. § 3553(a) and the Sentencing Guidelines.

        Respectfully submitted,

        TIMOTHY J. DOWNING
        United States Attorney


        s/ MATT DILLON
        MATT DILLON
        OBA No. 19321
        Assistant United States Attorneys
        210 Park Ave., Suite 400
        Oklahoma City, OK 73102
        (405) 553-8700 (Office)
        (405) 553-8888 (Fax)
        Matthew.Dillon@usdoj.gov

        s/ MARK R. STONEMAN
        MARK R. STONEMAN
        OBA No. 22730
        Assistant United States Attorney
        210 Park Avenue, Suite 400
        Oklahoma City, Oklahoma 73102
        (405) 553-8700 - Office
        (405) 553-8888 - Fax
        Mark.Stoneman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Vicki Behenna, Marna Franklin, and Laura Deskin, attorneys for Mr. Varnell.

s/MARK R. STONEMAN
Assistant U.S. Attorney